**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Felice R. Yudkin, Esq.
fyudkin@coleschotz.com
Rebecca W. Hollander, Esq.
rhollander@coleschotz.com

*Proposed Counsel to Debtors*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
(212) 446-4900 Facsimile
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
joshua.sussberg@kirkland.com
Christopher T. Greco, P.C. (*pro hac vice* pending)
christopher.greco@kirkland.com
Rachael M. Bentley (*pro hac vice* pending)
rachael.bentley@kirkland.com

*-and-*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2000
(312) 862-2200 Facsimile
Alexandra Schwarzman, P.C. (*pro hac vice* pending)
alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, LLC, *et al.*, | Case No. 23-_____ (___) |
| Debtors.[1] | (Joint Administration Requested) |

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335).  The location of debtor David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING BIDDING
PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET
PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS AND LEASES AND (II) (A) APPROVING THE
ASSET PURCHASE AGREEMENT, (B) AUTHORIZING THE SALE OF ASSETS, AND
(C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
CONTRACTS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Motion"):

**Preliminary Statement**

1.      As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases

with the intent to conduct a going concern sale process for all or some of their assets, on an

expedited basis, and simultaneously initiating "soft" sales in their retail locations to monetize their

inventory.  This dual path process is necessary to maintain optionality, conserve liquidity and

maximize the value of the Debtors' assets.  The Debtors, however, continue to believe that there

is value in their brand and operations as a going concern.  The Debtors and potential purchasers

remain interested in exploring potential sale transactions on a post-petition basis.  Accordingly, by

this Motion, the Debtors propose an expeditious, public and flexible bidding and sale process to

pursue a going concern transaction or a sale of discrete assets that is substantially similar to those

procedures by other retailers in similar circumstances.  In the event that the Debtors are unable to

implement a sale transaction, the Debtors will not have sufficient liquidity to continue to operate

---

[2]  A detailed description of the Debtors, their business, and the facts and circumstances supporting these
chapter 11 cases is set forth in the *Declaration of James Marcum, Chief Executive Officer of the Debtors, in Support
of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously
herewith.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day
Declaration.

in the ordinary course and will be forced to wind-down their operations and liquidate the inventory in all of their retail stores.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference of the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and rules 6004-1 and 6004-2 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

## Background

5.     As set forth in the First Day Declaration, the Debtors are international bridal and special occasion retailers.  The Debtors sell a broad assortment of bridal gowns, bridesmaid dresses, special occasion dresses and accessories.  As of the date hereof, the Debtors and their non-debtor subsidiaries operate 294 stores across the United States, Canada, and United Kingdom and franchise 8 stores in Mexico.  The Debtors are headquartered in Conshohocken, Pennsylvania and currently employ approximately 10,000 employees.

65783/0001-44892354

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

7.      David's Bridal, LLC, as proposed foreign representative, will shortly commence an ancillary proceeding in Canada (the "Canadian Proceedings") on behalf of the Debtors' estates under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to request that the Canadian Court recognize these chapter 11 cases as "foreign main proceedings" under the applicable provisions of the CCAA in order to, among other things, protect the Debtors' assets and operations in Canada.

**Relief Requested[3]**

8.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

    a.      authorizing and approving the bidding procedures attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures");

    b.      establishing the following dates and deadlines in connection with the Bidding Procedures:

        i.      Bid Deadline: May 30, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all binding bids must be actually received

---

[3] The Debtors reserve the right to file and serve any supplemental pleadings or declarations that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Bidding Procedures Order or the Sale Order.

by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline");

ii.    Auction: June 1, 2023, at 10:00 a.m., prevailing Eastern Time, as the date by which the Debtors will conduct an auction, if necessary;

iii.    Sale Hearing: June 5, 2023, at 10:00 a.m., prevailing, Eastern Time, or such other date that the Court may later direct and as agreed upon by the Debtors, as the date on which the Court shall hold a hearing on the Sale;

c.    approving certain procedures for the selection of a Stalking Horse Bidder and bid protections for the Stalking Horse Bidder, if any, including a breakup fee of up to 3% of the purchase price contemplated by a Stalking Horse APA (the "Breakup Fee") and reimbursement of reasonable and documented out-of-pocket fees and expenses (the "Expense Reimbursement") (together with the Breakup Fee, the "Bid Protections");

d.    approving a form of Asset Purchase Agreement, substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order (the "Form APA");

e.    approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale"), attached as **Exhibit 3** to the Bidding Procedures Order (the "Sale Notice");

f.    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"), including notice of proposed cure payments;

g.    providing that, in light of the fact that the Debtors' privacy policy does not prohibit the transfer of personal identifiable information, the appointment of a consumer privacy ombudsman is not required; and

h.    granting related relief.

9.    Additionally, the Debtors will seek entry of one or more orders at the Sale Hearing (the "Sale Order"):[4]

a.    authorizing and approving the Sale to the Successful Bidder(s) on the terms substantially set forth in the Successful Bid;

---

[4] A copy of the Sale Order will be filed on the docket in advance of the Sale Hearing.

b.      authorizing and approving the Sale of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in an asset purchase agreement with a Successful Bidder;

c.      authorizing the assumption and assignment of executory contracts and leases as set forth in an asset purchase agreement with a Successful Bidder; and

d.      granting any related relief.

## The Proposed Sale

### I.      The Prepetition Marketing Process.

10.     In December of 2022, the Debtors engaged Houlihan Lokey Capital, Inc. (the "Investment Banker") as their investment banker to initiate a comprehensive marketing process for a going-concern sale of some or all of the Debtors' assets.  Beginning on February 20, 2023, the Debtors and the Investment Banker contacted in excess of 90 potentially interested parties, including various strategic and financial buyers.  All of those parties either reviewed a teaser document or participated in high-level discussions about the transaction.  Thirty-five of those parties entered into confidentiality agreements with the Debtors and were provided access to a virtual data room that included, among other things, a confidential information memorandum and the Debtors' go-forward business plan.  Several of those parties conducted management meetings or calls.

### II.      Proposed Dates and Deadlines.

11.     Pursuant to the Bidding Procedures, the Debtors will solicit proposals to purchase the Assets according to the following proposed schedule, subject to Court approval and availability:

| Event | Date |
|---|---|
| Bid Deadline | May 30, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all bids must be actually received |

6

| Event | Date |
|-------|------|
| Sale Objection Deadline | May 31, 2023, at 5:00 p.m., prevailing Eastern Time |
| Auction (if necessary) | June 1, 2023, at 10:00 a.m., prevailing Eastern Time, if necessary |
| Objection to Successful Bidder | June 2, 2023 at 5:00 p.m. |
| Sale Hearing | June 5, 2023, at 10:00 a.m., prevailing Eastern Time, or such other date that the Court may later direct and as agreed upon by the Debtors |

12.    The Debtors believe this timeline is necessary, appropriate, and reasonable under the circumstances.  The Debtors require immediate access to the proposed DIP financing to operate their businesses and administer these cases.  Accordingly, the funds provided by the proposed DIP lenders and the use of the cash collateral of the Prepetition Secured Parties are enabling the Debtors to pursue this sale process and an extended sale process may create risk of further diminution of the value of the lenders' collateral.  In light of the foregoing, as part of the negotiation of the proposed DIP Facility, and as an express term of providing the postpetition financing and consenting to the use of their cash collateral, the proposed DIP Agents have required – and the Debtors have agreed – to the sale milestones set forth in this Motion.

13.    The Debtors believe the Bidding Procedures will provide time for any potential bidder to put forth an actionable bid.  During the Debtors' prepetition marketing process, relevant information regarding the Debtors' businesses was made available in the data room, allowing potential bidders to conduct diligence on the Debtors' business.  To the extent that any potential bidder has not conducted such diligence to-date, such bidder will have immediate access to the information regarding the Debtors' Assets contained in the data room, subject to the terms set forth in the Bidding Procedures.

65783/0001-44892354

## The Bidding Procedures Order

### I.    The Bidding Procedures.

14.    The Debtors have developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order, to govern the marketing process.  The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to expeditiously submit competitive, value-maximizing bids.

15.    The Debtors are seeking approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids on a timeline that allows the Debtors to consummate a sale of all or discrete subset of the Debtors' Assets pursuant to section 363 of the Bankruptcy Code. The parties that execute confidentiality agreements in accordance with the Bidding Procedures will continue to have access to the virtual data room throughout the sale process.

16.    The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and Potential Bidders with the need to run an expeditious and efficient sale process in accordance with the DIP milestones.  The Debtors believe that the Bidding Procedures and the timeline set forth therein are in the best interests of the Debtors' estates, will establish whether and to what extent any additional market for some or all of the Assets exists, and provide interested parties with sufficient opportunity to participate in a competitive, value-maximizing process. Because the Bidding Procedures are attached as Exhibit

65783/0001-44892354

1 to the Order, they are not restated in their entirety herein. Generally speaking, however, the

Bidding Procedures establish the following, among other things:[5]

    a.    **Potential Bidders**.  To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse Bidder, if any) (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information:

        i.    an executed confidentiality agreement on terms acceptable to the Debtors and no less restrictive than that agreed to with the Stalking Horse Bidder, if any, in any material respects (a "Confidentiality Agreement");

        ii.    identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale Transaction(s); and

        iii.    proof by the Potential Bidder of its financial capacity to close a proposed Sale Transaction(s), which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors, in consultation with the Consultation Parties (as defined in the Bid Procedures).

    b.    **Requirements for Qualified Bids**.  Any proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment and the consent of the applicable Consultation Parties (a "Qualified Bid" and such bidder a "Qualified Bidder"):

        i.    *Assets.*  The Bid must clearly identify the following: (a) the Assets, or the portion thereof, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

---

[5]  This summary was drafted to comply with Local Rule 6004-1 and is qualified in its entirety by the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

65783/0001-44892354

ii.    ***Purchase Price.***  The Bid must clearly set forth the purchase price to be paid (the "<u>Purchase Price</u>").  If requested by the Debtors or the Consultation Parties, a Potential Bidder shall allocate its Purchase Price among the Debtors' assets subject to the Bid.

iii.    ***Deposit***.  Each Bid must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "<u>Deposit</u>").

iv.    ***Same or Better Terms.***  Each Bid must be on terms no less favorable than the terms of the Stalking Horse APA, if any, as the Debtors may determine in their business judgment and in consultation with the Consultation Parties.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "<u>Bid Documents</u>").  The Bid Documents shall include a schedule of assumed Contracts to the extent applicable to the Bid, and a clearly marked version of the Stalking Horse APA, if any, or the Form APA, if there is no Stalking Horse APA, showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

v.    ***Committed Financing***.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors and the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all Contracts proposed to be assumed by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Consultation Parties.

vi.    ***Identity***.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Acceptable Bidder, Stalking Horse Bidder, Consultation Party or Qualified

Bidder, and/or any officer or director of the foregoing. Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

vii.    ***Irrevocable.*** An Acceptable Bidder's Bid must be irrevocable until three months after the date of selection of the Successful Bid; _provided_ that if the Bid is not selected as the Successful Bid or Backup Bid, the Bid may be revoked after consummation of the Successful Bid or Backup Bid.

viii.   ***Backup Bidder.*** Each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder.

ix.     ***Satisfaction of DIP Obligations***. To the extent that any bid includes Primary Collateral, an Acceptable Bidder's Bid must provide for (a) the payment in full of all DIP Obligations (as defined in the DIP Order),[6] and (b) either (i) the cancellation and return undrawn of all outstanding letters of credit under the DIP ABL Facility (as defined in the DIP Order) and/or (ii) the furnishing to the DIP ABL Agent of a cash deposit, or at the discretion of the DIP ABL Agent, a backup standby letter of credit satisfactory to the DIP ABL Agent in an amount equal to 105% of the face amount of all letters of credit or such other amount as is reasonably acceptable to the DIP ABL Agent.

x.      ***As-Is, Where-Is.*** The Bid must include the following representations and warranties: (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed asset sale agreement ultimately accepted and executed by the Debtors. The Bid shall not be conditional on any further due diligence.

---

[6] The DIP Order shall mean Interim and Final Orders (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related Relief.

65783/0001-44892354

xi.   ***Authorization.***  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors and the Consultation Parties with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

xii.   ***Disclaimer of Fees.***  Each Bid (other than the Stalking Horse Bid, if any) must disclaim any right to receive a fee analogous to a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder, if any) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid each Qualified Bidder agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

xiii.   ***Adherence to Bidding Procedures.***  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions and agrees to be bound by these Bidding Procedures.

xiv.   ***No Collusion.***  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code  with respect to any Bids, the Auction, or the Sale.

xv.   ***Retention of Records.***  To the extent a Bid is a Bid for all or substantially all of the Debtors Assets, such Bid must include a statement that the Acceptable Bidder will retain or allow the Debtors access to the Debtors' books and records.

xvi.   ***Other Information.*** The Bid contains such other information as may be reasonably requested by the Debtors and the Consultation Parties.

c.      **<u>Bid Deadline</u>**.  An Acceptable Bidder that desires to make a bid must transmit via email (in .pdf or similar format) or deliver written copies of its bid to the following parties so as to be received not later than 5:00 p.m. (prevailing Eastern Time) on May 30, 2023 (the "Bid Deadline"): (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Christopher T. Greco, P.C., and Rachael M. Bentley, email: Joshua.sussberg@kirkland.com, christopher.greco@kirkland.com, and Rachael.bentley@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Alexandra Schwarzman, P.C., email: alexandra.schwarzman@kirkland.com; (ii) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Felice R. Yudkin, Esq., and Rebecca W. Hollander, Esq., email: msirota@coleschotz.com, fyudkin@coleschotz.com, and rhollander@coleschotz.com; and (iii) the Debtors' proposed investment banker, Houlihan Lokey Capital, Inc., 10250 Constellation Blvd., Los Angeles, California 90067, Attn: Surbhi Gupta/Ethan Kopp, email: projectdiamond@hl.com.  The Debtors will provide copies of all Bids via electronic mail within one (1) day of receipt by the Debtors to (i) the Consultation Parties, and (ii) the Office of the United States Trustee.

d.      **<u>Minimum Overbid</u>.**  Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the relevant Assets (each such bid, an "<u>Overbid</u>").  The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to initial or subsequent Overbids at any time during the Auction.

e.      **<u>Stalking Horse Bid Protections</u>**.  Upon entry of the Bidding Procedures Order, the Debtors shall be authorized but not obligated, in an exercise of their business judgment, and in consultation with the Consultation Parties, to: (a) select one or more Acceptable Bidders to act as stalking horse bidders in connection with the Auction (each, a "<u>Stalking Horse Bidder</u>"); and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder (each such agreement, a "<u>Stalking Horse APA</u>") (i) provide a breakup fee (the "<u>Breakup Fee</u>") in an amount not to exceed three percent (3%) of the proposed Purchase Price, and/or (ii) agree to reimburse reasonable and documented out-of-pocket fees and expenses (the "<u>Expense Reimbursement</u>," and together with the Breakup Fee, the "<u>Bid Protections</u>").

f.      **<u>Highest or Best Offer</u>.**  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe, in their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best offer for the relevant Assets (the "<u>Leading Bid</u>").  Each round of bidding will conclude

13

after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

g.      **Reservation of Rights.** The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment and with the reasonable consent of the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids; *provided* that any modifications to these Bidding Procedures which extends the timelines included herein shall be subject to the consent of the DIP Agents (as defined in the DIP Order), whose consent shall not be unreasonably withheld.

17.      Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

18.      The Debtors reserve the right to submit supplemental materials in support of the Bidding Procedures and the Sale in advance of the hearing on the Bidding Procedures or Sale Hearing, as applicable.

**III.    Form and Manner of Sale Notice.**

19.      The Bidding Procedures contemplate that the Auction, if necessary, will be held on June 1, 2023, at 10:00 a.m., prevailing Eastern Time, and that the Sale Hearing will be held on June 5, 2023, at 10:00 a.m., prevailing Eastern Time, or such other date and time that the Court may later direct and as agreed upon by the Debtors.

20.      As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as **Exhibit 3** to the Bidding Procedures

14

Order, to be served on the parties that receive notice of this motion.  In light of the nature of the relief requested, no other or further notice need be given.

21.    In addition, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will post the Sale Notice on their restructuring website, https://omniagentsolutions.com/DavidsBridal (the "Case Website") and publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in the *New York Times (National Edition)*, and the *Globe and Mail* (National Edition) to provide notice to any other potential interested parties.  The information officer appointed by the Canadian Court in the Canadian Proceeding will also post the Sale Notice on its case website.

22.    The Sale Notice and the Assumption and Assignment Procedures (described below) are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction; (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (e) notice of the proposed assumption and assignment of Contracts the Successful Bidder.

23.    Notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and, as applicable, the Assumption and Assignment Procedures, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Debtors'

15

assets, and no other or further notice of the Sale is required.  Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice and Assumption and Assignment Procedures.

## IV.    Summary of the Assumption and Assignment Procedures.

24.    The Debtors also seek approval of Assumption and Assignment Procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale.  Because the Bidding Procedures Order sets forth the Assumption and Assignment Procedures in detail, they are not restated herein.  In general, the Assumption and Assignment Procedures (a) outline the process by which the Debtors may serve notice to certain Contract counterparties regarding the proposed assumption and assignment and related cure payments, if any, informing such parties of their right and the procedures to object thereto, and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts, to the extent necessary.

## V.    Disclosures Under Local Rule 6004-1

25.    Local Rule 6004-1 requires, among other things, that a debtor include the "material terms of the proposed sale" in a sale motion.  As set forth above, the Debtors and their professionals have commenced an aggressive marketing of the Debtors' assets.  Nevertheless, the Debtors do not, as yet, have a signed agreement.  Moreover, because the Debtors continue to negotiate with parties in interest, they cannot, as yet, identify, with any reasonable specificity, the terms of the sale of the Assets.  Accordingly, the Debtors are unable, at this time, to make the disclosures required under Local Rule 6004-1.  In the event the Debtors secure a Stalking Horse Bidder, the Debtors will file the Stalking Horse APA and make the requisite disclosures.

65783/0001-44892354

## Basis for Relief

**I.      The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Debtors' Assets, and an Exercise of the Debtors' Reasonable Business Judgment.**

26.      A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 ](D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

27.      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866, 2017 WL 5483156, at *12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to

17

maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

28.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Dura Auto. Sys.*, 379 B.R. 257, 263 (Bankr. D. Del. 2007); *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

29.    It is well-settled that where there is a court-approved auction process, a full and fair price is presumed for the assets sold because the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (noting that while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").  This is true here where any Sale(s) and related transactions will be subjected to a marketing process and intensively scrutinized by the Debtors and their advisors.  As a result, the Debtors and their creditors can be assured that, taking into

account current macroeconomic and industry conditions, the consideration obtained will be fair and reasonable and at or above market.

30.      The proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for all or a portion of the Assets.  The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction.  Specifically, the Bidding Procedures contemplate an open auction process with minimal barriers to entry and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

31.      At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer related to the Sale(s), while preserving the Debtors' right to not sell any particular Asset if the Debtors do not believe that such a sale would maximize the value of such Asset.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable in light of the circumstances and at or above market value.

32.      The proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District.  *See, e.g.*, *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 20230 [Doc. No. 441]; *In re Christopher & Banks Corp.*, Case No. 21-10269 (ABA) (Bankr. D.N.J. 146) [Doc. No. 146]; *In re RTW Retailwinds, Inc.*, Case No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Doc. No. 192]; *In re Congoleum Corporation*, Case No. 20-18488 (MBK) (Bankr. D.N.J.

Sept. 4, 2020) [Doc. No. 275]; *In re SLT Holdco, Inc.*, Case No. 20-18368 (MBK) (Bankr. D.N.J.

July 13, 2020) [Doc. No. 72]; *In re Aceto Corp.*, Case No. 19-13448 (VFP) (Bankr. D.N.J. March

15, 2019) [Doc. No. 142]; *In re Saint Michael's Medical Ctr.*, Case No. 15-24999 (VFP) (Bankr.

D.N.J. Aug. 25, 2015) [Doc. No. 121].

## II.     <u>The Bid Protections Are Necessary and Appropriate and Should Be Approved</u>.

33.     In the event the Debtors seek to appoint a Stalking Horse Bidder, the Debtors seek

authority to offer customary bid protections, including the Breakup Fee and Expense

Reimbursement.  The use of a stalking horse in a public auction process for the sale of a debtor's

assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many

circumstances, the best way to maximize value in an auction process by "establish[ing] a

framework for competitive bidding and facilitate[ing] a realization of that value." *Off. Comm. Of*

*Unsecured Creditors v. Interform Holding LLC*, No. 11-CV-219, 2011 WL 2671254, No. 11-129,

*1 (E.D. Wis. July 7, 2011).  As set forth in more detail in the Bidding Procedures Order, in the

event the Debtors seek to appoint a Stalking Horse Bidder, the Debtors will file a Stalking Horse

Notice.  Courts in this jurisdiction have approved substantially similar noticing processes in

connection with other bidding procedures motions filed without a stalking horse bidder.  *See, e.g.*,

*In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 2023) [Doc. No. 441].

34.     Generally, bid protections, such as breakup fees, are a normal and, in many cases,

necessary component of significant sales under the Bankruptcy Code.  *See Integrated Res.*, 147

B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the

value of the debtor's assets. . . . In fact, because the . . . corporation has a duty to encourage

bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value.") (emphasis

added).  As a result, courts routinely approve such bidding protections in connection with proposed

bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.

*See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe that the allowance of the Bid Protections is in the best interests of their estates and their creditors, as a Stalking Horse Bidder, if designated, will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

35. In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206 (holding that the general standard used for all administrative expenses applies to breakup fees). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

36. The Debtors propose to pay the Bid Protections only in the event they determine, after good faith, arm's-length negotiations, and in consultation with the Consultation Parties, that designating a Stalking Horse Bidder would be necessary and beneficial for their estates. Courts in this district have routinely approved breakup fees and/or expense reimbursements offered to stalking horse bidders. *See, e.g.*, *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 20230 [Doc. No. 441]; *In re Congoleum Corp.*, Case No. 20-18488 (MBK) (Bankr. D.N.J. Sept. 4, 2020) [Doc. No. 275]; *In re Alliant Techs., L.L.C.*, No. 21-19748 (JKS) (Bankr. D.N.J.

Jan. 21, 2022) [Docket No. 101] (approving bidding procedures and bidding protections including an expense reimbursement payable to the stalking horse bidder); *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (approving bidding procedures and bidding protections including a breakup fee payable to the stalking horse bidder); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72] (same); *In re New England Motor Freight, Inc.*, No. 19-12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *In re Aceto Corp.*, No. 19-13448 (VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (same).

37.    Without the Bid Protections, a potential bidder may elect not to participate in the process at all to the detriment of the Debtors' estates.  The Bidding Procedures do not require the payment of the Bid Protections.  Rather, the Debtors have the option of paying or otherwise incurring such obligations in the event that offering such Bid Protections is necessary to foster a competitive bidding process that will maximize the value of the Debtors' estates.  In that instance, the value created for the Debtors' estates will likely greatly outweigh the cost of any Bid Protections.  In any case, granting the Debtors authority to offer the Bid Protections sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their estates.

38.    The Breakup Fee will not exceed three (3%) percent of any proposed purchase price.  This is an amount that is well within market for transactions of this type, and which has been routinely approved by courts in this district.  *See, e.g.*, *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (approving breakup fee of up to three percent of the proposed purchase price); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72] (same); *In re New England Motor Freight, Inc.*, No. 19-

12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *In re Aceto Corp.*, No. 19-

13448 (VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (approving breakup fee of up to two

percent of the cash component of the proposed purchase price); *In re East Orange Gen. Hosp.*,

No. 15-31232 (VFP) (Bankr. D.N.J. Dec. 15, 2015) [Docket No. 171] (approving breakup fee of

approximately four percent of the proposed aggregate consideration).

39.    Accordingly, for the reasons set forth above, the Debtors respectfully request that

the Court grant the Debtors the authority to incur and pay the Bid Protections to the extent the

Bid Protections are necessary to preserve the value of the Debtors' estates.  In order to provide full

transparency for the sale process, in the event the Debtors appoint a Stalking Horse Bidder, the

Debtors will file a notice on the docket identifying the proposed buyer and the Bid Protections

offered.

### III.    The Form and Manner of the Sale Notice Should Be Approved.

40.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors

with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the

estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice

to include the time and place of the auction and the hearing and the deadline for filing any

objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the Debtors

seek approval of the Sale Notice as proper notice of the Auction.  Notice of this motion and the

related hearing to consider entry of the Bidding Procedures Order, coupled with service of the

Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the

proceedings with respect thereto in compliance with, and satisfaction of, the applicable

requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve

the form and manner of the Sale Notice.

65783/0001-44892354

**IV.    The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

41.    As set forth above, the Sale contemplates the assumption and assignment of the Contracts to the Successful Bidder.  In connection with this process, the Debtors believe it is necessary to establish Assumption and Assignment Procedures by which: (a) the Debtors and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure payments.

42.    As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure payments identified in the Contract Assumption Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

43.    The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

**V.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.**

44.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to

65783/0001-44892354

section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

45.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

### A.    A Sound Business Purpose Exists for the Sale.

46.    As set forth above, the Debtors have a sound business justification for selling the Assets. ***First***, the Debtors believe the Sale will maximize the value of the Assets exposing them to the market as part of a competitive, arms'-length process. Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4

(Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure[, t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

47.     *Second*, because any sale of Assets will likely contemplate the assumption of certain of the Debtors' Contracts, it will result in payment in full for a number of the Debtors' creditors.

48.     Thus, the Debtors submit that the Successful Bid will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### B.     Adequate and Reasonable Notice of the Sale Will Be Provided.

49.     The Sale Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

65783/0001-44892354

### C.    The Sale and Purchase Price Reflects a Fair Value Transaction.

50.     It is well-settled that, where there is a court-approved auction process, a full and
fair price is presumed to have been obtained for the assets sold, as the best way to determine value
is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*,
526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056,
2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not
require an auction procedure," "the auction procedure has developed over the years as an effective
means for producing an arm's length fair value transaction.").

51.     As noted above, prior to the Bidding Deadline Houlihan Lokey Capital, Inc. will
continue to market the Assets and solicit other offers consistent with the Bidding Procedures,
including, for example, by contacting previously solicited parties, continuing to provide acceptable
bidders with data room access and requested information, considering a variety of alternative
transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction
value.  In this way, the number of bidders that are eligible to participate in a competitive Auction
process will be maximized, or, if no Auction is held because no Auction is necessary the purchase
price will, conclusively, be deemed fair value.

### D.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Is a "Good-Faith Successful Bidder."

52.     The Debtors request that the Court find the Successful Bidder is entitled to the
benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with
the sale of the Assets.

53.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease or property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,

27

> whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

54.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

55.    The Debtors submit that the Successful Bidder(s), will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA, if any, or the Form APA, or any marked versions thereof, would be a good-faith, arms'-length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.[7]  ***First***, as set forth

---

[7]  The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with

28

in more detail above, the consideration to be received by the Debtors from a Successful Bidder will be substantial, fair, and reasonable.  *Second*, any sale agreement with a Successful Bidder will presumably be the culmination of a competitive Auction process in which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.  And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  *Finally*, any bids that the Debtors ultimately determine to be Successful Bids will have been evaluated and approved by the Debtors in consultation with their advisors.  Accordingly, the Debtors believe that the Successful Bidder, if any, and any purchase agreement associated with a Successful Bid should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

## E.    The Sale Should be Approved "Free and Clear" Under Section 363(f).

56.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

---

sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

65783/0001-44892354

57.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all Encumbrances, except with respect to any interests that may be assumed liabilities under the applicable Purchase Agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

58.    The Debtors submit that any interest in the Assets that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Successful Bidder, if any, free and clear of all Encumbrance, with any such Encumbrances to attach to the proceeds of the Sale.

## VI.    The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman.

59.    The sale of the Assets will not necessitate the appointment of a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that:

> [I]if the debtors in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtors and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless . . . such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(1).

60.    Section 101(41A) defines "personally identifiable information" as an individual's name, residence address, email address, telephone number, social security number or credit card

number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual." 11 U.S.C. § 101(41A).

61.    The Debtors' privacy policy provides that:

> The Debtors] may also transfer personal data [the Debtors] have about [their customers] in the event [the Debtors] sell all or a portion of [the Debtors'] business or assets (including in the event of a reorganization, spin-off, dissolution or liquidation).[8]

62.    Based on the language of the policy itself, section 363(b)(1) is not implicated because the Debtors did not disclose to an "individual a policy *prohibiting* the transfer of personally identifiable information." See 11 U.S.C. §363(b)(1) (emphasis added).  Courts in this district have routinely found that section 363(b)(1) is not implicated where, as here, the Debtors did not disclose to an individual a policy *prohibiting* the transfer of personally identifiable information.  *See, e.g.*, *In re Christopher & Banks Corp.*, Case No. 21-10269 (ABA) (Bankr. D.N.J. Feb. 23, 2021) [Doc. No. 266]; *In re RTW Retailwinds, Inc.*, Case No. 20-18445 (JKS) (Bankr. D.N.J. Sept. 4, 2020) [Doc. No. 319]; *In re Modell's Sporting Goods, Inc.*, Case No. 20-14179 (VFP) (Bankr. D.N.J. Aug. 14, 2020) [Doc. No. 580].

63.    In any event, the buyer of the Assets will utilize the "personally identifiable information" in exactly the same fashion as the Debtors.  Accordingly, even if section 363(b)(1) were implicated, the Court may authorize the proposed Sale without appointing a privacy ombudsman because the transfer of the "personally identifiable information" is consistent with the Debtors' privacy policy as provided in 11 U.S.C. § 363(b)(1).

---

[8]  A true and correct copy of the Debtors' privacy policy, as of the Petition Date, is attached hereto as **Exhibit B**.  The privacy policy is also available at: https://www.davidsbridal.com/legal/privacy-policy

65783/0001-44892354

VII.    **The Assumption and Assignment of the Contracts Should Be Approved.**

      A.    **The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment.**

64.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign or transfer the Contracts to the Successful Bidder, to the extent required by such bidders.

65.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.").

66.    Here, the Court should approve the decision to assume and assign certain designated Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment: ***First***, certain of the Contracts are necessary to operate the Assets and, as such, they are

32

essential to inducing the best offer for the Assets.  *Second*, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Contracts needed to manage the Debtors' day-to-day operations were included in the transaction.  *Third*, any Stalking Horse APA and any marked copy of the Form APA submitted by Potential Bidder will likely provide that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, a proposed Sale.  *Finally*, the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

67.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

### B.      Defaults Under the Assumed Contracts Will Be Cured Through the Sale.

68.     Upon finding that a debtor has exercised its business judgment in determining that assuming a Contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  Section 365 "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

69.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because any Stalking Horse APA and any marked

65783/0001-44892354

copy of the Form APA submitted by Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Contracts. Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure payments or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Contract counterparties.

### C.      Contract Counterparties Parties Will Be Adequately Assured of Future Performance.

70.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

71.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of

potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under any Contracts to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform under any Contracts to be assumed and assigned to a Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure payments.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the any Contracts to be assumed and assigned to any Successful Bidder.

## VIII.   Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

72.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

73.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."   10 *Collier on Bankruptcy* ¶ 6004.10

35

(15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party

informs the court of its intent to appeal, the stay may be reduced to the amount of time actually

necessary to file such appeal.  *Id.*

74.     To maximize the value received for the Assets, the Debtors seek to close the Sale

as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court

waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

75.     The Debtors will provide notice of this Motion to the following parties or their

respective counsel: (a) the Office of the United States Trustee for the District of New Jersey; (b) the

holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis);

(c) counsel for Bank of America, N.A., in its capacity as the ABL Agent and DIP Agent,

(i) Morgan, Lewis & Bockius LLP, Julia Frost-Davies, Esq. and Christopher L. Carter, Esq., and

(ii) Greenberg Traurig, LLP, Alan Brody, Esq.; (d) counsel for 1903P Loan Agent, LLC, in its

capacity as First In Last Out Agent, (i) Riemer & Braunstein LLP, Steven E. Fox, Esq. and Brendan

C. Recupero, Esq., and (ii) Lowenstein Sandler LLP, Kenneth A. Rosen, Esq.; (e) counsel for

CPPIB Credit Investments III Inc. and its affiliates and managed accounts, in their capacity as

Prepetition Senior Superpriority Term Loan Lenders, Weil, Gotshal & Manges LLP, Matt Barr,

Esq., Matthew P. Goren, Esq. and F. Gavin Andrews, Esq.; (f) the United States Attorney's Office

for the District of New Jersey; (g) the Internal Revenue Service; (h) the offices of the attorneys

general for the states in which the Debtors operate; (i) the National Association of Attorneys

General; (j) all parties who have expressed a written interest in some or all of the Assets; and (k) all

known holders of liens, encumbrances, and other claims secured by the Assets.  The Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be given.

## Waiver of Memorandum of Law

76.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## No Prior Request

77.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested by the Motion and such further relief as may be just and proper under the circumstances.

*[Remainder of page left intentionally blank]*

65783/0001-44892354

DATED:  April 17, 2023                Respectfully submitted,

**COLE SCHOTZ P.C.**

By:___*/s/Michael D. Sirota*___
       Michael D. Sirota, Esq.
       Felice R. Yudkin, Esq.
       Rebecca W. Hollander, Esq.
       Court Plaza North
       25 Main Street
       Hackensack, NJ 07601
       (201) 489-3000
       (201) 489-1536 Facsimile
       Email: msirota@coleschotz.com
            fyudkin@coleschotz.com
            rhollander@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
       Joshua A. Sussberg, P.C. (*pro hac vice*
       pending)
       Christopher T. Greco, P.C. (*pro hac vice*
       pending)
       Rachael M. Bentley (*pro hac vice* pending)
       601 Lexington Avenue
       New York, New York 10022
       (212) 446-4800
       (212) 446-4900 Facsimile
       Email: joshua.sussberg@kirkland.com
            christopher.greco@kirkland.com
            rachael.bentley@kirkland.com
-and-
       Alexandra Schwarzman, P.C. (*pro hac vice*
       pending)
       300 North LaSalle Street
       Chicago, Illinois 60654
       (312) 862-2000
       (312) 862-2200 Facsimile
       Email: alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

## EXHIBIT A

**Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-2(c)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Felice R. Yudkin, Esq.
fyudkin@coleschotz.com
Rebecca W. Hollander, Esq.
rhollander@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
(212) 446-4900 Facsimile
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
joshua.sussberg@kirkland.com
Christopher T. Greco, P.C. (*pro hac vice* pending)
christopher.greco@kirkland.com
Rachael M. Bentley (*pro hac vice* pending)
rachael.bentley@kirkland.com
-and-
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2000
(312) 862-2200 Facsimile
Alexandra Schwarzman, P.C. (*pro hac vice* pending)
alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

| | |
|---|---|
| In re:<br><br>DAVID'S BRIDAL, LLC, *et al.*,<br><br>               Debtors. [1] | Chapter 11<br><br>Case No. Case No. 23-_____ (___)<br><br>Judge: _____<br><br>(Joint Administration Requested) |

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335). The location of debtor

| | |
|---|---|
| Page (2) | |
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

**ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES**

The relief set forth on the following pages, numbered three (3) through seventeen (17), is hereby ORDERED.

---

David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

65783/0001-44892354

Page (3)
Debtor:                 DAVID'S BRIDAL, LLC, *et al.*
Case No.:               23-_____ (_____)
Caption of Order:       ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                        PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                        AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                        HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                        THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                        FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                        LEASES

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"), authorizing the Debtors to

(a) approve the bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") and

the selection of, and Bid Protections for, a Stalking Horse Bidder, if any, (b) approving the Form

APA attached hereto as **Exhibit 2**, (c) approving the form and manner of notice of the Auction

and the Sale Hearing with respect to the Sale of all or substantially all of the Debtors' Assets or

any portion thereof, (d) scheduling an Auction and a Sale Hearing, and (e) establishing notice and

procedures for the assumption and assignment of certain executory contracts and leases, all as

more fully set forth in the Motion; and upon the First Day Declaration; and this Court having

jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Standing Order of Reference to

the Bankruptcy Court Under Title 11* of the United States District Court for the District of New

Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and this Court having found that this Court may enter a final order consistent with Article

III of the United States Constitution; and this Court having found that venue of this proceeding

and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

| | |
|---|---|
| Page (4) | |
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court, if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

## I.      <u>Important Dates and Deadlines.</u>

3.      The following dates and deadlines shall apply in these chapter 11 cases:

| Event | Date |
|---|---|
| Bid Deadline | May 30, 2023 at 5:00 p.m. |
| Sale Objection Deadline | May 31, 2023 at 5:00 p.m. |
| Auction | June 1, 2023 at 10:00 a.m. |

Page (5)
Debtor:              DAVID'S BRIDAL, LLC, *et al.*
Case No.:            23-_____ (_____)
Caption of Order:    ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                     PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                     AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                     HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                     THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                     FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                     LEASES

| Event | Date |
| --- | --- |
| Objection to Successful Bidder | June 2, 2023 at 5:00 p.m. |
| Sale Hearing | June 5, 2023 at 10:00 a.m. |

4.       ***Notice of Successful Bidder***.  The Debtors shall file upon conclusion of the Auction

or as soon as practicable if the Auction is extended.

5.       ***Sale Hearing***.  The Sale Hearing shall commence on or before June 5, 2023,

at **10:00 a.m. (prevailing Eastern Time)** before the assigned Bankruptcy Judge, at the United

States Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher US Courthouse, 402

East State Street, Trenton, NJ 08608.  Upon entry of this Order, the Debtors are authorized to

perform any obligations of the Debtors set forth in the Stalking Horse APA or other applicable

Purchase Agreement that are intended to be performed prior to the Sale Hearing or entry of the

Sale Order.  The Sale Hearing may be adjourned by announcement in open Court or on the Court's

calendar without any further notice required.

6.       ***Sale Objection Deadline***.  Objections, if any, to the Sale must be made on or before

**May 31, 2023, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").

Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy

Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection

| Page (6) | |
|---|---|
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

and the specific grounds therefor; and (d) be filed with the Court and served so as to be **actually received** no later than the Sale Objection Deadline by the following parties: (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C.**,** Christopher T. Greco, P.C.**,** and Rachael M. Bentley, email: Joshua.sussberg@kirkland.com**,** christopher.greco@kirkland.com**,** and Rachael.bentley@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Alexandra Schwarzman, P.C., email: alexandra.schwarzman@kirkland.com; (ii) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Felice R. Yudkin, Esq., and Rebecca W. Hollander, Esq., email: msirota@coleschotz.com, fyudkin@coleschotz.com, and rhollander@coleschotz.com; (iii) counsel for Bank of America, N.A., in its capacity as the ABL Agent and DIP Agent, (a) Morgan, Lewis & Bockius LLP, Julia Frost-Davies, Esq. and Christopher L. Carter, Esq., and (b) Greenberg Traurig, LLP, Alan Brody, Esq.; (iv) counsel for 1903P Loan Agent, LLC, in its capacity as First In Last Out Agent, (a) Riemer & Braunstein LLP, Steven E. Fox, Esq. and Brendan C. Recupero, Esq., and (b) Lowenstein Sandler LLP, Kenneth A. Rosen, Esq.; (v) counsel for CPPIB Credit Investments III Inc. and its affiliates and managed accounts, in their capacity as lenders under the Prepetition Senior Superpriority Term Loan Agreement, Weil, Gotshal &

Page (7)
Debtor:                   DAVID'S BRIDAL, LLC, *et al.*
Case No.:                 23-_____ (_____)
Caption of Order:         ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                          PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                          AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                          HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                          THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                          FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                          LEASES

Manges LLP, Matt Barr, Esq., Matthew P. Goren, Esq. and F. Gavin Andrews, Esq.; (vi) the Office

of the U.S. Trustee for the District of New Jerseys, (viii) counsel to any official committee

appointed in these chapter 11 cases; *provided*, that any objection to the Sale to the Successful

Bidder shall be filed on or before **June 2, 2023 at 5:00 p.m.** and served on the same parties.

7.       A party's failure to timely file or make an objection in accordance with this Order

shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, and/or

consummation of the Sale with the Successful Bidder pursuant to the applicable

purchase agreement, including the assumption and assignment of the Contracts to the

Successful Bidder pursuant to the applicable purchase agreement, and shall be deemed to

constitute any such party's consent to entry of the Sale Order and consummation of the Sale and

all transactions related thereto, including, without limitation, such assumption and assignment.  All

rights to the extent they exist are reserved for a party to later seek relief from the Court, and the

Debtors and all other parties reserve all defenses.

8.       ***Bid Deadline***.  The deadline by which all Bids for the Debtors' Assets must be

***actually received*** by the parties specified in the Bidding Procedures is 5:00 p.m.

(prevailing Eastern Time), on May 30, 2023 (the "Bid Deadline").

| Page (8) | |
|---|---|
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

9.      *Auction*.  June 1, 2023 at 10:00 a.m. (prevailing Eastern Time), is the date and time the Auction, if one is needed.  Such Auction will be held at the offices of counsel to the Debtors: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022-4611, or such later time on such day or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  The Auction shall be transcribed by a court reporter.  As set forth more fully in the Bidding Procedures, only Qualified Bidders shall be permitted to participate at the Auction, however, any party in interest may attend the Auction.

## II.    **Auction, Bidding Procedures, and Related Relief.**

10.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Assets.  Any party desiring to bid on the Assets or a portion thereof shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

11.      The Form APA, substantially in the form attached hereto as **Exhibit 2**, is hereby approved in its entirety.

| | |
|---|---|
| Page (9) | |
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

12.     The Debtors, upon entry of this Order, shall be authorized, but are not obligated or directed, in an exercise of their business judgment, to select one or more Stalking Horse Bidders with respect to some or all of the Debtors' Assets and enter into a Stalking Horse APA.

13.     Upon entry of the order approving the designation of a Stalking Horse Bidder and Stalking Horse APA, the Debtors are authorized, but not directed, to incur and pay the Bid Protections to each Stalking Horse Bidder.

14.     No Qualified Bidder (other than the Stalking Horse Bidder, if any) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid each Qualified Bidder agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

15.     If the Debtors receive (i) a Qualified Bid, other than a Stalking Horse Bid, or (ii) two or more Qualified Bids in the absence of a Stalking Horse Bid, the Debtors shall conduct the Auction to determine the Successful Bidder with respect to the Assets or portion of the Assets.

16.     If the Debtors do not receive any Qualified Bids but have received one or more Stalking Horse Bids, the Debtors shall (i) not conduct the Auction, (ii) designate any Stalking Horse's Qualified Bid as the Successful Bid, and (iii) be authorized to seek approval of any such

Page (10)
Debtor:             DAVID'S BRIDAL, LLC, *et al.*
Case No.:           23-_____ (_____)
Caption of Order:   ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                    PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                    AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                    HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                    THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                    FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                    LEASES

Stalking Horse APA at the Sale Hearing. If the Debtors receive only one Qualified Bid in the

absence of a Stalking Horse Bid, the Debtors shall (i) not conduct the Auction, (ii) designate the

sole Qualified Bid as the Successful Bid, and (iii) be authorized to seek approval of such Qualified

Bid at the Sale Hearing.

17.     Pursuant to Local Rule 6004-2: (a) each bidder participating at the Auction shall be

required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale,

as set forth in the Bidding Procedures; (b) the Auction shall be conducted openly; and (c) the

Auction shall be transcribed or videotaped.

18.     Debtors, in their reasonable business judgment, after consultation with the

Consultation Parties, may reject, at any time before entry of an order of the Court approving a

Qualified Bid, any bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in

conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms

and conditions of the Sale or (iii) contrary to the best interests of the Debtors, their estates, their

creditors, and other stakeholders.

## III.    Bid Protections

19.     The Debtors are hereby authorized but not obligated, in an exercise of their business

judgment, and in consultation with the Consultation Parties, to: (a) select one or more Acceptable

Page (11)
Debtor:                    DAVID'S BRIDAL, LLC, *et al.*
Case No.:                 23-_____ (_____)
Caption of Order:      ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                               PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                               AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                               HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                               THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                               FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                               LEASES

Bidders to act as Stalking Horse Bidders in connection with the Auction and (b) in connection with

any Stalking Horse APA (i) provide a Breakup Fee in an amount not to exceed three percent (3%)

of the proposed Purchase Price, and/or (ii) agree to the Expense Reimbursement.

20.     In the event that the Debtors enter into a Stalking Horse APA with one or more

Stalking Horse Bidders, within two business days of entry, the Debtors shall file a notice and

proposed form of order with the Court (the "Stalking Horse Notice") and serve on the Stalking

Horse Bidder and the Consultation Parties.  The Stalking Horse Notice shall: (i) set forth the

identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity,

then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the

Stalking Horse Bid and what portion (if any) is cash; (iii) state whether the Stalking Horse Bidder

has any connection to the Debtors other than those that arise from the Stalking Horse Bid;

(iv) specify any proposed Bid Protections; (v) attach the Stalking Horse APA, including all

exhibits, schedules and attachments thereto; and (vi) sets forth the deadline to object to the Stalking

Horse Bidder designation and any Bid Protections.  If there are no objections to the Stalking Horse

Notice within two business days of filing with the Court, (the "Notice Period"), the Debtors may

submit an order to the Court that incorporates any comments received during the Notice Period

that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse

| | |
|---|---|
| Page (12) | |
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

APA, without the need for further hearing. If a party files an objection to the Stalking Horse Notice, the Court shall hold a hearing on the first date that the Court is available that is no later than two business days after filing such applicable Stalking Horse Notice.

## IV.     Assumption and Assignment Procedures.

21.     The procedures set forth below regarding the assumption and assignment of the Contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder, if any, pursuant to section 364(f) of the Bankruptcy Code in connection with the Sale are hereby approved to the extent set forth herein.

22.     These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' Contracts to be assumed and assigned in connection with the Sale under the Stalking Horse APA, if any, subject to the payment of any amount necessary to satisfy all defaults and actual pecuniary loss to the counterparty resulting from such defaults including, but not limited to, all claims, demands, charges, rights to refunds and monetary and non-monetary obligations that the relevant counterparty can assert under a Contract, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising

| | |
|---|---|
| Page (13) | |
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

under or out of, in connection with, or in any way relating to a Contract (the foregoing amounts as stated in the Contract Assumption Notice, the "Cure Payments"):

    a.    **Contract Assumption Notice.**  No later than May 15, 2023 (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a notice of contract assumption (the "Contract Assumption Notice"), in substantially the form attached hereto as **Exhibit 4** via first class mail on the Contract counterparties and provide a copy of the same to the Consultation Parties.  The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of  the executory contract or lease, (ii) the name of the counterparty to the executory contract or lease, (iii) Debtors' good faith estimates of the Cure Payments, if any, required in connection with the executory contract or lease, and (iv) the Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or that such stated Cure Payment constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved.  Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

    b.    **Cure Payments**.  The payment of the applicable Cure Payments by the Debtors and/or the Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contracts by the Debtors and the assignment of such Contracts to the Successful Bidder, constitute adequate assurance of future performance thereof.

    c.    **Supplemental Contract Assumption Notice**.  To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Contracts that may be assumed by and assigned to the Successful Bidder, (ii) remove any Contracts from the list attached to the

Page (14)
Debtor:            DAVID'S BRIDAL, LLC, *et al.*
Case No.:          23-_____ (_____)
Caption of Order:  ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                   PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                   AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                   HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                   THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                   FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                   LEASES

Contract Assumption Notice, (iii) and/or modify the previously stated Cure
Payment associated with any Contract, the Debtors will promptly file with
this Court and serve by first-class mail a supplemental notice of contract
assumption (a "<u>Supplemental Assumption Notice</u>") on each of the
counterparties to a Contract affected by the Supplemental Assumption
Notice.  Each Supplemental Assumption Notice will include the same
information with respect to listed Contracts as was included in the Contract
Assumption Notice.  A Successful Bidder may designate additional
Contracts to be assumed and assigned up to two business days prior to
closing and may remove Contracts from the list of Contracts up to two
business days prior to closing.

d.    **Objections**.  Objections, if any, to the proposed assumption and assignment
or the Cure Payment proposed with respect thereto, must (i) be in writing,
(ii) comply with the applicable provisions of the Bankruptcy Rules, and the
Local Rules, (iii) state with specificity the nature of the objection and, if the
objection pertains to the proposed Cure Payment, state the correct Cure
Payment alleged by the objecting counterparty, together with any applicable
and appropriate documentation in support thereof, and (iv) be filed with the
Court and served upon (a) proposed counsel to the Debtors, (b) counsel to
the Stalking Horse Bidder, if any, (c) the Notice Parties (as defined in the
Bidding Procedures), and (v) any other party that has filed a notice of
appearance in these chapter 11 cases, so as actually to be received on or
before the Sale Objection Deadline or deadline set forth in the Supplemental
Assumption Notice, as applicable.

e.    **Dispute Resolution**.  In the event that the Debtors and a Contract
counterparty cannot resolve an objection to a Cure Payment, the Contract at
issue may be assumed by the Debtors and assigned to the Successful Bidder,
*provided that* the Debtors shall segregate the Cure Payment that the
counterparty asserts is required to be paid, pending a resolution of the
dispute by the Court or mutual agreement by the parties.  Any objection to
the proposed assumption and assignment of a contract or related Cure
Payment proposed in connection with the Sale that remains unresolved as

Page (15)
Debtor:              DAVID'S BRIDAL, LLC, *et al.*
Case No.:            23-_____ (_____)
Caption of Order:    ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                     PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                     AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                     HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                     THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                     FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                     LEASES

of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

f.    **Contract Assumption**.  No Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Contract or (ii) the date the Sale has closed.

23.    Any party failing to timely file an objection to the Cure Payments or the proposed assumption and assignment of a Contract listed on the Contract Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Contract, (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Contract, adequate assurance of future performance, the relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Contract.

## V.    Personal Identifiable Information.

24.    The Debtors' privacy policy does not prohibit the transfer of personal identifiable information, and therefore, the appointment of a consumer privacy ombudsman is not required.

Page (16)

| | |
|---|---|
| Debtor: | DAVID'S BRIDAL, LLC, *et al.* |
| Case No.: | 23-_____ (_____) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

## VI.   **Sale Notice.**

25.     The Sale Notice, substantially in the form attached hereto as **Exhibit 3**, is hereby approved.  Within three (3) business days following entry of this Order, the Debtors shall cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the Notice Parties (as defined in the Bidding Procedures); (b) counsel to the Stalking Horse Bidder, if any; (c) all parties to executory contracts and leases to be assumed and assigned, or rejected as part of the proposed Sale; (d) all parties who have expressed a written interest in some or all of the Assets; (e) all known holders of liens, encumbrances, and other claims secured by the Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) the Federal Trade Commission; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

## VII.   **Miscellaneous.**

26.     Notwithstanding anything to the contrary in the Application or this Order, any payment made or authorization hereunder, including any Break-Up Fee or Expense Reimbursement, shall be subject to the applicable budget and/or cash collateral authorization requirements imposed on the Debtors under any order(s) of this Court authorizing the Debtors' use

Page (17)
Debtor:           DAVID'S BRIDAL, LLC, *et al.*
Case No.:         23-_____ (_____)
Caption of Order: ORDER (A) APPROVING BIDDING PROCEDURES AND BID
                  PROTECTIONS, (B) APPROVING THE FORM ASSET PURCHASE
                  AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                  HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                  THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                  FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                  LEASES

of cash collateral and post-petition debtor-in-possession financing facilities, including any order(s)

authorizing post-petition financing.

27.     Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied

by such notice.

28.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order

are immediately effective and enforceable upon its entry.

29.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

30.     Any party in interest may move for modification of this Order in accordance with

D.N.J. LBR 9013-5(e).

31.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be

accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion

or otherwise waived.

32.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order,

# **EXHIBIT 1**

**Bidding Procedures**

**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Felice R. Yudkin, Esq.
fyudkin@coleschotz.com
Rebecca W. Hollander, Esq.
rhollander@coleschotz.com

*Proposed Counsel to Debtors*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
(212) 446-4900 Facsimile
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
joshua.sussberg@kirkland.com
Christopher T. Greco, P.C. (*pro hac vice* pending)
christopher.greco@kirkland.com
Rachael M. Bentley (*pro hac vice* pending)
rachael.bentley@kirkland.com

*-and-*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2000
(312) 862-2200 Facsimile
Alexandra Schwarzman, P.C. (*pro hac vice* pending)
alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, LLC, *et al.,* | Case No. 23-_____ (___) |
| Debtors.[1] | (Joint Administration Requested) |

**BIDDING PROCEDURES**

On [●], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. [●]] (the "Bidding Procedures Order"),[2] by which the Court authorized the Debtors to solicit bids for and conduct an auction (the "Auction") for a sale or disposition (collectively, the "Sale," and each, a "Sale Transaction") of all or substantially all

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335). The location of debtor David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

[2] Capitalized terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

1

of the Debtors' assets or any portion thereof in accordance with the following procedures (the "Bidding Procedures").

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE DEBTORS' PROPOSED ADVISORS, AS FOLLOWS:**

**Houlihan Lokey Capital, Inc.:** Surbhi Gupta (SGupta@hl.com) or Ethan Kopp (EKopp@hl.com)
**Berkeley Research Group:** Bob Duffy (bduffy@thinkbrg.com) or Stephan Coulombe (scoulombe@thinkbrg.com)
**Kirkland & Ellis LLP:** Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Christopher T. Greco, P.C. (christopher.greco@kirkland.com), Rachael M. Bentley, (Rachael.bentley@kirkland.com), and Alexandra Schwarzman, P.C. (alexandra.schwarzman@kirkland.com)
**Cole Schotz P.C.:** Michael D. Sirota, Esq. (msirota@coleschotz.com), Felice R. Yudkin, Esq. (fyudkin@coleschotz.com), and Rebecca W. Hollander, Esq. (rhollander@coleschotz.com)

## I.    Description of the Assets.

The Debtors are seeking to sell all or substantially all of their assets or any portion thereof, which include, but are not limited to, their owned real property, unexpired leases, executory contracts, cash, equipment, supplies, intellectual property, insurance proceeds, receivables, prepaid expenses and deposits, and books and records (collectively, the "Assets"), in each case, free and clear of all liens, claims, interests, or other encumbrances.

## II.    Participation Requirements.

### A.    Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse Bidder (defined below), if any) (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information:

1.    an executed confidentiality agreement on terms acceptable to the Debtors and no less restrictive than that agreed to with the Stalking Horse Bidder, if any, in any material respects (a "Confidentiality Agreement");

2.    identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale Transaction(s); and

3.    proof by the Potential Bidder of its financial capacity to close a proposed Sale Transaction(s), which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors, with the reasonable consent of the Consultation Parties (as defined below).

2

### B.  Obtaining Due Diligence.

The Debtors, with their advisors, with the reasonable consent of the Consultation Parties, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may submit a Bid (each, an "Acceptable Bidder," and each such bid an "Acceptable Bid").  Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with Potential Bidders to aggregate Bids into a consolidated Acceptable Bid prior to the Bid Deadline (defined herein).

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors and the Assets.  The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; _provided_ that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to competitors and (ii) the Debtors may decline to provide such information, after prior notice to, and with the reasonable consent of the Consultation Parties, to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a proposed Sale Transaction.  The due diligence period will end on the Bid Deadline.  Subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information to any party.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors and the Consultation Parties. The Debtors and their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction.

The Debtors shall keep the Consultation Parties reasonably informed of all interested parties that become Acceptable Bidders and the status of their due diligence.

### III.  Stalking Horse Bidders and Bid Protections.

Upon entry of the Bidding Procedures Order, the Debtors shall be authorized but not obligated, in an exercise of their business judgment, and in consultation with the Consultation Parties, to: (a) select one or more Acceptable Bidders to act as stalking horse bidders in connection with the Auction (each, a "Stalking Horse Bidder"); and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder (each such agreement, a "Stalking Horse APA") (i) provide a breakup fee (the "Breakup Fee") in an amount not to exceed three percent (3%) of the proposed Purchase Price, and/or (ii) agree to reimburse reasonable and documented out-of-pocket fees and expenses (the "Expense Reimbursement," and together with the Breakup Fee, the "Bid Protections").

In the event that the Debtors enter into a Stalking Horse APA with one or more Stalking Horse Bidders, within two business days of entry, the Debtors shall file a notice and proposed form of order with the Court (the "Stalking Horse Notice") and serve on the Stalking Horse Bidder and the Consultation Parties. The Stalking Horse Notice shall: (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the Stalking Horse Bid and what

3

portion (if any) is cash; (iii) state whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid; (iv specify any proposed Bid Protections; (v) attach the Stalking Horse APA, including all exhibits, schedules and attachments thereto; and (vi) sets forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections. If there are no objections to the Stalking Horse Notice within two business days of filing with the Court, (the "Notice Period"), the Debtors may submit an order to the Court that incorporates any comments received during the Notice Period that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse APA, without the need for further hearing. If a party files an objection to the Stalking Horse Notice, the Court shall hold a hearing on the first date that the Court is available that is no later than two business days after filing such applicable Stalking Horse Notice.

Upon entry of the order approving the designation of a Stalking Horse Bidder and Stalking Horse APA, the Debtors are authorized, but not directed, to incur and pay the Bid Protections to each Stalking Horse Bidder.

**IV.    Requirements for Qualified Bids.**

Any proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment and with the reasonable consent of the applicable Consultation Parties (a "Qualified Bid" and such bidder a "Qualified Bidder"):

1.    *Assets*.  The Bid must clearly identify the following: (a) the Assets, or the portion thereof, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

2.    *Purchase Price.*  The Bid must clearly set forth the purchase price to be paid.  If requested by the Debtors or the applicable Consultation Parties, a Potential Bidder shall allocate its purchase price among the Debtors' assets subject to the Bid.

3.    *Deposit*.  Each Bid must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

4.    *Same or Better Terms*.  Each Bid must be on terms no less favorable than the terms of the Stalking Horse APA, if any, as the Debtors may determine in their business judgment and in consultation with the Consultation Parties.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include a schedule of assumed Contracts to the extent applicable to the Bid, and a clearly marked version of the Stalking Horse APA, if any, or the Form APA, if there is no Stalking Horse APA, showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

4

5.      ***Committed Financing***.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors and the applicable Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all Contracts proposed to be assumed by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors and the applicable Consultation Parties.

6.      ***Identity***.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Acceptable Bidder, Stalking Horse Bidder, Consultation Party or Qualified Bidder, and/or any officer or director of the foregoing.  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

7.      ***Irrevocable***.  An Acceptable Bidder's Bid must be irrevocable until three months after the date of selection of the Successful Bid; *provided* that if the Bid is not selected as the Successful Bid or Backup Bid, the Bid may be revoked after consummation of the Successful Bid or Backup Bid.

8.      ***Backup Bidder.***  Each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder.

9.      ***As-Is, Where-Is.***  The Bid must include the following representations and warranties: (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its bid; (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed asset sale agreement ultimately accepted and executed by the Debtors.  The Bid shall not be conditional on any further due diligence.

5

10. ***Satisfaction of DIP Obligations***.  To the extent that any bid includes DIP Primary Collateral, an Acceptable Bidder's Bid must provide for (a) the payment in full of all DIP Obligations (as defined in the DIP Order),  and (b) either (i) the cancellation and return undrawn of all outstanding letters of credit under the DIP ABL Facility (as defined in the DIP Order) and/or (ii) the furnishing to the DIP ABL Agent of a cash deposit, or at the discretion of the DIP ABL Agent, a backup standby letter of credit satisfactory to the DIP ABL Agent in an amount equal to 105% of the face amount of all letters of credit or such other amount as is reasonably acceptable to the DIP ABL Agent.

11. ***Authorization***.  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors and the applicable Consultation Parties with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

12. ***Disclaimer of Fees***.  Each Bid (other than the Stalking Horse Bid, if any) must disclaim any right to receive a fee analogous to a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder, if any) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid each Qualified Bidder agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

13. ***Adherence to Bidding Procedures***.  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions and agrees to be bound by these Bidding Procedures.

14. ***No Collusion***.  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code  with respect to any Bids, the Auction, or the Sale.

15. ***Retention of Records***.  To the extent a Bid is a Bid for all or substantially all of the Debtors Assets, such Bid must include a statement that the Acceptable Bidder will retain or allow the Debtors access to the Debtors' books and records.

6

16.     ***Joint Bids.***  The Debtors may, in consultation with the applicable Consultation Parties, approve joint Bids on a case-by-case basis.

17.     ***Other Information***.  The Bid contains such other information as may be reasonably requested by the Debtors and the Consultation Parties.

## V.     Bid Deadline.

An Acceptable Bidder that desires to make a bid must transmit via email (in .pdf or similar format) or deliver written copies of its bid to the following parties so as to be received not later than **5:00 p.m. (prevailing Eastern Time) on May 30,  2023** (the "Bid Deadline"): (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C.**,** Christopher T. Greco, P.C.**,** and Rachael M. Bentley, email: Joshua.sussberg@kirkland.com**,**          christopher.greco@kirkland.com**,**          and Rachael.bentley@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Alexandra Schwarzman, P.C., email: alexandra.schwarzman@kirkland.com; (ii) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Felice R. Yudkin, Esq., and Rebecca W. Hollander, Esq., email: msirota@coleschotz.com, fyudkin@coleschotz.com, and rhollander@coleschotz.com; and (ii) the Debtors' proposed investment banker, Houlihan Lokey Capital, Inc., 245 Park Avenue, New York, New York 10167 Attn: Surbhi Gupta, email: sGupta@hl.com.  The Debtors will provide copies of all Bids via electronic mail within one (1) day of receipt by the Debtors to (i) the Consultation Parties, and (ii) the Office of the United States Trustee.

## VI.     Qualified Bidders.

Within two business days after the Bid Deadline, the Debtors, after having consulted with the Consultation Parties, shall notify each Acceptable Bidder whether such party is a Qualified Bidder.

If any Bid is determined by the Debtors and the Consultation Parties, not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five business days after the Bid Deadline.

The Debtors may accept as a single Qualified Bid, multiple bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid. The Debtors may permit otherwise Qualified Bidders who submitted bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of multiple bids as described in the preceding sentence, to participate in the Auction and to submit higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Assets, as part of such a single Qualified Bid for overbid purposes.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification regarding any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors and the applicable Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid,

7

except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (a) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Acceptable Bid prior to the Bid Deadline or (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualifying Bid prior to the conclusion of the Auction.  The Debtors reserve the right to cooperate with any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Qualified Bidder to consummate its contemplated transaction.  Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

Notwithstanding anything to the contrary herein, for all purposes under the Bidding Procedures, a Stalking Horse Bidder, to the extent appointed, is deemed to be a Qualified Bidder and any bid by a Staking Horse Bidder (a "Stalking Horse Bid") shall be deemed to be a Qualified Bid, such that the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid. The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.

## VII.    Right to Credit Bid.

Pursuant to the DIP Order,[3] (a) the DIP Secured Parties, and (b) subject to the rights preserved in paragraph 35 of the DIP Order, the Prepetition ABL Parties and Prepetition Term Loan Parties (or any such party's designee) may credit bid, consistent with the applicable DIP Documents and/or Prepetition Documents, some or all of their claims for their respective collateral (each a "Credit Bid") to the extent permitted by section 363(k) of the Bankruptcy Code, subject in each case to the rights, duties, and limitations, as applicable, of the parties under the Intercreditor Agreement and the Prepetition Documents, and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the Credit Bid, except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion; and such DIP Secured Parties, Prepetition ABL Parties, and Prepetition Term Loan Parties shall be deemed a Qualified Bidder with respect to their rights to acquire their respective collateral by Credit Bid.

---

[3] The DIP Order shall mean Interim and Final Orders (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related Relief.

8

## VIII.   The Auction.

If the Debtors receive (i) a Qualified Bid, other than a Stalking Horse Bid, or (ii) two or more Qualified Bids in the absence of a Stalking Horse Bid, the Debtors shall conduct the Auction to determine the Successful Bidder with respect to the Assets or portion of the Assets.  If the Debtors do not receive a Qualified Bid but have received one or more Stalking Horse Bids, the Debtors will not conduct the Auction and will designate any Stalking Horse's Qualified Bid as the Successful Bid.  If the Debtors receive only one Qualified Bid in the absence of a Stalking Horse Bid, the Debtors will not conduct the Auction and will designate the sole Qualified Bid as the Successful Bid.

No later than two days prior to the Auction, the Debtors, with the reasonable consent of the applicable Consultation Parties, will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment (the "Baseline Bid") and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes to the Stalking Horse APA or the Form APA, as applicable, requested by the Qualified Bidder, including the type and portion of the Assets sought and Assumed Obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close the proposed Sale Transaction(s), the conditions thereto, and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated by the Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place at **10:00 a.m. (prevailing Eastern Time) on June 1, 2023**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 4611, or such later date, time and location as designated by the Debtors, after providing notice to the Notice Parties and the Consultation Parties.  The Debtors shall have the right to conduct any number of Auctions on that date to accommodate multiple bids that comprise a single Qualified Bid, if the Debtors determine, in their reasonable business judgment, and the reasonable consent of Consultation Parties, that conducting such auctions would be in the best interests of the Debtors' estates.

### A.   Participants and Attendees.

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (defined below).

Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the

9

Debtors in accordance with these Bidding Procedures and in consultation with the Consultation Parties. Qualified Bidders participating in the Auction must appear in person at the Auction, or through a duly authorized representative. The Auction will be conducted openly and all creditors may be permitted to attend; *provided* that the Debtors may, in their sole and exclusive discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction. In addition, professionals and/or other representatives of the Consultation Parties and the Canadian information officer will be permitted to attend and observe the Auction. Any creditor wishing to attend the Auction may do so by contacting, no later than three (3) business days prior to the start of the Auction, the Debtors' advisors.

## B. Auction Procedures.

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment and in consultation with the Consultation Parties:

1. ***Baseline Bids.*** Bidding shall commence at the amount of the Qualified Bid or combination of Qualified Bids that the Debtors determine in their business judgment and in consultation with the Consultation Parties to be the highest and/or best Qualified Bid (the "Baseline Bid").

2. ***Minimum Overbid.*** Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the relevant Assets (each such bid, an "Overbid"). The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to initial or subsequent Overbids at any time during the Auction.

3. ***Highest or Best Offer.*** After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe, in their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best offer for the relevant Assets (the "Leading Bid"). Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

4. ***Rejection of Bids.*** The Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

5. ***Additional Information***. The Debtors and the Consultation Parties, shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties, to make a reasonable determination as to a Qualified

Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors, in consultation with the Consultation Parties, believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

6. ***Modification of Procedures.*** Any modification of these Bidding Procedures which extends the timelines included herein hall be subject to the consent of the DIP Agents (as defined in the DIP Order), whose consent shall not be unreasonably withheld.

The Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; *provided* that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors, in consultation with the Consultation Parties, accept a higher or otherwise better Qualified Bid as the Leading Bid. The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, negotiate with any and all Qualified Bidders participating in the Auction.

## C.    Adjournment of the Auction.

The Debtors reserve the right, in their reasonable business judgment and with the reasonable consent of the Consultation Parties, to adjourn the Auction one or more times to, among other things (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment and with the reasonable consent of the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount.

## D.    Successful Bidder.

Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid constitutes the highest or otherwise best bid(s) for the applicable Assets (each such bid, a "Successful Bid"); and (ii) notify all Qualified Bidders at the Auction for the applicable Assets of the identity of the bidder that submitted the Successful Bid (each such bidder, the "Successful Bidder") and the amount of the purchase price and other material terms of the Successful Bid.

The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) by 5:00 p.m. (prevailing Eastern Time) on the date that is one day following the date the Auction is closed.

## IX.    Backup Bidder.

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at

the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment and in consultation with the Consultation Parties (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the applicable Consultation Parties, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

## X.    **Acceptance of Successful Bid**

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (defined below).  The Debtors shall seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

## XI.    **Free and Clear of Any and All Encumbrances**

Except as otherwise provided for in a Stalking Horse APA, the Form APA, or another Successful Bidder's purchase agreement, all right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all liens, claims, rights, interests, charges, and encumbrances (collectively, the "Encumbrances"), subject only to the Assumed Liabilities (as defined in a Stalking Horse APA, the Form APA, or  another Successful Bidder's purchase agreement), if any, in accordance with Bankruptcy Code section 363(f), with such Encumbrances to attach to the net proceeds (if any) received by the Debtors from the Sale of the Assets in accordance with the Bankruptcy Code, applicable non-bankruptcy law, and any prior orders of the Court.

## XII.    **Consultation Parties**

The term "Consultation Parties" as used in these Bidding Procedures shall mean (i) (a) Bank of America N.A. in its capacity as the ABL Agent and DIP Agent, (b) 1903P Loan Agent, LLC and (c) CPPIB Credit Investments III Inc. and its affiliates and managed accounts, in their capacity as lenders under the Senior Superpriority Term Loan Credit Agreement (the "Prepetition Lenders") and (ii) any official committee appointed in these chapter 11 cases; provided, however, notwithstanding anything herein to the contrary, the Debtors shall only be required to reasonably consult with any official committee appointed in these chapter 11 cases and any such committee shall not have any consent rights with respect to these Bidding Procedures.  The Debtors shall regularly and timely consult and confer with the Consultation Parties in respect of all aspects of the bidding and Auction process in order to maximize value for all parties in interest.  The Debtors

65783/0001-44892354

may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; *provided*, however, that the Debtors may, limit the consultation rights of a Consultation Party that is or becomes a Qualified Bidder. In the event that a Consultation Party submits a Bid, such party shall no longer be a Consultation Party until such time as such party withdraws such Bid.

## XIII.  Notice Parties.

The term "Notice Parties" as used in these Bidding Procedures shall mean (i) counsel to the Prepetition Lenders, (iii) the Office of the U.S. Trustee for the District of New Jersey, and (iv) counsel to any official committee appointed in these chapter 11 cases.

## XIV.  Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment and with the reasonable consent of the applicable Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids. All rights of the Consultation Parties with respect to the proposed Sale Transaction are fully reserved.

## XV.  Consent to Jurisdiction.

All Potential Bidders, Acceptable Bidders and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XVI.  Sale Hearing.

A hearing to consider approval of the sale of the Debtors' Assets to the Successful Bidder (the "Sale Hearing") is currently scheduled to take place on June 5, 2023, at 10:00 a.m., (prevailing Eastern Time), before the assigned United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608.

**The Sale Hearing may be continued to a later date by the Debtors (after consultation with the Consultation Parties) by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Successful Bidder and the Backup Bidder must acknowledge on the record at the start of the hearing that, in connection with submitting their Bids, they did not engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with

13

respect to any Bids, the Auction, or the Sale, specifying that they did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control the price or any other terms of the Sale.

## XVII.  **Return of Deposit.**

The Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors, with the reasonable consent of the Consultation Parties, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.  The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to close and the Debtors, in consultation with the Consultation Parties, opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction(s) at closing.  In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XVIII. **DIP Order.**

Notwithstanding anything to the contrary contained in these Bidding Procedures, any right of the DIP Agents to consent to the Sale of any portion of their collateral on terms and conditions acceptable to the DIP Agents (as applicable) are hereby expressly preserved and not modified, waived or impaired in any way by these Bidding Procedures or the Bidding Procedures Order.  For the avoidance of doubt, nothing in these Bidding Procedures or the Bidding Procedures Order shall amend, modify or impair any provision of the DIP Order, or the rights of the Debtors or the DIP Agents.

65783/0001-44892354

**<u>EXHIBIT 2</u>**

**Form APA**

**FORM APA**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF [●], 2023**

**BY AND AMONG**

**[●], AS PURCHASER,**

**AND**

**DBI INVESTORS, INC.**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

---

*This is a draft agreement only, and delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever with respect to the proposed transaction unless and until the definitive agreement providing for such transaction has been executed and delivered by all parties thereto.*

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### PURCHASE AND SALE OF THE ACQUIRED ASSETS;
### ASSUMPTION OF ASSUMED LIABILITIES
1.1  Purchase and Sale of the Acquired Assets ........................................................1
1.2  Excluded Assets ................................................................................................3
1.3  Assumption of Certain Liabilities ....................................................................5
1.4  Excluded Liabilities ..........................................................................................7
1.5  Assumption/Rejection of Certain Contracts .....................................................7

## ARTICLE II
### CONSIDERATION; PAYMENT; CLOSING
2.1  Consideration; Payment ....................................................................................9
2.2  Deposit ..............................................................................................................9
2.3  Closing .............................................................................................................10
2.4  Closing Deliveries by Sellers .........................................................................10
2.5  Closing Deliveries by Purchaser .....................................................................10
2.6  Withholding .....................................................................................................11

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLERS
3.1  Organization and Qualification .......................................................................11
3.2  Authorization of Agreement ...........................................................................11
3.3  Conflicts; Consents .........................................................................................11
3.4  Financial Statements .......................................................................................12
3.5  Equity Interests of Non-Debtor Subsidiaries .................................................12
3.6  Title to Properties ...........................................................................................13
3.7  Contracts .........................................................................................................13
3.8  No Litigation ...................................................................................................15
3.9  Permits; Compliance with Laws .....................................................................15
3.10 Environmental Matters ....................................................................................15
3.11 Intellectual Property ........................................................................................15
3.12 Tax Matters .....................................................................................................16
3.13 Assumed Benefit Plans ...................................................................................17
3.14 Employees .......................................................................................................18
3.15 Affiliate Transactions .....................................................................................18
3.16 Suppliers ..........................................................................................................18
3.17 Brokers ............................................................................................................18
3.18 No Other Representations or Warranties .........................................................18

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF PURCHASER
4.1  Organization and Qualification .......................................................................19
4.2  Authorization of Agreement ...........................................................................19
4.3  Conflicts; Consents .........................................................................................20
4.4  Financing..........................................................................................................20

i

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.5 | Brokers | 21 |
| 4.6 | No Litigation | 21 |
| 4.7 | Investment Representation; Investigation | 21 |
| 4.8 | Certain Arrangements | 21 |
| 4.9 | No Foreign Person | 21 |
| 4.10 | Solvency | 22 |
| 4.11 | No Additional Representations or Warranties | 22 |

## ARTICLE V
## BANKRUPTCY COURT MATTERS

| | | |
|---|---|---|
| 5.1 | Bankruptcy Actions | 22 |
| 5.2 | Cure Costs | 24 |
| 5.3 | Sale Order | 24 |
| 5.4 | Approval | 24 |

## ARTICLE VI
## COVENANTS AND AGREEMENTS

| | | |
|---|---|---|
| 6.1 | Conduct of Business of Sellers | 24 |
| 6.2 | Access to Information | 27 |
| 6.3 | Employee Matters | 29 |
| 6.4 | Regulatory Approvals | 31 |
| 6.5 | Antitrust Notification | 31 |
| 6.6 | Reasonable Efforts; Cooperation | 33 |
| 6.7 | Further Assurances | 34 |
| 6.8 | Insurance Matters | 34 |
| 6.9 | Receipt of Misdirected Assets | 34 |
| 6.10 | Acknowledgment by Purchaser | 34 |
| 6.11 | [Guaranty | 36 |
| 6.12 | Directors' and Officers' Indemnification | 37 |

## ARTICLE VII
## CONDITIONS TO CLOSING

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 38 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 38 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 39 |
| 7.4 | Waiver of Conditions | 39 |

## ARTICLE VIII
## TERMINATION

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 39 |
| 8.2 | Effect of Termination | 41 |

## ARTICLE IX
## TAXES

| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 41 |

# TABLE OF CONTENTS

**Page**

9.2    Cooperation ........................................................................................41

9.3    Preparation of Tax Returns and Payment of Taxes ...........................41

## ARTICLE X MISCELLANEOUS

10.1   Non-Survival of Representations and Warranties and Certain Covenants; Certain
Waivers ...............................................................................................42

10.2   Expenses ...........................................................................................43

10.3   Notices ..............................................................................................43

10.4   Binding Effect; Assignment...............................................................44

10.5   Amendment and Waiver .....................................................................44

10.6   Third Party Beneficiaries ...................................................................44

10.7   Non-Recourse ....................................................................................45

10.8   Severability .......................................................................................45

10.9   Construction ......................................................................................45

10.10   Schedules ..........................................................................................45

10.11   Complete Agreement .........................................................................46

10.12   Specific Performance .........................................................................46

10.13   Jurisdiction and Exclusive Venue .....................................................47

10.14   Governing Law; Waiver of Jury Trial ...............................................47

10.15   No Right of Set-Off ...........................................................................48

10.16   Counterparts and PDF .......................................................................48

10.17   Publicity ............................................................................................48

10.18   Bulk Sales Laws................................................................................49

10.19   Fiduciary Obligations........................................................................49

10.20   Time of Essence ................................................................................49

10.21   Sellers' Representative .......................................................................49

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   Certain Definitions.............................................................................49

11.2   Index of Defined Terms ......................................................................56

11.3   Rules of Interpretation ........................................................................57

## INDEX OF EXHIBITS

EXHIBIT A      FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B      FORM OF TRADEMARK ASSIGNMENT AGREEMENT

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of [●], 2023, is made by and among [●], a [●] ("Purchaser"),[1] [●], a [●] ("Guarantor"), and DBI Investors, Inc., a Delaware corporation ("DBI") and the Subsidiaries of DBI that are indicated on the signature pages attached hereto (together with DBI, each a "Seller" and collectively "Sellers"). Purchaser, Sellers and Guarantor are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on [April 17], 2023 Sellers, together with other of Sellers' Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of title **Error! Bookmark not defined.** of the United States Code, **Error! Bookmark not defined.** U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. [___] (collectively, the "Bankruptcy Cases"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
### ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and

---

[1]     **Note to Draft**: In the event that Purchaser is a newly formed or undercapitalized entity, Purchaser will be required to provide a guarantee of its obligations under this Agreement from a creditworthy Affiliate; see Section 6.11. In addition, if Purchaser presents enforceability concerns or regulatory risk (including, *e.g.*, regarding ability to deliver cash to the U.S.), this Agreement will include further provisions mitigating, or compensating Seller for, such Purchaser risks.

interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)     subject to Section 1.5, all Contracts to which any Seller is a party, including the Contracts listed on Schedule 1.1(a), and all purchase orders, to the extent assignable under applicable Law (the "Assigned Contracts");

(b)     all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

(c)     to the extent transferable in compliance with applicable Law, all Documents;

(d)     the Owned Real Property listed on Schedule 1.1(d) (the "Acquired Owned Real Property");

(e)     the Leased Real Property listed on Schedule 1.1(e) (the "Acquired Leased Real Property"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(f)     all shares of capital stock or other equity interests that any Seller owns in the Non-Debtor Subsidiaries and the JVs, including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests, investments or contributions in the Non-Debtor Subsidiaries and the JVs;

(g)     all tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property or Acquired Owned Real Property and any tangible assets on order to be delivered to any Seller;

(h)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(i)     to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(j)     the sponsorship of, and all rights, interests and assets associated with, the Seller Plans (collectively, the "Assumed Benefit Plans");

2

(k)      all Intellectual Property of Sellers, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(l)      all goodwill, payment intangibles and general intangible assets and rights of Sellers; and

(m)      all Inventory of Sellers.

EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN ARTICLE III, (I) THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE SELLERS MAKE NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES AND (III) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLER MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE ACQUIRED ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

1.2      Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):

(a)      all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)      all Contracts of Sellers listed on Schedule 1.2(b) (the "Excluded Contracts");[2]

(c)      all documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the other Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates, stock registers and such other books and records of

---

[2]    **Note to Draft**: to include leases and contracts at GOB stores.

any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, (iii) that any Seller is required by Law to retain or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; *provided* that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)      all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the transactions contemplated hereby or thereby, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, including any privileged materials, documents and records that are in the possession of any Non-Debtor Subsidiary, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(e)      all current and prior insurance policies of any Seller that are not Assumed Benefit Plans, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)      all stock, membership interests or other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests, in each case, other than such interests in any Non-Debtor Subsidiaries;

(g)      (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)      Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)      all Tax refunds and Tax attributes that are not transferred by the operation of applicable Tax Law;

(j)        all real estate and all interests in real estate other than the Acquired Owned Real Property and the Acquired Leased Real Property, including any Leasehold Improvements thereon;

(k)        all tangible assets located at, or on order to be delivered to, any Excluded Store;

(l)        every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(m)        all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date;

(n)        all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries;

(o)        Privileged Materials; and

(p)        the properties, rights, interests and assets set forth on Schedule 1.2(p).[3]

1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)        all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(b)        all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

---

[3]    **Note to Draft**: This is a placeholder; currently expected to be none.

(c)      all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(d)      all current Liabilities, including all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable), of Sellers, other than any such Liabilities of any Excluded Store;

(e)      all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)      all Liabilities owing to any Non-Debtor Subsidiary or any JV;

(g)      without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period; and (iii) all Taxes or other Liabilities with respect to the Acquired Assets with respect to which "responsible person" or similar claims may be made against any of any Seller's or any Affiliate of any Seller's employees, managers, officers, directors or similar persons, including pursuant to any wage payment statute ("Responsible Person Liabilities"); *provided* that such Responsible Person Liabilities shall constitute Assumed Liabilities solely to the extent Sellers are unable to discharge such Responsible Person Liabilities due to the operation of the Bankruptcy Code or a lack of available funds; *provided further* that (A) Sellers shall take all commercially reasonable steps to discharge Responsible Person Liabilities in a way that avoids such Taxes becoming Assumed Liabilities and (B) Sellers shall promptly notify Purchaser if they become aware of a material possibility that any Responsible Person Liabilities will become Assumed Liabilities;

(h)      the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Assumed Benefit Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;

(i)      all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement;

(j)      all Liabilities owed to vendors and customers that are providing goods or services to, or purchasing products or services from, the DBI or are reasonably expected to, after the Closing, provide goods or services to, or purchase products or services from, the DBI, other than any such Liabilities of any Excluded Store;

(k)      all Liabilities arising under section 503(b)(9) of the Bankruptcy Code; and

(l)      all Liabilities set forth on Schedule <u>1.3(l)</u>.[4]

1.4    <u>Excluded Liabilities</u>. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "<u>Excluded Liabilities</u>"). Purchaser hereby acknowledges and agrees that no Liability of any Non-Debtor Subsidiary shall be an Excluded Liability and that all Liabilities of any Non-Debtor Subsidiary as of the Closing shall continue to be the Liabilities of such Non-Debtor Subsidiary following the Closing.

1.5    <u>Assumption/Rejection of Certain Contracts</u>.

(a)    <u>Assumption and Assignment of Executory Contracts</u>. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)    <u>Excluding or Adding Assigned Contracts Prior to Closing</u>. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than purchase orders) that it does not wish to assume or a Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract up to one Business Day prior to the Bid Deadline (as defined in and established pursuant to the Bidding Procedures Order with respect to the sale of the Acquired Assets), and (i) any such previously considered Assigned Contract that Purchaser no longer wishes

---

[4]    **Note to Draft**: This is a placeholder; currently expected to be none.

to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(c)    <u>Non-Assignment</u>.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases, if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after

8

the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, (a) the provisions of this <u>Section 1.5(c)</u> shall not apply to any consent or approval required under the HSR Act and any Foreign Competition Laws, which consent or approval shall be governed by <u>Section 6.4</u> and (b) Seller will not be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1     <u>Consideration; Payment</u>.

(a)     The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $[●] (the "<u>Cash Payment</u>").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers the Cash Payment <u>less</u> the Deposit (the "<u>Closing Date Payment</u>"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2     <u>Deposit</u>.

(a)     Purchaser has, on or prior to the date hereof, made an earnest money deposit with [_____] (the "<u>Escrow Agent</u>") in the amount equal to 10% of the Cash Payment (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the Bidding Procedures Order. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)     If this Agreement has been terminated by Sellers pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u> (or by Purchaser pursuant to <u>Section 8.1(b)</u>, <u>8.1(c)</u> or <u>8.1(d)</u>, in each case in circumstances where Sellers would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u>), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)     If this Agreement has been terminated by any Party, other than as contemplated by <u>Section 2.2(b)</u>, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.

(d)     The Parties agree that Sellers' right to retain the Deposit, as set forth in <u>Section 2.2(b)</u>, is not a penalty, but rather is liquidated damages in a reasonable amount that will

9

compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to Sellers.

2.3    <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents and signatures (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the date that is the second (2nd) Business Day following, subject to the satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>."  For financial, accounting and economic purposes, including risk of loss, and for all other purposes under this Agreement, upon the occurrence of the Closing, the Closing shall be deemed to have occurred at 12:01 a.m., New York City time, on the Closing Date.

2.4    <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of <u>Exhibit A</u> (the "<u>Assignment and Assumption Agreement</u>") duly executed by the applicable Sellers;

(b)    instruments of transfer of the equity interests of the Non-Debtor Subsidiaries and the JVs, in customary form (which shall not expand the representations and warranties, or rights or remedies, of Purchaser hereunder), duly executed by the applicable Sellers;

(c)    a short-form trademark assignment agreement substantially in the form of <u>Exhibit B</u>, duly executed by the applicable Sellers;

(d)    an IRS Form W-9 [or applicable IRS Form W-8] executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of DBI certifying that the conditions set forth in <u>Sections 7.2(a)</u> and <u>7.2(b)</u> have been satisfied.

2.5    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)    the Closing Date Payment;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser; and

(c)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6     Withholding. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under Section 2.4(d).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (ii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to Section 10.10, Sellers jointly and severally represent and warrant to Purchaser as follows:

3.1     Organization and Qualification. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation.

3.2     Authorization of Agreement. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3     Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), and (c) the requirements of the HSR Act and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Body ("Foreign Competition Laws") are complied with, neither the execution and

delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the transactions contemplated hereby or thereby, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Seller, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    <u>Financial Statements</u>. Attached to <u>Schedule 3.4</u> are Sellers' audited consolidated balance sheets as of December 31, 2022 and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for the fiscal year then ended (collectively, the "<u>Audited Financial Statements</u>") and unaudited consolidated balance sheets as of February 28, 2023 and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for the portion of the fiscal year then ended (the "<u>Unaudited Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>"). The Financial Statements have been prepared in all material respects in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of Unaudited Financial Statements, subject to (a) normal year-end audit adjustments, (b) the absence of notes and (c) any other adjustments described therein, including in any notes thereto) and fairly present in all material respects the consolidated financial position of the Sellers and their respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

3.5    <u>Equity Interests of Non-Debtor Subsidiaries</u>.

(a)    The authorized and outstanding capital stock or other equity interests of each of the Subsidiaries of DBI, other than Sellers (such Subsidiaries, the "<u>Non-Debtor Subsidiaries</u>"), are as set forth on <u>Schedule 3.5(a)</u>. All of the outstanding capital stock or other equity interests of the Non-Debtor Subsidiaries have been duly authorized, validly issued, fully paid and are non-assessable (where such concepts are legally recognized in the jurisdictions of organization of such Non-Debtor Subsidiaries). Except as set forth on <u>Schedule 3.5(a)</u>, there are no outstanding options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, sale or repurchase of any capital stock or other equity interests issued by the Non-Debtor Subsidiaries containing any equity features, or Contracts, commitments, understandings, arrangements or other obligations by which any of the Non-Debtor Subsidiaries is bound to issue, deliver or sell, or cause to be issued, delivered or sold, additional capital stock or other equity interests, or options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to any capital stock or other equity interests of the Non-Debtor Subsidiaries, or that

otherwise give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of capital stock or other equity securities of any Non-Debtor Subsidiary (including any rights to receive any payment in respect, or based on the price or value, thereof). No Subsidiary of DBI is a party to any shareholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any such securities or any other agreement relating to the disposition, voting or dividends with respect to any such securities. Except as set forth on <u>Schedule 3.5(a)</u>, One or more of the other Sellers own all of the outstanding capital stock or other equity interests of the Non-Debtor Subsidiaries, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Except as set forth on <u>Schedule 3.5(b)</u>, there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which DBI or any of DBI's Subsidiaries own as of the date of this Agreement, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

3.6     <u>Title to Properties</u>.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, one or more of the Sellers has good and valid title to the real estate owned by the Sellers (the "<u>Owned Real Property</u>") free and clear of all Encumbrances, including any leases, subleases, licenses, concessions or other agreements by or pursuant to which the Sellers grants to any party or parties the right of use or occupancy of any portion of the Owned Real Property (other than Permitted Encumbrances). <u>Schedule 3.6(a)</u> sets forth the address and owner of all such Owned Real Property. Except as set forth on <u>Schedule 3.6(a)</u>, the Sellers and their Subsidiaries do not own any real property.

(b)     Except as set forth on <u>Schedule 3.6(b)</u>: there are no outstanding options, repurchase rights or rights of first refusal to purchase or lease any Owned Real Property, or any portion thereof or interest therein, to which any Seller or their Subsidiaries are a party.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, one or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances).

(d)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Sellers hold good title to, or a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Sellers and the Acquired Assets, taken as a whole.

3.7     <u>Contracts</u>.

(a)    Schedule 3.7 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $5,000,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, properties or other assets in the Ordinary Course, or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Sellers);

(iv)    is a Contract (other than purchase orders) (A) with any Material Supplier or (B) for the purchase of materials, supplies, goods, services, Equipment or other assets pursuant to which DBI or any of its Subsidiaries would reasonably be expected to make payments of more than $1,000,000 during any fiscal year (other than a Contract with any Material Supplier);

(v)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property that is material to Sellers, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) and (B), other than (1) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (2) Contracts entered into in the Ordinary Course granting exclusive rights to certain of Sellers, services or containing "most favored nation" provisions with respect to certain of Seller's, products or (C) any provision in any license agreements for Intellectual Property limiting Seller's, use of such Intellectual Property to specified fields of use or specified territories.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases and (ii) with respect to any Contract that has previously

14

expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.8    No Litigation. Except as set forth on Schedule 3.8, there are no Actions pending or, to Sellers' knowledge, threatened against or affecting any of the Sellers that will adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

3.9    Permits; Compliance with Laws. Except as set forth on Schedule 3.9, each Seller is, and has been since January 1, 2023, in compliance in all material respects with all state or federal Laws or Orders, applicable to such Seller, and each Seller holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of its respective business, except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (collectively, "Permits"). Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2023, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws, (b) since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Sellers possesses and are in compliance with all Permits required under Environmental Laws for the operation of their businesses as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, and (f) no Seller has released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Sellers to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers own all of the rights, title and interest in and to the Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property is subsisting, valid and enforceable.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Sellers as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; *provided* that nothing in this Section 3.11(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(d).

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(d)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2022, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to Sellers and (ii) the operation of the business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(e)     The consummation of the transactions contemplated hereby will not result in the grant of any right or license to any third party of any Intellectual Property that is owned by or exclusively licensed to any Seller and is material to any such Seller.

3.12   Tax Matters.

(a)     Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed prior to the Closing Date by it with respect to the Acquired Assets.

(b)     All material Taxes owed by a Seller with respect to the Acquired Assets that are due prior to the Closing Date and shown on a filed Tax Return have been timely paid or have been adequately reserved against in accordance with GAAP, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code.

(c)     There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

16

(d)    None of the Sellers has, within the past five years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is DBI or one of its Subsidiaries) or has any material Liability for the Taxes of any Person (other than a Seller) under U.S. Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(e)    None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), in each case, which could have effect after the Closing Date.

(f)    None of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(g)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.12</u> and <u>Section 3.13</u> (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    <u>Assumed Benefit Plans</u>.

(a)    Each Assumed Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to Purchaser.

(b)    None of the Sellers maintains, contributes to, or has any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(c)    No Assumed Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(d)    The consummation of the transactions contemplated hereby will not (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any

17

Assumed Benefit Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by Purchaser or any of its Affiliates.

3.14    Employees. None of the Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of a Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) no demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union and (b) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the employees of any Seller. Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.15    Affiliate Transactions. Except as set forth on Schedule 3.15, to the Knowledge of Sellers, no Affiliate of any Seller, or any officer or director of any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $2,000,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.16    Suppliers. Schedule 3.16 sets forth a true, complete and correct list of the five (5) largest suppliers from which DBI and its Subsidiaries purchased materials, supplies, services or other goods (measured by dollar volume of purchases from such suppliers) for the period ended December 31, 2022 (such suppliers collectively referred to as "Material Suppliers"),.

3.17    Brokers. Except for HL, the fees and expenses of which will be paid by Sellers, to the Knowledge of Sellers no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

3.18    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, any JVs, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person

18

(including in any presentations or other materials prepared by HL) (the "Information Presentation") or in that certain datasite administered by Finsight (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the transactions contemplated by this Agreement or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1    Organization and Qualification. Purchaser is a [●] duly formed, validly existing and in good standing under the laws of the State of [●] and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2    Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party, and the consummation by Purchaser of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which it is a party have been, or will be, duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute legal, valid and binding

obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except that such enforceability may be limited by the Enforceability Exceptions.

    4.3    Conflicts; Consents.

    (a)    Assuming that (i) requisite Bankruptcy Court approvals are obtained, (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(a)[5] are made, given or obtained (as applicable), and (iii) the requirements of the HSR Act and Foreign Competition Laws are complied with, neither the execution and delivery by Purchaser of this Agreement or the other Transaction Agreements to which it is a party, nor the consummation by Purchaser of the transactions contemplated hereby or thereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof or thereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser or its assets, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or by which it or its assets are bound or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

    (b)    Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit, registration with or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the Transaction Agreements to which it is a party or the consummation by Purchaser of the transactions contemplated hereby or thereby, except (i) any filings required to be made under the HSR Act, or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby or thereby.

    4.4    Financing. Purchaser has, and at all times from the date hereof through the Closing will have, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement and the other Transaction Agreements, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement and the Transaction Agreements. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities. Purchaser acknowledges that its obligations under

---

[5] **Note to Draft**: Purchaser to schedule any Foreign Competition Law requirements to which Purchaser is subject in connection with the transaction.

this Agreement are not subject to any conditions regarding its ability to obtain financing for any portion or all of the Purchase Price.

4.5    Brokers. Except for Houlihan Lokey, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6    No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by the other Transaction Agreements or that would, individually or in the aggregate, reasonably be expected to delay the Closing or that would otherwise adversely affect Purchaser's performance of its obligations or covenants under this Agreement or the other Transaction Agreements to which it is a party or the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements to which it is a party.

4.7    Investment Representation; Investigation. Purchaser is acquiring the capital stock or other equity interests of the Non-Debtor Subsidiaries (other than Excluded Stores) and the JVs for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which Sellers, their Subsidiaries and the JVs operate and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and the other Transaction Agreements and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded full access to the books and records, facilities and personnel of each Seller and their Subsidiaries for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of Sellers, their Subsidiaries and the JVs and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8    Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of managers (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets, the assumption of the Assumed Liabilities or the transactions contemplated by this Agreement or the Transaction Agreements or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9    No Foreign Person. As of Closing, Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

4.10   Solvency. Purchaser is, and immediately after giving effect to the transactions contemplated by this Agreement and the other Transaction Agreements shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement or the other Transaction Agreements with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the transactions contemplated hereby, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured. There are no bankruptcy, reorganization or arrangement Actions pending, being contemplated by or, to the Knowledge of Purchaser, threatened against Purchaser.

4.11   No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1   Bankruptcy Actions.

(a)     As promptly as practicable after the date hereof, Sellers shall file with the Bankruptcy Court a motion seeking approval of the Sale Order; *provided* that Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications being acceptable to Purchaser in its commercially reasonable discretion.

(b)     The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(c)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(d)     Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this

Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement or the other Transaction Agreements and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court with respect to the transactions contemplated by this Agreement or the other Transaction Agreements.

(f)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the later of (i) 60 days following the hearing to consider the Sale Order and (ii) such other date as this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(g)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers and the other Debtors, as applicable, must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(i)     Nothing in this Section 5.1 shall prevent Sellers from modifying the Bidding Procedures Order as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

5.2     Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3     Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and the assumption of the Assumed Liabilities on the terms set forth herein, and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4     Approval. Sellers' obligations under this Agreement and the other Transaction Agreements and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including the Sale Order). Nothing in this Agreement or any of the other Transaction Agreements shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Sellers.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) as required, limited, authorized or prohibited by the Bankruptcy Court, the Bankruptcy Case or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the

case may be, (iii) as expressly contemplated, required or permitted by this Agreement or the other Transaction Agreements, (iv) to the extent related to any Excluded Store, any Excluded Asset or any Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their commercially reasonable efforts to carry on their business in the Ordinary Course except as would not reasonably be expected to be material to Sellers; *provided* that no action by any Seller with respect to matters specifically addressed by <u>Section 6.1(b)</u> shall be deemed to be a breach of this <u>Section 6.1(a)</u> unless such action would constitute a breach of <u>Section 6.1(b)</u>.

(b)      Except (i) as required by applicable Law, Order or a Governmental Body, (ii) as required, limited, authorized or prohibited by the Bankruptcy Court, the Bankruptcy Case or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement or the other Transaction Agreements, (iv) to the extent related to any Excluded Store, any Excluded Asset or any Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not:

(i)      (A) other than transactions among Sellers and their Subsidiaries or among Sellers' Subsidiaries, issue, sell, encumber or grant any shares of the capital stock or other equity or voting interests of the Non-Debtor Subsidiaries, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights, warrants or options to purchase any shares of such capital stock or other equity or voting interests; (B) other than transactions among Sellers and their Subsidiaries or among Sellers' Subsidiaries, redeem, purchase or otherwise acquire any of the outstanding shares of capital stock or other equity or voting interests of the Non-Debtor Subsidiaries, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, (C) establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of the capital stock or other equity or voting interests of the Non-Debtor Subsidiaries, other than dividends and distributions by a Non-Debtor Subsidiary to another Non-Debtor Subsidiary, or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests of the Non-Debtor Subsidiaries;

(ii)      (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "<u>Indebtedness</u>"), except for Indebtedness incurred pursuant to an existing facility, (B) enter into any swap or hedging transaction or other derivative agreements other than in the Ordinary Course or (C) make any loans, capital contributions or advances to, or

25

investments in, any Person other than (1) as permitted pursuant to Section 6.1(b)(v) or (2) in the Ordinary Course;

(iii)    sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets for consideration, individually or in the aggregate, in excess of $5,000,000, except (A) Ordinary Course dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Sellers, (B) transfers among the Sellers, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales of Inventory, fixtures and leases in the Ordinary Course;

(iv)    make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (B) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (B) not to exceed $10,000,000 in the aggregate;

(v)    except as permitted under Section 6.1(b)(iv), and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger), except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to exclude any acquisition of capital stock or of a material portion of the assets of any other Person);

(vi)    except (A) in the Ordinary Course or (B) pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $300,000 per annum (other than filling any vacancies), (5) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (6) take any action to accelerate any rights or benefits under any Assumed Benefit Plan; *provided* that the foregoing shall not restrict any Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(vii)    make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers, except insofar as may be required (A) by GAAP (or

26

any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(viii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i);

(ix)    settle any pending or threatened Action against any Seller that would result in an Assumed Liability in an amount in excess of $1,000,000; or

(x)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's Subsidiary's or JV's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by any Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 and (ii) any action taken, or omitted to be taken, by a Seller to protect the business of such Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its sole and reasonable discretion (any action or inaction described in clauses (i) or (ii) of this Section 6.1(c), a "COVID-19 Response"), shall in no event be deemed to constitute a breach of this Section 6.1.

6.2    Access to Information.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Sellers (in their discretion) will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is in Sellers' possession or control and reasonably necessary in order to consummate the transactions contemplated by this Agreement; *provided* that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to HL or such other Person(s) as HL may designate in writing from time to time and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the transactions contemplated by

this Agreement are not consummated, (B) would require any Seller to disclose any financial or proprietary information of or regarding the Affiliates of any Seller (other than any Subsidiary) or otherwise disclose information regarding the Affiliates of any Seller (other than any Subsidiary) that such Seller deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws (including the HSR Act and Foreign Competition Laws) or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty. Notwithstanding anything to the contrary contained herein, no COVID-19 Response by any Seller shall be deemed to violate or breach this Section 6.2 in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the transactions contemplated hereby and by the other Transaction Agreements and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers (including, for clarity, any trust established under a Chapter 11 plan of any Seller or any other successors of any Seller) and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records) and such cooperation and assistance as shall be reasonably required to enable Sellers to complete their legal, regulatory, stock exchange and financial reporting requirements, as applicable, to complete it Tax Returns or for other reasonable business purposes, including the continued administration of the Bankruptcy Cases and remaining asset and liabilities and the investigation, prosecution and defense of all claims, causes of action, lawsuits or demands to which the bankruptcy estates of Sellers may have. Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down (if applicable) and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

28

(d)      Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the transactions contemplated by this Agreement or the other Transaction Agreements without the prior written consent of Seller for each such contact.

6.3      Employee Matters.

(a)      At least 15 Business Days prior to Closing, Purchaser shall extend to each employee of Sellers (other than employees at Excluded Stores) a written offer of employment reviewed by Sellers, and which Sellers have had an opportunity to comment on, providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") and that, if accepted, shall become effective immediately after the Closing. Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees." Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates.

(b)      For a period of one year from and after the Closing Date, Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is no lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) cash bonus opportunities that are no less favorable than those provided to such Transferred Employee as of immediately prior to the Closing; and (iii) other employee benefits (including severance benefits) that are no less favorable than those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)      Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan

29

year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due the following: (i) all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date; (ii) all cash retention and cash long term incentive plans and similar obligations and Liabilities; and (iii) all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case of this clause (iii), accruing, incurred or arising as a result of employment or separation from employment with Purchaser on or after the Closing Date with respect to Transferred Employees.

(e)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)     Effective as of the Closing, Purchaser and Purchaser's Affiliates shall assume all obligations, Liabilities and commitments in respect of claims made by any Transferred Employee (or any other individual claiming that he or she is or should be a Transferred Employee) for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of Contract) arising out of, relating to or in connection with any failure to offer employment to, or to continue the employment of, any such Transferred Employee (or other individual claiming that he or she is or should be a Transferred Employee) on terms and conditions that would preclude any claims of actual or constructive dismissal or similar claims under any Law or other failure to comply with the terms of this Agreement.

(g)     Purchaser will, or will cause its Affiliates to, provide any required notice under the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") and to otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Sellers or Transferred Employees (including as a result of the consummation of transactions contemplated by this Agreement) and occurring on and after the Closing. Purchaser will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any employees by Sellers or their Affiliates occurring prior to or at

30

the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event under the WARN Act, or to create any Liability or penalty to Sellers or any of their Affiliates for any employment terminations under Law.

(h)      Purchaser shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

(i)      For any Transferred Employees who are principally based outside the United States, the provisions of this <u>Section 6.3</u> shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

6.4      <u>Regulatory Approvals</u>.

(a)      Subject to <u>Section 6.5</u>, Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to <u>Section 6.4(b)</u>, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(a)</u> or <u>Section 6.4(b)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)      Subject to <u>Section 6.5</u>, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, if any, (ii) cooperate with Sellers in exchanging such information and providing such assistance as Sellers may reasonably request in connection with any filings made by a Seller pursuant to <u>Section 6.4(a)</u>, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.5      <u>Antitrust Notification</u>.

(a)      Sellers and Purchaser will, as promptly as practicable and no later than 10 Business Days following the date hereof, (i) file with the United States Federal Trade Commission and the United States Department of Justice the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will request early termination of the waiting period prescribed by the HSR Act (if available), and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on <u>Schedule 7.1(a)</u>. Each Seller and Purchaser shall (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws, and will respond to any requests made for any supplemental information by any Governmental Body as promptly as practicable. Sellers and Purchaser shall not extend any waiting period or enter into any agreement or understanding with any Governmental Body without the prior written consent

31

of the other; *provided* that such consent shall not be unreasonably withheld, conditioned, or delayed. Purchaser will be solely responsible for payment of all filing fees payable in connection with such filings.

(b)     Subject to the immediately following sentence, Sellers and Purchaser will use their reasonable best efforts to as promptly as practicable (and in any event prior to the Outside Date) obtain any clearances, consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations required under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) opposing at Purchaser's cost and expense any motion or action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the transactions contemplated by this Agreement, and exhausting all avenues of appeal, including appealing properly any adverse decision or Order by any Governmental Body, (ii) entering into a consent decree, consent agreement, settlement or other agreement or arrangement (including any customary ancillary agreements) containing Purchaser's agreement to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) such assets (whether tangible or intangible), rights, properties, products or businesses of Purchaser and its Affiliates (including, after the Closing, the Acquired Assets), (iii) agreeing to the termination, modification, or assignment of existing relationships, joint ventures, contracts or obligations of Purchaser and its Affiliates and (iv) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the closing conditions set forth in <u>Section 7.1(a)</u> prior to the Outside Date, in each case, so as to allow the consummation of this Agreement and the transactions contemplated hereby as soon as practicable and, in any event, prior to the Outside Date.

(c)     The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite obtaining any clearances, consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws at the earliest practicable dates and, in any event, prior to the Outside Date. Such reasonable best efforts and cooperation shall include each Party and its respective counsel undertaking to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any communication received by such Person from a Governmental Body in connection with the filings made pursuant to this <u>Section 6.5</u> and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Body in connection with this Agreement and the transactions contemplated hereby and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the receipt of any non-action, action, clearance, consent, approval, waiver, or other authorizations, (B) the expiration or termination of any waiting period, (C) the commencement or proposed or threatened commencement of any investigation, litigation or administrative or judicial action or

proceeding under applicable Laws, including any proceeding initiated by a private party, and (D) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the transactions contemplated hereby. Neither Sellers nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion. Sellers will have the right to review and approve the content of any draft notifications, formal notifications, filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this <u>Section 6.5</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets.

(d)    Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any clearances, consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws from any Governmental Body necessary to consummate the transactions contemplated by this Agreement, (ii) increase the risk of any Governmental Body entering an Order preventing, delaying or prohibiting the consummation of the transactions contemplated by this Agreement or (iii) delay the consummation of the transactions contemplated by this Agreement.[6]

6.6    <u>Reasonable Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein and by the other Transaction Agreements to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

---

[6]    <u>Note to Draft</u>: Subject to discussion with Purchaser of applicable regulatory approvals and required licensure. Purchaser to confirm any Foreign Competition Laws or CFIUS filings that may be required.

(b)     The obligations of Sellers pursuant to this Agreement, including this Section 6.6, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.7     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such conveyances, notices, assumptions, assignments, releases, documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; *provided* that nothing in this Section 6.7 will prohibit Sellers or any Affiliates of Sellers from ceasing operations or winding up their affairs following the Closing.

6.8     Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.9     Receipt of Misdirected Assets. From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer its right, title and interest in and to such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and Sellers' right, title and interest in and to such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

6.10     Acknowledgment by Purchaser.

(a)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, the JVs and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have relied solely on the Express Representations and the results of the Purchaser Group's own independent

34

investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, the Non-Debtor Subsidiary or the JV's, or the quality, quantity or condition of any Seller's, any Non-Debtor Subsidiary or any JV's, assets (including any express or implied warranty under Section 8-108 of the Uniform Commercial Code, or of merchantability, suitability or fitness for a particular purpose), are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in clause (ii) in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller, any Non-Debtor Subsidiary or any JV's, or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, suitability or fitness for a particular purpose, or condition of any Seller's, any Non-Debtor Subsidiary or any JV's, business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof (including any express or implied warrant under Section 8-108 of the Uniform Commercial Code), except, in each case, solely to the extent expressly set forth in the Express Representations. Purchaser will accept the Acquired Assets and Assumed Liabilities at Closing "as is", "where is" and "with all faults" and without recourse against any Seller Party. Purchaser

further acknowledges and agrees that the Acquired Assets that are capable of being delivered are being delivered by Sellers to Purchaser at the location where they are located on the Closing Date.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Sellers, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.10, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.10 (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.10, Seller would not enter into this Agreement.

6.11    [Guaranty.

(a)    Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to Sections 2.1 (the matters set forth in clauses (i), (ii), and (iii), collectively, "Guaranteed Obligations").

(b)    If Purchaser fails to perform any of the Guaranteed Obligations, then Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)      Nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless the Seller against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this Section 6.11, including Section 6.11(f) and 6.11(h).

(d)      The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Section 6.11 and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this Section 6.11.

(e)      Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to Guarantor but not available to Purchaser, and Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)      The guarantee by Guarantor contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser or Guarantor of all of the Guaranteed Obligations and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and Guarantor shall stand discharged of all of its obligations under this guarantee. Guarantor shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this Section 6.11, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. Guarantor's obligations under this Section 6.11 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)      The liability of Guarantor under this Section 6.11 shall be unlimited and unconditional, and this Section 6.11 shall be a continuing guaranty.

(h)      Guarantor hereby makes the representations and warranties set forth in Article IV as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.]

6.12   Directors' and Officers' Indemnification. Following the Closing until the six (6) year anniversary thereof, Purchaser shall (a) cause the Non-Debtor Subsidiaries not to amend, repeal or otherwise modify the Non-Debtor Subsidiaries' constitutive documents as in effect at the Closing in any manner that would adversely affect the rights thereunder of individuals who are or were directors or officers of the Non-Debtor Subsidiaries (the "Indemnified Person") and (b) cause the Non-Debtor Subsidiaries to honor and pay the indemnification, advancement of expenses and exculpation provisions of each of the Non-Debtor Subsidiaries' constitutive documents as in effect at the Closing, in any manner; *provided* that all rights to indemnification in respect of any Action pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim. Purchaser shall not cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Non-Debtor Subsidiaries prior to the Closing; *provided* that no payments shall be required of the Non-Debtor Subsidiaries or the Purchaser Group with respect to such policies after the Closing. This Section 6.12 is intended to be for the

benefit of each of the Indemnified Persons and may be enforced by any such Indemnified Person as if such Indemnified Person were a party to this Agreement. The obligations of the Purchaser under this <u>Section 6.12</u> will not be terminated or modified in such a manner as to adversely affect any Person to whom this <u>Section 6.12</u> applies without the consent of such affected Person.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    the expiration or termination of any waiting period under the HSR Act or under the Foreign Competition Laws set forth in <u>Schedule 7.1(a)</u> related to the transactions contemplated by this Agreement, and receipt of any necessary approval related to the transactions contemplated by this Agreement under the Foreign Competition Laws or other regulations set forth in <u>Schedule 7.1(a)</u>;

(b)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect; and

(c)    the Bankruptcy Court shall have entered the Sale Order.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (*provided* that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.4</u> or in <u>Section 3.7</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.17</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)    Sellers shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or

complied with by Sellers under this Agreement on or prior to Closing (or will have cured any such breach to the extent necessary to satisfy this condition); and

(c)      Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3      <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)      Purchaser shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date (or will have cured any such breach to the extent necessary to satisfy this condition); and

(c)      Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.5</u>.

7.4      <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

**ARTICLE VIII
TERMINATION**

8.1      <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Sellers and Purchaser;

(b)      by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; *provided* that no Party may terminate this Agreement under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's breach of its representations, warranties, covenants or failure to perform any of its obligations under this Agreement;

(c)      by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before [●] (the "Outside Date") (or such later date as provided in Section 5.1(f); *provided* that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if such Party is in material breach or violation of its representations, warranties, covenants or obligations under this Agreement;

(d)      by written notice of either Purchaser or Seller, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case;

(e)      by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; *provided* that (i) if such breach is curable by Purchaser then Sellers may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Sellers at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(f)      by written notice from Purchaser to Sellers, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; *provided* that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(g)      by written notice from Sellers to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(h)      by written notice from Sellers to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(i)      by written notice of either Purchaser or Sellers, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(j)    by written notice from Purchaser to Sellers, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction.

8.2    <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers, employees, managers, Advisors or equityholders will have any Liability under this Agreement; *provided* that <u>Section 2.2</u>, <u>Section 6.2(b)</u>, this <u>Section 8.2</u> and <u>Article X</u> shall survive any such termination; *provided further* that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the transactions contemplated by this Agreement lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to <u>Section 10.12</u>, nothing in this <u>Section 8.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

## ARTICLE IX
## TAXES[7]

9.1    <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (excluding, for the avoidance of doubt, income taxes of Sellers) (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2    <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.3    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Sellers.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by <u>Section 9.3(a)</u>. With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall provide Seller with a draft of such Tax Returns at least 30 days prior to the filing of any such Tax Return.

---

[7]    **Note to Draft**: Article IX and this Agreement in general is subject to ongoing tax review.

Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns.

(c)      Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position or action that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the day before the Closing Date, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than 45 days' notice of such position before filing any such Tax Return. In the event Sellers disagree with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Sellers, on the other hand. The determination of such independent national accounting firm or law firm shall be binding on all Parties and any Tax Return shall be filed consistently with such resolution.

(d)      For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any Taxes other than Taxes specified in clause (i), deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

## ARTICLE XMISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement, the other Transaction Agreements or in any other document contemplated hereby or thereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for 5 years following the Closing Date, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for 5 years and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement. The Purchaser Group

hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement, the other Transaction Agreements or the transactions contemplated hereby or thereby.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all fees and expenses in connection with any filing or submission that is necessary under the HSR Act and any Foreign Competition Laws will be allocated pursuant to Section 6.4, (b) all Transfer Taxes will be allocated pursuant to Section 9.1 and (c) all Cure Costs will be allocated pursuant to Section 5.2.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands, consents, waivers and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail if transmitted prior to 5:00 PM (local time of the recipient) on a Business Day and otherwise on the next Business Day after transmittal, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

[_____]
[_____]
[_____]
Attention:        [_____]
Email:            [_____]

with a copy to (which shall not constitute notice):

[_____]
[_____]
[_____]
Attention:        [_____]
Email:            [_____]

       <u>Notices to Sellers</u>:

DBI Investors, Inc.
1001 Washington Street
Conshohocken, PA 19428 Attn:
Attention:    Lori Cochran Kinkade, SVP Head of Legal
Email:        LKinkade@dbi.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Joshua A. Sussberg, P.C.
                Christopher T. Greco, P.C.
                Willard S. Boothby, P.C.
                Rachel M. Bentley
Email:        jsussberg@kirkland.com
                cgreco@kirkland.com
                willard.boothby@kirkland.com
                rachael.bentley@kirkland.com

       10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; *provided* that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; *provided further* that Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.

       10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Furthermore, neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

       10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein (including in <u>Section 6.12</u>), nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties and their permitted successors and assigns any legal or equitable

right, remedy, cause of action or claim under or with respect to this Agreement or any provision of this Agreement.

10.7     Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8     Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9     Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; *provided* that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement, without the need for repetition or cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits: (a) shall not be construed to mean that such information is required to be disclosed by this Agreement; (b) shall not be construed as or constitute an admission, evidence or agreement that a violation, right of termination, default, non-compliance, liability or other obligation of any kind exists with respect to any item; (c) with respect to the enforceability of contracts with third-parties, the existence or non-existence of third-party rights, the absence of breaches or defaults by third-parties, or similar matters or statements, is intended only to allocate rights and risks among the Parties and is not intended to be admissions against interests, give rise to any inference or proffer of accuracy, be admissible against any Party by any Person who is not a Party, or give rise to any claim or benefit to any Person who is not a Party; and (d) does not waive any attorney-client privilege associated with such item or information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. No Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules

45

or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened or would constitute a "Material Adverse Effect") or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations, warranties, obligations, covenants, conditions or agreements contained herein. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and the other Transaction Agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by hereby and thereby and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and the other Transaction Agreements. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches, or threatened breaches, of this Agreement and to enforce specifically the terms and provisions hereof and its rights hereunder in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, or other rights and remedies existing in its favor at law or in equity, and (b) the right of specific performance, injunctive relief and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the

46

election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13  <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the Transaction Agreements or the negotiation, execution, or performance of this Agreement or the Transaction Agreements or the transactions contemplated hereby or thereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement or the Transaction Agreements (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the United States federal courts for the District of New Jersey (the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14  <u>Governing Law; Waiver of Jury Trial</u>.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE TRANSACTION

AGREEMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser or the Purchaser Group pursuant to this Agreement, the Transaction Agreements or any other document or instrument delivered by Purchaser or a member of the Purchaser Group in connection herewith.

10.16   Counterparts and PDF. This Agreement, the Transaction Agreements and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF, DocuSign or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF, DocuSign or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. No Party or any of its Affiliates shall issue, and shall cause its Advisors not to issue, any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party,

which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; *provided* that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. Notwithstanding anything to the contrary in this Agreement, nothing shall restrict or prohibit Sellers or their Affiliates from communicating with their respective employees, customers, suppliers or other business relations.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20   Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.21   Sellers' Representative. Each Party agrees that DBI has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by DBI on behalf of the Sellers.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   Certain Definitions.

"Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind

whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

"<u>Advisors</u>" means, with respect to any Person, any directors, officers, members, shareholders, equity holders, manager, partners, employees, contractors, subcontractors, investment bankers, financial advisors, accountants, auditors, agents, attorneys, consultants, or other representatives of such Person.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Sellers or (ii) a material portion of the Acquired Assets and/or Assumed Liabilities, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates shall not be an Alternative Transaction.

"<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>"[8] means the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, and (III) Granting Related Relief* [Docket No. [____]].

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

"<u>Cash and Cash Equivalents</u>" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

---

[8]    <u>**Note to Draft**</u>: To be updated upon entry of the Bidding Procedures Order by the Bankruptcy Court.

"Confidentiality Agreement" means that certain letter agreement, dated as of [●], by and between [●] and [●].[9]

"Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is legally binding upon a Person or its property, in each case, other than a purchase order, service order or sales order.

"Debtors" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

"Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

"Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"GDPR" means Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018.

"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or

---

[9]    **Note to Draft**: Purchaser to complete.

otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

"HL" means Houlihan Lokey Capital, Inc.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

"Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property.

"Inventory" means all raw materials, work in process, finished goods and property held for sale by DBI or its Subsidiaries.

"JV" means each of Executive Management Limited, Fillberg Ltd., Wingreat Limited and Maxtel Limited.

"Knowledge of Purchaser" or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of [●], who shall not, for the sake of clarity and avoidance of doubt, have any personal liability or obligations regarding such knowledge.

"Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of [●], who shall not, for the sake of clarity and avoidance of doubt, have any personal liability or obligations regarding such knowledge.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title

to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

"Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; *provided* that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing or raw materials used, changes in market share or financial results, and other related changes; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, civil protests, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), outbreak of illness or public health event (whether human or animal), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any Inventory, Equipment or supplies necessary to or used in the provision of services by any Seller (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from, or relating to financial, banking, securities or currency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body (including, for the avoidance of doubt, any such items related to Section 6.5) and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii ) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement or if such inaction

is requested by Purchaser, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement, consummation or pendency of this Agreement or the transactions contemplated hereby, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or Governmental Bodies or litigation arising from or relating to this Agreement or the transactions contemplated hereby; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules or any matter set forth in any filings with the Bankruptcy Court prior to the date hereof; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xv) (A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Sale Order, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith.

"Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and past practice in light of the current pandemic, epidemic or disease outbreak; *provided* that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic, public health conditions or disease outbreak or to comply with any orders, directives, guidelines or commendations issued by a Governmental Body in response thereto or health and safety measures shall be deemed to be in the ordinary course of business.

"Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Owned Real Property and Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Owned Real Property or Leased Real Property as it relates to the operation of the Acquired Assets,

(iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Owned Real Property or Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on Schedule 11.1, and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the day before the Closing Date.

"Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

"Sale Order" mean an Order of the Bankruptcy Court reasonably acceptable to the Parties approving this Agreement and authorizing Seller to undertake the transactions contemplated hereunder, including pursuant to sections 363 and 365, of the Bankruptcy Code.

"Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by any Seller that is an Acquired Asset.

"Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

"Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

"<u>Tax Code</u>" means the United States Internal Revenue Code of 1986.

"<u>Tax Return</u>" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

"<u>Transaction Agreements</u>" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"<u>Willful Breach</u>" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2   <u>Index of Defined Terms</u>.

Acquired Assets .......................................... 1
Acquired Leased Real Property ................. 2
Acquired Owned Real Property ................. 2
Agreement .................................................. 1
Agreement Dispute ................................... 48
Assigned Contracts .................................... 2
Assignment and Assumption Agreement .. 10
Assumed Benefit Plans .............................. 2
Assumed Liabilities ................................... 5
Audited Financial Statements ................... 12
Backup Bidder .......................................... 23
Bankruptcy Cases ....................................... 1
Bankruptcy Code ....................................... 1
Bankruptcy Court ....................................... 1
Cash Payment ............................................. 9
Chosen Courts .......................................... 48

Closing ..................................................... 10
Closing Date ............................................. 10
Closing Date Payment ................................ 9
COVID-19 ................................................ 54
COVID-19 Response ............................... 28
Cure Costs ................................................. 6
Dataroom .................................................. 19
Deposit ...................................................... 9
Effect ........................................................ 54
Enforceability Exceptions ........................ 12
Environmental Permits ............................. 16
Escrow Agent ............................................. 9
Excluded Assets ......................................... 3
Excluded Contracts .................................... 3
Excluded Liabilities ................................... 7
Express Representations ........................... 19

56

Financial Statements ................................. 12
Foreign Competition Laws ..................... 12
Fundamental Representations .................. 39
Guaranteed Obligations ........................... 37
Guarantor ................................................. 1
Indebtedness ............................................ 26
Indemnified Person .................................. 38
Information Presentation.......................... 19
Leased Real Property ............................... 14
Leasehold Improvements ......................... 53
Material Contract ..................................... 14
Material Suppliers .................................... 18
Non-Debtor Subsidiaries.......................... 13
Outside Date............................................. 40
Owned Real Property ............................... 13
Parties........................................................ 1

Party ........................................................... 1
Permits .................................................... 15
Projections................................................ 36
Purchase Price ........................................... 9
Purchaser.................................................... 1
Purchaser Plans ....................................... 30
Responsible Person Liabilities................... 6
Seller .......................................................... 1
Sellers......................................................... 1
Successful Bidder..................................... 23
Transfer Offer .......................................... 29
Transfer Taxes ......................................... 42
Transferred Employees ............................ 29
Unaudited Financial Statements ............... 12
WARN Act................................................ 31

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or" unless expressly indicated otherwise.

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow.*]

58

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

**[PURCHASER]**


By: _____
Name:
Title:

**SELLERS:**

[●]


By: _____
Name:
Title:

## EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

[*See attached*]

## **<u>EXHIBIT B</u>**

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

**[*See attached*]**

E-1

**<u>EXHIBIT 3</u>**

**Sale Notice**

**COLE SCHOTZ P.C.**

Court Plaza North

25 Main Street

P.O. Box 800

Hackensack, New Jersey 07602-0800

(201) 489-3000

(201) 489-1536 Facsimile

Michael D. Sirota, Esq.

msirota@coleschotz.com

Felice R. Yudkin, Esq.

fyudkin@coleschotz.com

Rebecca W. Hollander, Esq.

rhollander@coleschotz.com

*Proposed Counsel to Debtors*

**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**

601 Lexington Avenue

New York, New York 10022

(212) 446-4800

(212) 446-4900 Facsimile

Joshua A. Sussberg, P.C. (*pro hac vice* pending)

joshua.sussberg@kirkland.com

Christopher T. Greco, P.C. (*pro hac vice* pending)

christopher.greco@kirkland.com

Rachael M. Bentley (*pro hac vice* pending)

Rachael.bentley@kirkland.com

*-and-*

300 North LaSalle Street

Chicago, Illinois 60654

(312) 862-2000

(312) 862-2200 Facsimile

Alexandra Schwarzman, P.C. (*pro hac vice* pending)

alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, LLC, *et al.*, | Case No. 23-_____ (___) |
| Debtors.[1] | (Joint Administration Requested) |

## <u>NOTICE OF SALE BY AUCTION AND SALE HEARING</u>

**PLEASE TAKE NOTICE** that on [●], 2023, the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") filed the *Debtors' Motion for Entry of Orders (I) (A) Approving Bidding Procedures and Bid Protections, (B) Approving the Form Asset Purchase Agreement, (C) Scheduling an Auction and Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Establishing Procedures for the Assumption and Assignment of Contracts and Leases and (II)(A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, and (C) Authorizing the Assumption and Assignment of Contracts and Leases* [Docket No. [●]] (the

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335). The location of debtor David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

"Motion")[2] with the United States Bankruptcy Court for the District of New Jersey (the "Court") seeking, among other things, entry of an order (the "Sale Order") authorizing and approving: (a) a sale (the "Sale") of all or substantially all of the Debtors' Assets or any portion thereof free and clear of all Encumbrances, except as set forth in a Stalking Horse APA or an alternative asset purchase agreement with a Successful Bidder at auction; and (b) the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court by entry of an order on [●], 2023 [Docket No. [●]] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Assets **on June 1, 2023 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022-4611 (or at any other location as the Debtors may hereafter designate on proper notice).

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on or before **June 5, 2023, at 10:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable [●], United States Bankruptcy Judge for the Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher US Courthouse, Courtroom [●], 402 East State Street, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to any objections to proposed cure payments or the assumption and assignment of Contracts, objections to the relief requested in the Motion ***must***: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before May 31, 2023 at 5:00 p.m. (prevailing Eastern Time)** by the following parties: (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C.**,** Christopher T. Greco, P.C.**,** and Rachael M. Bentley, email: Joshua.sussberg@kirkland.com**,** christopher.greco@kirkland.com**,** and Rachael.bentley@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Alexandra Schwarzman, P.C., email: alexandra.schwarzman@kirkland.com; (ii) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Felice R. Yudkin, Esq., and Rebecca W. Hollander, Esq., email: msirota@coleschotz.com, fyudkin@coleschotz.com, and rhollander@coleschotz.com; (iii)

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order.

counsel for Bank of America, N.A., in its capacity as the ABL Agent and DIP Agent, (a) Morgan, Lewis & Bockius LLP, Julia Frost-Davies, Esq. and Christopher L. Carter, Esq., and (b) Greenberg Traurig, LLP, Alan Brody, Esq.; (iv) counsel for 1903P Loan Agent, LLC, in its capacity as First In Last Out Agent, (a) Riemer & Braunstein LLP, Steven E. Fox, Esq. and Brendan C. Recupero, Esq., and (b) Lowenstein Sandler LLP, Kenneth A. Rosen, Esq.; (v) counsel for CPPIB Credit Investments III Inc. and its affiliates and managed accounts, in their capacity as lenders under the Prepetition Senior Superpriority Term Loan Agreement, Weil, Gotshal & Manges LLP, Matt Barr, Esq., Matthew P. Goren, Esq. and F. Gavin Andrews, Esq. (vi) the Office of the U.S. Trustee for the District of New Jerseys, (vii) counsel to any official committee appointed in these chapter 11 cases; *provided* that any objection to the Sale to the Successful Bidder shall be filed on or before **June 2, 2023 at 5:00 p.m.**

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

      **PLEASE TAKE FURTHER NOTICE** that copies of the Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, including the Form APA, the Stalking Horse APA, if any, and the proposed Sale Order, are available: (a) free of charge upon request to Omni Agent Solutions (the notice and claims agent retained in these chapter 11 cases) by calling (888) [482]-[0174] (U.S./ Canada toll-free), +1 (747) [293]-[0079] (international); (b) by visiting the website maintained in these chapter 11 cases at https://omniagentsolutions.com/DavidsBridal or (c) for a fee via PACER by visiting http://www.njb.uscourts.gov.

3

**PLEASE TAKE FURTHER NOTICE** that you may obtain additional information concerning the above-captioned chapter 11 cases at the website maintained in these chapter 11 cases at **https://omniagentsolutions.com/DavidsBridal**

DATED: _____, 2023        Respectfully submitted,

**COLE SCHOTZ P.C.**

By:_____
     Michael D. Sirota, Esq.
     Felice R. Yudkin, Esq.
     Rebecca W. Hollander, Esq.
     Court Plaza North
     25 Main Street
     Hackensack, NJ 07601
     (201) 489-3000
     (201) 489-1536 Facsimile
     Email: msirota@coleschotz.com
           fyudkin@coleschotz.com
           rhollander@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
     Joshua A. Sussberg, P.C. (*pro hac vice* pending)
     Christopher T. Greco, P.C. (*pro hac vice* pending)
     Rachael M. Bentley (*pro hac vice* pending)
     601 Lexington Avenue
     New York, New York 10022
     (212) 446-4800
     (212) 446-4900 Facsimile
     Email: joshua.sussberg@kirkland.com
           christopher.greco@kirkland.com
           rachael.bentley@kirkland.com
-and-
     Alexandra Schwarzman, P.C. (*pro hac vice* pending)
     300 North LaSalle Street
     Chicago, Illinois 60654
     (312) 862-2000
     (312) 862-2200 Facsimile
     Email: alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

4

## EXHIBIT 4

**Contract Assumption Notice**

**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Felice R. Yudkin, Esq.
fyudkin@coleschotz.com
Rebecca W. Hollander, Esq.
rhollander@coleschotz.com

*Proposed Counsel to Debtors*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
(212) 446-4900 Facsimile
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
joshua.sussberg@kirkland.com
Christopher T. Greco, P.C. (*pro hac vice* pending)
christopher.greco@kirkland.com
Rachael M. Bentley (*pro hac vice* pending)
Rachael.bentley@kirkland.com
-and-
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2000
(312) 862-2200 Facsimile
Alexandra Schwarzman, P.C. (*pro hac vice* pending)
alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID'S BRIDAL, LLC, *et al.*, | Case No. 23-_____ (___) |
| Debtors.[1] | (Joint Administration Requested) |

## NOTICE TO CONTRACT PARTIES TO POTENTIALLY
## <u>ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES ARE A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.

**PLEASE TAKE NOTICE** that on [●], 2023, the United States Bankruptcy Court for the District of New Jersey (the "<u>Court</u>") entered the Order (A) Approving Bidding Procedures and Bid Protections, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335).  The location of debtor David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

of Notice Thereof, and (D) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the Debtors to conduct an auction (the "Auction") to select the party to purchase the Debtors' assets. The Auction will be governed by the bidding procedures attached to the Bidding Procedures Order as **Exhibit 2** (the "Bidding Procedures") and approved pursuant to the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the contract or agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the Sale. The Debtors have conducted a review of their books and records and have determined that the Cure Payments for unpaid monetary obligations under such Contracts is as set forth on **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Payments, object to a proposed assignment to the Successful Bidder of any Contract, or dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payments, state the correct Cure Payments alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than May 31, 2023**, at **5:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**") by the Court and the following parties: (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Christopher T. Greco, P.C., and Rachael M. Bentley, email: Joshua.sussberg@kirkland.com**,** christopher.greco@kirkland.com**,** and Rachael.bentley@kirkland.com, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Alexandra Schwarzman, P.C., email: alexandra.schwarzman@kirkland.com; (ii) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Felice R. Yudkin, Esq., and Rebecca W. Hollander, Esq., email: msirota@coleschotz.com, fyudkin@coleschotz.com, and rhollander@coleschotz.com; (iii) counsel to the Stalking Horse Bidder, if any; (iii) counsel for Bank of America, N.A., in its capacity as the ABL Agent and DIP Agent, (a) Morgan, Lewis & Bockius LLP, Julia-Frost Davies, Esq. and Christopher L. Carter, Esq., and (b) Greenberg Traurig, LLP, Alan Brody, Esq.; (iv) counsel for 1903P Loan Agent, LLC, in its capacity as First In Last Out Agent, (a) Riemer & Braunstein LLP, Steven E. Fox, Esq. and Brendan C. Recupero, Esq., and (b) Lowenstein Sandler LLP, Kenneth A. Rosen, Esq.; (v) counsel for CPPIB Credit Investments III Inc. and its affiliates and managed accounts, in their capacity as lenders under the Prepetition Senior Superpriority Term Loan Agreement, Weil, Gotshal & Manges LLP, Matt Barr, Esq., Matthew P. Goren, Esq and F. Gavin Andrews, Esq.; (vi) the Office of the U.S. Trustee for the District of New Jerseys, (vii)

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order.

65783/0001-44892354

counsel to any official committee appointed in these chapter 11 cases; and (viii) any other party that has filed a notice of appearance in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Payments, (b) the proposed assignment and assumption of any Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Payments as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Payments are due under the Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of aa Contract or related Cure Payments in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Contract on the Contract Assumption Notice or any Supplemental Assumption Notice does not require or guarantee that such Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such executory contracts and/or unexpired leases are reserved. Moreover, the Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Contracts or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Contract against the Debtors that may arise under such Contract.

DATED: _____, 2023        Respectfully submitted,

**COLE SCHOTZ P.C.**

By:_____
        Michael D. Sirota, Esq.
        Felice R. Yudkin, Esq.
        Rebecca W. Hollander, Esq.
        Court Plaza North
        25 Main Street
        Hackensack, NJ 07601
         (201) 489-3000
         (201) 489-1536 Facsimile
        Email: msirota@coleschotz.com
                fyudkin@coleschotz.com
                rhollander@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
        Joshua A. Sussberg, P.C. (*pro hac vice*
        pending)
        Christopher T. Greco, P.C. (*pro hac vice*
        pending)
        Rachael M. Bentley (*pro hac vice* pending)
        601 Lexington Avenue
        New York, New York 10022
         (212) 446-4800
         (212) 446-4900 Facsimile
        Email: joshua.sussberg@kirkland.com
                christopher.greco@kirkland.com
                rachael.bentley@kirkland.com
-and-
        Alexandra Schwarzman, P.C. (*pro hac vice*
        pending)
        300 North LaSalle Street
        Chicago, Illinois 60654
         (312) 862-2000
         (312) 862-2200 Facsimile
        Email: alexandra.schwarzman@kirkland.com

*Proposed Counsel to Debtors*

4

## **EXHIBIT B**

**Privacy Policy**

win your wedding dress!   ENTER NOW

DAVID'S
BRIDAL

**LIMITED TIME ONLY!** Friends & Family Event — Take an **EXTRA 10% OFF EVERYTHING!** See Details

*privacy*
**rights**

# Privacy Rights

Your Privacy and the Security of Your Personal Information is Very Important to Us.

David's Bridal, LLC, a Florida limited liability company, and our respective divisions, subsidiaries and affiliates (collectively, "David's Bridal", "we", "us", or "our") are committed to maintaining your confidence and trust. We have adopted the following privacy policy to explain our practices relating to the information we collect, and the information you provide to us, through your completion of a registration or other form in one of our US retail stores, and from your visit to and use of US websites, and other mobile applications, content and services (collectively, the "Service") we make publicly available. This Privacy Policy protects consumers and job candidates providing information through our US websites, US stores or other communication channels and is not designed to protect business data.

This Privacy Policy answers the following questions, which we believe are the questions you are most likely to have about our handling of your personal information:

TOP

A. California Privacy Rights .

B. What information does David's Bridal collect?

C. How does David's Bridal use the information it collects and why?

D. What is the Legal Bases of David's Bridal's Collection and Processing?

E. Will David's Bridal disclose or share my personal information?

F. How can I review and revise my personal information?

G. How long does David's Bridal keep my personal data?

H. How can I manage my preferences with regard to advertising and marketing communications from David's Bridal and cookies and other technologies?

I. How does David's Bridal protect my personal information?

J. If I am an EU citizen, are there any other rights I need to be aware of regarding management of my personal data?

K. Are there any other special considerations that I should know about Internet privacy?

We review this policy regularly, and make changes in connection with its review. Please check this privacy policy page periodically for changes. Your submission of a registration form or your continued use of the Service following the posting of changes to this privacy policy means that you have accepted those changes.

## Personal Information

For US and Canadian citizens, "personal information" means information that can be linked to a specific individual, such as name, postal address, mobile and wired telephone numbers, e-mail address, and credit card number. Personal information also includes demographic information (e.g., identity of bride or groom, date and location of the wedding, and other biographical and demographic information), location information (e.g., zip code, fine location

TOP

information), and other information about a specific individual, once it is associated with personal information. For EU residents, personal data has the meaning described in Article 4.1 of the GDPR.

## A. California Privacy Rights

<u>Your California Privacy Rights</u>

## B. What information does David's Bridal collect?

**Information you give us**

David's Bridal collects information that you provide to us online, through completion of registration and other forms in our retail stores, or through other means.

For example:

If you join our registry or request an appointment through the Service, we will collect your first and last name, postal address, e-mail address and telephone number, specific bridal party and wedding information, and other preferences and demographic information you provide.

If you make a purchase through the Service, we will ask you to register with us, and we will also ask you for your credit card number, a shipping address and a telephone number for that shipping address, and for any additional information that may be required to personalize the product you purchase.

If you contact our customer service, we will ask you for your name, postal address, e-mail address, telephone number, order number and such other information as you wish to submit to us to allow us to assist you.

If you submit a wedding, prom or special occasion story through the Service, we will ask you for your e-mail address, the names of the bride and groom or the subject of the story, the date and location of the wedding, prom or celebration of the special occasion, and such other information as you may include in the story and photos that you submit to us.

If you use the wedding planning section of the Service, we will also ask you to provide us with your zip code or city and state or province, if applicable.

If you enter our "gown giveaway", "tuxedo giveaway", "prom dress giveaway" or other contests and sweepstakes, complete our

TOP

surveys, or voluntarily participate in other promotions offered by us
or third parties through the Service (collectively, "Contests"), we will
ask you to provide personal information, such as your first and last
name, postal address, e-mail address and telephone number.

If you send us a text message, we will collect the mobile phone
number you use to send us a text message, the content of the
message, and we will log the wireless telecommunications service
provider associated with the number and the date and time of the
message.

Please note that registration is required to use certain features of
the Service.

### Social Networks

If you are a member of Facebook or another social network or
service, and you use functionality available through the Service or
otherwise authorize us to associate your Service account with that
social network or service, both we and the social network or service
will gather information about your behavior on the Service, and may
associate that information with personal information we and the
social network or service already have about you.

### Public Conduct

If you engage in behavior at or through the Service that is intended
to be viewed by other users (collectively, "Public Conduct"), such as
participating in forums, message boards and chat rooms; using your
Facebook page, Twitter® account or other functionality available
through the Service to share product preferences, comment on
products and other content; creating an event page, or posting
stories about your wedding, prom or other special occasion to the
Service, we and others may collect information about you as a result
of your Public Conduct, and all such information will be publicly
available to anyone visiting or using the Service.

### Automatic Gathering of Information

We and other companies and individuals we select to provide us
with goods and services (each, for the purposes of this Privacy
Policy, a "Website Analytic Service Provider") collect non-identifying
information about your visit to or use of the Service, your Web
browsing movements across the Internet (not just on the Service),
and your interaction with our advertisements at the Service and
elsewhere. For example, we may keep track of how many of our
advertisements you saw before visiting the Service, how you were
directed to the Service, how you navigate around the Service, which
products you browse, as well as your purchasing activities through
the Service.

TOP

To do this, we and our Website Analytic Service Providers use technology (e.g., cookies action tags, web beacons, and GIF tags), placed at various sections within the Service and in our advertisements delivered by e-mail or served during your Web browsing session. Some of this technology may be disabled by changing your Web browser settings. Please consult the documentation for your Web browser on how to manage the information gathering and storage aspects of this technology on your computer. We and our Website Analytic Service Providers do not collect any personal information through the use of this technology.

If you use the mobile application portion of the Service, we and our Website Analytic Service Providers may also use various technology (e.g., anonymous identifiers, flash cookies, HTML5 software, local storage, and mini-databases) to track your Web browsing movements at the Service and across the Internet, and may store such information on your mobile device. Many mobile devices have this technology pre-loaded or incorporated in the Web browser, or the technology may be included in the mobile application you download and use on your device. Please consult your device documentation on how to manage the information gathering and storage aspects of this technology. We and our Website Analytic Service Providers do not collect any personal information through the use of this technology.

If you choose to reject all cookies, anonymous identifiers or similar technology, you may be unable to use some of the functionality of the Service.

Unless we associate non-identifying information that we gather through use of technology with your personal information, we will NOT treat such information as personal information.

**Text/SMS Message Consent**

If you choose, you can provide your mobile phone number to receive text message alerts containing product and/or event information, products tips or promotions that may be sent using automated dialing systems ("Text Messages"). You agree that by providing your mobile phone number you expressly consent to receive automated marketing text messages from us to the mobile phone number provided. Consent is not required to purchase goods or services. Message and data rates will apply and you should check the rates of your mobile carrier.

We may share your mobile phone number with service providers with whom we contract to assist us with the above activities, but we will not share your mobile phone number with third parties for their own

purposes without your consent. You acknowledge that Text Messages are distributed via third party mobile network providers and, therefore, we cannot control certain factors relating to message delivery. You acknowledge that, depending on the recipient's mobile carrier, it may not be possible to transmit the Text Message to the recipient successfully; nor is content available on all carriers. We do not claim or guarantee availability or performance of this service, including liability for transmission delays or message failures.

**Information from Other Sources**

We may also collect information (including personal information) about you from our Service Providers and other third parties and add it to the personal information we maintain.

## C. How does David's Bridal use the information it collects?

**Request Fulfillment**

We use your personal information to confirm, fulfill and ship your orders, to set up appointments that you request, to confirm your entry in our Contests, and to otherwise respond to your requests. We may also use your personal information to contact you if we want to communicate with you about your order, appointment or other request.

We may match personal information we have collected from your prior on-line or in-store interactions with us (i.e., completion of a survey or sweepstakes entry) with the personal information you enter when you complete our in-store electronic registration form to speed up the registration process and improve your in-store and on-line experience with us.

**Promotional Messages**

We may also use your personal information to send you newsletters, information about special events, e-mail offers, text message offers, and other savings opportunities; to notify you of changes to the Service; to provide you with up-to-date information on the newest David's Bridal products and services that may be of interest to you; to handle billing disputes with you; and to tailor our online offerings and advertisements to your preferences. We may also use non-identifying information about your visits to the Service and other Web sites in order to provide you with special offers about goods and services of interest to you, make sure you are not shown the same content repeatedly on the Service, deliver information that is specific to your interests, and to save your password so you don't have to re-enter it each time you visit the Service.

**Rewards Programs and Advertisements**

We may also participate in rewards programs with other business organizations where our customers who are also members of these

TOP

programs receive a reward from the other businesses for their purchases from David's Bridal. We also place advertisements for our products on other Web sites that include a link enabling visitors to click on the link to be taken to the Service and purchase the products featured in the advertisement. In these situations, we share your personal information about your purchases with the other member organizations or Web sites under the contracts these entities have with us.

**Optional Features**

If you choose to participate in certain other features or functions available through the Service, such as customer service, product reviews, wish-lists, and special occasion stories or other Public Conduct, we will use your personal information to administer and operate those features and functions. We may also aggregate information we gather from your Public Conduct with other information we collect from your use of the Service.

**Other Business Purposes**

We may also use personal information, on-identifying information, and aggregated information about our customers 'access and navigation of the Service and their browsing and purchasing activities that we and our Website Analytic Service Providers obtain from our use of technology, to improve the Service, and for other business purposes, such as marketing, advertising and research.

## D. What is the Legal Bases of Our Collection and Processing?

We only collect or process your data based on the following legal bases:

Where the processing of your Personal Information is in our legitimate interests (such as to improve our products and services and the content of our websites, prevent fraud, and for administrative purposes as described in this Privacy Policy);

When we perform our obligations under a contract with you (for example, if you are a consumer we will use your Personal Information to carry out our obligations under the contract that we have with you);

When we have a legal obligation to do so (for example, to comply with the law or respond to legal process or lawful requests, including from law enforcement and government agencies); or

When we have your consent to use your Personal Information.

## E. Will David's Bridal disclose my personal information?

**Retail Stores**

TOP

from your completion of a registration or other form, and we combine it with the information we collect from you through the Service, so that the Service will be able to provide you with relevant information regarding special events and offers. We share the personal information we collect from you through your use of the Service with our retail stores so that they can provide you with relevant information regarding special events and offers.

**Service Providers**

We engage Service Providers from time to time to perform business functions on our behalf, such as fulfilling orders, delivering packages, sending postal mail and e-mail, maintaining customer lists, analyzing data, providing marketing assistance including brand and product promotions, processing debit and credit card payments, providing customer service, as well as administering certain services and features. We furnish personal information to our Service Providers as required to perform these business functions on our behalf.

We may also transfer personal data we have about you in the event we sell or transfer all or a portion of our business or assets (including in the event of a reorganization, spin-off, dissolution or liquidation).

We also engage advertising agencies and other Service Providers and share non-identifying information and aggregated information with them for purposes of analysis and improvement of the Service. In addition, we have carefully selected certain Service Providers to provide us with digital analytics and marketing optimization services. These Service Providers use technology, such as cookies and anonymous identifiers, to collect information on our behalf that will educate us on such things as search engine referral, how you navigate around the Service, unique visitor identification, and product browsing and purchasing information. These Service Providers are not permitted to collect credit card, username or password information. These Service Providers analyze the information collected on our behalf and return it to us through a secure web connection for our use in understanding your use of the Service and how to better serve you. These Service Providers are contractually prohibited from using our information for any other purpose and are required to maintain all information collected and their analyses in strictest confidence. You may choose to continue to benefit from the improved experience with the Service that such analyses provide to you, but maintain your anonymity. You may also choose to deactivate the ability of these Service Providers to analyze your browsing and purchasing behavior at the Service by setting your Web browser to reject cookies and other technology.

**Third Parties**

Unless you elect or instruct us otherwise, David's Bridal may share your personal information with The Black Tux, our formalwear

partner, for direct marketing purposes. David's Bridal may also choose to share, sell, trade, or rent your personal information to other third parties for direct marketing purposes (i.e., offering goods and services that we believe would be attractive to our customers). We require all third parties with whom we share information (including personal information) that we collect to handle that information in accordance with this privacy policy and all applicable laws.

However, these third parties may also have additional or different privacy practices that you may find on their respective Web sites. You may also go to their Web sites to find out more about technology they use to collect information while providing us with services.

We also may share non-identifying and aggregate information with third parties that advertise at or through the Service. For example, we may tell an advertiser that X-number of individuals visited a certain area of the Service, or that Y-number of women who filled out our registration form are from the northeast U.S., but we will not disclose anything that could be used to identify those individuals.

**Optional Features**

If you use optional features or functions available through the Service to engage in Public Conduct, any personal information that you post or submit may also be collected and used by other users of these features to send you marketing messages and for other purposes. In addition, we may forward the information you provide as a part of Public Conduct to other Web sites as a part of an RSS feed, API, or other format. We are not responsible for editing or removing any personal information that you post or submit as a result of your Public Conduct. Additionally, we share personal information about you when you voluntarily use certain optional features of the Service. For example, if you include personal information in a product review that you submit, the content of that review will be posted on the Service and may be distributed and posted to other Websites. If you are a member of a third-party rewards program, we will share personal information concerning your purchases through the Service with that organization. If you participate in a Contest, we will share the personal information you submit with our Service Providers assisting us in the administration of the Contest.

**Law Enforcement**

From time to time, we may be required to disclose your personal information in response to a court order, subpoena, government investigation, or as otherwise required by law. We also reserve the right to share information i) with law enforcement agencies concerning any activities that we, in good faith, believe to be unlawful. (ii) to prevent illegal uses of our websites and applications or violations of our Terms of Use and our policies; (iii) to defend

TOP

ourselves against third party claims; and (iv) to assist in fraud
prevention or investigation (e.g., counterfeiting).

**Business Transfers**

We may also share personal information with third parties in
relation to planned or potential corporate sales, mergers,
reorganizations, consolidations, dissolutions, bankruptcies or similar
events. As a part of any such transaction, we will treat your personal
information as an asset and transfer it to the purchaser.

### F. How can I review and revise my personal information?

You may always review your Service account profile and update it by
going to the My Account area of the Service and clicking on My
Profile. You may also modify certain personal information, such as
your billing address, shipping address or payment method, when
you check out.

You can request our customer service representatives to assist you
with removal of your posted user generated content on the website
or application. But, please note that removal may not encompass
all possible locations, for example, back-ups or sharing by other
users initiated prior to removal. David's Bridal also respects your
right to have access to your personal data to correct it if it is
incomplete or inaccurate. Our customer service representatives are
also ready to assist you in checking or changing your personal
profile. You may reach our customer service representatives by
completing the form available on the "Contact Us" page of the
"Help" section of www.DavidsBridal.com, or by sending an e-mail to
us at customerservice@dbi.com .

In order to ensure that our Canadian customers receive a prompt
response to any inquiries regarding the review and revision of any
personal information we have collected, please follow the
procedures set out in the section below entitled, "ANote to
Residents of Canada".

In order to ensure that our California residents receive a prompt
response to any inquiries regarding the review and revision of any
personal information we have collected, please follow the
procedures set out in the section titled Your California Privacy
Rights.

Please note that you may not access or change non-identifying
information that we collect from visitors to the Service through use
of technology or otherwise.

### G. How long does David's Bridal keep my personal data?

We retain your personal data for as long as necessary to fulfill the
purposes described in this policy, or four year, whichever is longer.
We keep your David's Bridal and Diamond Loyalty account profile

TOP

information for four years. In the event that you access either
account at any time during that four-year period, the retention
policy will reset for another 4 years for both accounts because they
are linked together. But, we may keep your order history longer to
comply with legal obligations.

### H. How can I manage my preferences with regard to advertising and marketing communications from David's Bridal and cookies and other technologies?

**Managing Preferences and Withdrawing Consent**

You may at any time withdraw your consent with future effect and
without affecting the lawfulness of processing of your Personal
Data based on the consent you provided before you withdrew it,
and exercise other controls regarding website and online data
collection, interest-based advertising, your communication settings,
and app preferences. Depending on the Service, collection and use
of Personal Data may be required for the Services to work.

We provide you several ways to manage your preferences:

**If you have an account:**

If you have a David's Bridal account, you can opt-out of receiving
David's Bridal's marketing communications by modifying the
preferences in your account settings. If you have a request
regarding your personal data that cannot be fulfilled from your
account settings, please contact us. Contact details can be found in
the "How to Contact Us" section below.

**If you do not have an account:**

If you have a David's Bridal account, you can opt-out of receiving
David's Bridal's marketing communications by modifying the
preferences in your account settings. If you have a request
regarding your personal data that cannot be fulfilled from your
account settings, please contact us. Contact details can be found in
the "How to Contact Us" section below.

Telephone Marketing

You may request that we remove you from our telephone marketing
list and refrain from sharing your telephone number with third
parties by sending us an e-mail addressed to remove@dbi.com .
Please reference Telephone List Removal in your subject line and
include your telephone numbers in the body of your email. You may
also write to us at David's Bridal, LLC, 1001 Washington Street,
Conshohocken, PA 19428, Attn: Customer Service/Privacy.

Postal Mailing

You may request that we remove you from our postal mailing list
and refrain from sharing your postal address with third parties by
sending us an e-mail addressed to remove@dbi.com .Please
reference Postal Mailing List Removal in your subject line and

TOP

include your postal mailing address in the body of your email. You
may also write to us at David's Bridal, LLC, 1001 Washington Street,
Conshohocken, PA 19428, and Attn: Customer Service/Privacy.

Email Offers

If you would prefer not to receive our e-mail offers, please click on
the "unsubscribe" link or follow the instructions in our e-mail
message, or by sending us an e-mail addressed to remove@dbi.com
. Please reference E-mail List Removal in your subject line and
include your email address in the body of the email. You may also
write to us at David's Bridal, LLC, 1001 Washington Street,
Conshohocken, PA 19428, Attn: Customer Service/Privacy.

Text Messages

To opt out of text messages from David's Bridal, reply to the text
message you received with the word STOP.

Cookies and Other Technologies

You may opt-out of certain cookies by managing the preferences in
your web browser.

It may take David's Bridal up to thirty (30) days to implement your
request that we not contact you by telephone with promotional
communications. Similarly, it may take us up to ten (10) business
days to implement your preference that we not transmit emails to
you containing promotional offers. We will promptly communicate
your preferences concerning advertising communications to the
third parties with whom we have shared your contact information.
However, if these third parties have personal information directly
from you or from a source other than David's Bridal, you will have to
opt-out from receiving their advertising communications by
contacting them directly

From time to time, we may also use your personal information to
send important notices, such as notifications about your Service
account, changes to our terms of use, this privacy policy, or other
policies or agreements relevant to you, or regarding transactions or
services you have specifically requested. Because this information is
important to your interaction with us, you may not opt-out of
receiving these communications

## I. How does David's Bridal protect my personal information?

We take precautions to protect the personal information we collect.
We have implemented industry standard and commercially
reasonable physical, technological, and administrative procedures
to safeguard and secure the personal information we collect.

When you make a purchase through the Service, we offer the use of
a secure server. We also use Secure Socket Layer ("SSL") technology
to encrypt your order information when you send it to us; however,

TOP

your Web browser must support the use of SSL technology. To learn more about SSL, please follow this link to http://www.ssl.com . In addition, we use other means, such as firewalls, to safeguard the confidentiality of this information. However, no method of transmission or electronic storage provides certainty of security. Therefore, we cannot guarantee the absolute security of the information that we collect.

**J. If I am an EU citizen, are there any other rights I need to be aware of regarding management of my personal data?**

You have the right to withdraw your consent to the processing of your Personal Data at any time, without affecting the lawfulness of processing based on consent before its withdrawal, including the right to block cookies or to receive notice before they are set.

To the extent required by applicable law and subject to legal limitations, you have the right:

to have access to your Personal Data;

to have inaccurate data corrected or removed,

to object to the processing of your Personal Data;

to the erasure of your Personal Data;

to receive your Personal Data in a usable electronic format and transmit it to a third party (right to "data portability") within 30 days of submitting a written request for same; and

to lodge a complaint with their local data protection authority

Please contact David Bridal's customer service team, at gdpr-sar@dbi.com , if you need assistance with exercising any of the rights of EU citizens that are identified in this Section I. In particular, David's Bridal is committed to working with you to obtain a fair resolution of any complaint or concerns about privacy. If, however, you believe that David's Bridal has not been able to assist with your complaint or concern, you have the right to make a complaint with the competent EU Member State authority.

**K. Are there any other special considerations that I should know about Internet privacy?**

**A note concerning Third Party Web sites**

The Service may contain links to Web sites operated by third parties, including Web sites operated by our advertisers, Service Providers, and other business associates of David's Bridal. When you click on one of these links, you will visit the Web sites operated by

these third parties. Any information that you submit at these third-party Web sites are submitted by you directly to these third parties, and all such information will be governed by their privacy policies and procedures, not ours. The privacy policies of other Websites will vary, and some may have no stated privacy policy. We are not responsible for the privacy policies or procedures of third party Web sites.

**A note to residents of the European Union and other countries outside the United States**

David's Bridal, LLC is located in the United States and makes the Service publicly available from the United States. Any information that you provide to us will be transferred out of your country of residence to the United States.

By using the Service and/or providing us with this information, you acknowledge and consent to this transfer, and to its use and disclosure as described in this Privacy Policy (which may not offer the same level of data protection as the country where you reside), in accordance with the terms of this Privacy Policy. Please note that the privacy laws of the United States may offer different levels of protection from those in your country of residence and personal information may be subject to access by and disclosure to law enforcement agencies in the United States. We primarily use Standard Contractual Clauses and/or consent for data transfers from the EEA to countries outside the EEA.

David's Bridal does not fulfill product orders from outside the United States through the Service or by telephone. If you attempt to make a purchase through the Service from outside the United States, and you reside in a country that is serviced for us by our partner, Border free, Inc. (who also does business under the name "Fifty-one" or "E4X"), we will refer the order to Border free for collection of payment for, and fulfillment of, the order, at which time you will be required to submit certain credit card and other personal information to Border free to complete your order.

We do, however, require that customers residing outside the United States create an account with David's Bridal in order to make a purchase from Border free. To create that account, we ask you for certain personal information, including your first and last names, street address, telephone number, e-mail address and wedding or other event date. We provide your personal information to Border free so that it may fulfill your order. Please note that Border free maintains its own data protection practices.

We will also collect other personal information that you choose to provide to us or to Border free. For example, if you contact our customer service, we will ask you for your name, postal address, e-mail address, telephone number, order number and such other information as you wish to submit to us for our assistance.

TOP

You may elect at any time not to provide personal information to us, but in that event you may not be able to make a purchase of our products from Borderfree.

Any personal information you provide us is controlled and processed by David's Bridal, LLC, 1001 Washington Street, Conshohocken, PA19428, or its suppliers. Your personal information provided at checkout will be controlled and processed by Borderfree, Inc.,55 West 39th Street, 18th Floor, New York, New York 10018.

**A note to residents of Canada**

When you visit a David's Bridal store in Canada and provide personal information to the store or provide personal information through the Service, you consent to our collection, use, and disclosure of your personal information in accordance with this policy. When you provide us with information about your groom or bridal party, we expect you have obtained consent from them to dose and that they understand their information will be treated in accordance with this policy and may be shared with Moors, The Suit People, Inc. d/b/a Moors Clothing for Men. Do not provide personal information to us about your groom or bridal party if you do not have their consent. You understand that by providing information about your groom or bridal party, you are representing that you have a personal or family relationship with them, and that you are requesting they be sent information, as set out above, on your behalf. This information may identify that you had requested it be sent. As explained above, because David's Bridal operates in the United States, any information provided through the Service or through a store in Canada may be processed in the United States, where privacy laws may offer different levels of protection from those in Canada and personal information may be subject to access by and disclosure to law enforcement agencies in the United States.

David's Bridal provides you with the ability to access and review your personal information held by us and will endeavor to provide the information in question within a reasonable time following your written request, but no later than 30 days following your written request. We will provide information from our records in a form that is easy to understand. We may charge a reasonable cost (e.g. photocopying, mail charges) when a request is made. David's Bridal may refuse to provide access to personal information where the information requested:

Would disclose (i) personal information of another individual or a deceased individual; or (ii) trade secrets or other confidential business information that may harm David's Bridal or the competitive position of a third party or interfere with contractual or other negotiations of David's Bridal or a third party or result in a significant financial loss or gain to David's Bridal or a third party;

TOP

Is not readily retrievable and the burden or cost of providing would
be disproportionate to the nature or value of the information;

Is subject to solicitor-client or litigation privilege;

Does not exist, is not held, or cannot be found by David's Bridal;

Could reasonably result in serious harm to the treatment or recovery
of the individual concerned or another individual, serious emotional
harm to the individual or another individual or serious bodily harm
to the individual or another individual;

May harm or interfere with law enforcement activities and other
investigative or regulatory functions of a body authorized by law to
perform such functions, or;

Any other grounds under applicable legislation.

Where information will not or cannot be disclosed, the individual
making the request will be provided with the reasons for non-
disclosure.

David's Bridal will not respond to repetitive or vexatious requests for
access. To guard against fraudulent requests for access, David's
Bridal may require sufficient information to allow it to confirm the
identity of the person making the request before granting access.
Requests for access should be submitted to us by e-mail at
privacyCA@dbi.com or by writing to us at David's Bridal, Inc., P.O.
Box 549, Conshohocken, PA 19428, U.S.A., and Attn: Privacy
Officer.

**A special note concerning children's privacy**

The safety of children is very important to us. We are committed to
protecting children's privacy on the Internet and we comply fully
with the Children's Online Privacy Protection Act. We do not
knowingly collect personal information from children under the age
of 13. If a child has provided us with personal information through
the Service or otherwise, we ask that a parent or guardian send us
an e-mail at remove@dbi.com , or write to us at David's Bridal, LLC,
1001 Washington Street, Conshohocken, PA 19428, Attn: Customer
Service/Privacy and we will delete the information about the child
from our files. Please refer to Children's Privacy in your subject line.
Deletion requests from our Canadian customers should be
submitted to us by e-mail at privacyCA@dbi.com or writing to us at
David's Bridal, Inc., 1001 Washington Street, Conshohocken, PA
19428, U.S.A., and Attn: Customer Service/Privacy.

**A note concerning changes to our privacy policy**

By using the Service, you consent to our collection, use, and disclosure of your personal information you provide in accordance with this privacy policy. If we decide to change our privacy policy, we will post those changes on this page so that you are always aware of what information we collect, how we use it, and under what circumstances we disclose it. Privacy policy changes will apply to the information collected from the date we post our revised privacy policy, as well as to existing information we hold.

If any proposed change is unacceptable to you, you may withdraw consent by sending us an e-mail at remove@dbi.com  or write us at: 1001 Washington Street, Conshohocken, PA 19428, Attn: Customer Service/Privacy.

**How to contact us**

If you have other questions, concerns or would like to request prior versions of our privacy policy, please write us at: David's Bridal, LLC, 1001 Washington Street, Conshohocken, PA 19428, Attn: Customer Service/Privacy.

© 2021-2022 David's Bridal, LLC. All Rights Reserved.

---

**EXCLUSIVE PARTNERS**

TOP

**ALL THINGS PLANNING. ALL IN ONE APP.**

Download to start your party today

**FOLLOW**

    

**ONLINE ORDERS**

Order Status

Returns & Exchanges

Your Account

International Orders

**OUR STORES**

Find a Store

Make an Appointment

**ABOUT**

About David's Bridal

Quality & Craftsmanship

Frontline Fierce

Events

Careers ⬈

Media Room

Blog

Media & Investor Relations

**REWARDS**

Diamond Loyalty Program

*See Loyalty program underline details & restrictions,
gifts tier descriptions & disclaimers

**HELP**

Contact Us

Help & FAQs

**TEXT US**

HELLO to 38201

**CALL US**

1-844-400-3222

© 2023 Davids Bridal. All Rights Reserved.

Privacy & Cookies    Accessibility    Terms & Conditions    California Privacy Rights    Do Not Sell My Info – CA Residents Only
Ethics/Transparency in Supply Chain    Sitemap    Sitemap Redirects

🇺🇸 E N / ( $ ) U S D

TOP