## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DAVID'S BRIDAL, LLC, *et al.*,[1] | ) | Case No. 23-13131 (CMG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF JAMES MARCUM,
## CHIEF EXECUTIVE OFFICER OF THE DEBTORS, IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James Marcum, declare under penalty of perjury:

### Introduction

1.     David's Bridal, LLC ("David's Bridal"), a limited liability company and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and together with their non-Debtor affiliates, the "Company"), is the largest bridal and special occasion retailer in North America, offering a broad assortment of gowns, wedding-related apparel, social occasion apparel, and related accessories and services.  For over 70 years, the Company has been an iconic bridal destination, dressing more than 70 million women for the best and most memorable moments of their lives.  Approximately 25% of brides in the United States wear a David's Bridal gown at their wedding and approximately 87% of brides visit the Company's website at least once during their wedding planning process.  In addition to bridal gowns, David's Bridal offers a wide assortment of occasion dresses and bridesmaid dresses, dressing approximately 1,000,000 bridesmaids annually.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); Blueprint Registry, LLC (2335).  The location of Debtor David's Bridal, LLC's service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

2.      Headquartered in Conshohocken, Pennsylvania, the Debtors primarily derive their revenue from merchandise sold at 294 stores across the United States, Canada, and the United Kingdom, franchise stores located in Mexico, and through the Company's e-commerce site (www.DavidsBridal.com), which receives more than 70 million website visits annually. The Debtors also generate incremental revenue from their alteration services, strategic retail partnerships, and most recently, through the launch of their application, Pearl, providing a wide range of wedding planning tools and services to brides.   In light of the Company's extensive assortment of wedding related apparel and accessories offered in-store and online, David's Bridal is the only significant omni-channel bridal retailer in the United States.   The Company further benefits from its strong brand recognition and the quality and value of its products across various price points.

3.      On November 19, 2018, the Debtors commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "Prior Chapter 11 Cases") to implement a restructuring pursuant to a prepackaged chapter 11 plan.  Approximately two months later, on January 18, 2019, the Debtors successfully emerged from the Prior Chapter 11 Cases, deleveraging their balance sheet by approximately $434 million.  Since June 2019, the Company has been led by an experienced new senior management team that has been working tirelessly to stabilize and improve the Company's operational and financial performance and to ensure that David's Bridal remains relevant to the modern bride.  Under the new management team's guidance, the Company improved the customer experience with modern branding, the launch of new product lines, advancement in the Company's technology offerings, and by centering its business around service to brides.   Notwithstanding these efforts, the Company is suffering under severe liquidity

constraints brought on by a confluence of adverse macroeconomic trends and industry specific headwinds, including the lasting impact of COVID-19 on the wedding industry.

4.       Over the past several months, the Debtors and their advisors have worked to prepare for and develop various strategic alternatives, including undertaking a robust marketing process led by the Debtors' investment banker, Houlihan Lokey Capital, Inc. ("Houlihan").  In February 2023, Houlihan began reaching out to potential bidders and the marketing process yielded several parties that have expressed potential interest in certain of the Debtors' assets.  In light of the Company's liquidity constraints, the Debtors were unable to continue their marketing process out of court, but the Debtors continue to believe that there is value in their brands and potential purchasers remain interested in exploring transactions on a postpetition basis.

5.       In connection with the Company's consideration of strategic alternatives, the Company has identified various operational efficiency initiatives to support a new, scaled down enterprise, including a reduction in its store fleet, corporate and store workforce, and corporate expenses.  The Debtors commenced these chapter 11 cases to, among other things, obtain the immediate access to liquidity necessary to implement these cost saving initiatives and continue the marketing process for a potential sale transaction.  Simultaneously with the filing of these chapter 11 cases, the Debtors filed a motion proposing an efficient, public, and flexible auction process to continue their sale efforts.  While the Debtors will continue to conduct a sale process at the outset of these chapter 11 cases, if the Debtors are unable to implement a going-concern transaction, the Debtors will turn to an orderly liquidation of their remaining assets, including the sale of distinct assets separate from the Debtors' operations.[2]

---

[2]     Prior to filing the chapter 11 petitions, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act") to all Employees and certain governmental entities (collectively, the "WARN Act Notices").  The WARN Act Notices were conditional, providing that the Company is in the process of evaluating its strategic options, including a sale as a going concern, a sale of certain assets and

6.      The Debtors and Gordon Brothers Retail Partners, LLC ("Gordon Brothers") have proposed procedures related to a potential wind-down of the Debtors' business operations and liquidation of inventory in all retail stores that are substantially similar to procedures used by other retailers in similar circumstances.  To the extent necessary, the Debtors believe that the proposed timeline and procedures would result in an expedited and efficient wind-down process.  The Debtors will manage their inventory in the coming weeks to further the opportunity to secure a value-maximizing going-concern transaction and, to the extent one materializes, will quickly pivot to cease store closings at any stores needed to implement the transaction.  The Debtors believe that this dual-path process will best maximize value for all stakeholders.

## Background

7.      I have been the Chief Executive Officer of David's Bridal since June 24, 2019.  I am also the Chief Executive Officer of each of the other Debtors.  I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

8.      I submit this declaration (the "Declaration") to assist this court (the "Court") and parties in interest in understanding the Debtors, their operations, their capital structure, the circumstances related to the commencement of the chapter 11 cases, and in support of (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (b) the relief requested by the Debtors pursuant to the pleadings described herein (the "First Day Motions").

9.      I believe that the relief sought in each of the First Day Motions is necessary to facilitate an effective transition into chapter 11.  Indeed, I believe that the Debtors' estates would

---

intellectual property, or a potential wind-down of some or all of the business, and as a result, the Company's Employees may experience an employment loss under the WARN Act.

suffer immediate and irreparable harm absent the immediate ability to obtain financing, use cash collateral, and make certain essential payments and otherwise continue the Debtors' business operations as sought in the First Day Motions. In my opinion, approval of the relief requested in the First Day Motions will minimize disruptions to the Debtors' business operations and customers and is critical to preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a speedy and successful sale of the Debtors' assets.

10.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

11.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** provides an overview of the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' prepetition restructuring efforts; and

- **Part V** summarizes the Debtors' First Day Motions.

## I.    Corporate History and Operations.

### A.  Overview of the Company and the History of David's Bridal.

12.    David's Bridal is the successor to a bridal retailing business that began as a single bridal salon in Ft. Lauderdale, Florida in 1950.  In 1972, entrepreneur Phil Youtie purchased the business and expanded operations, opening several bridal salons throughout Florida. By 1988, Phil Youtie owned 18 bridal salons that were primarily operated as boutiques located in large department stores.  In 1990, David's Bridal was incorporated and commenced operations by opening a warehouse store in Hallandale, Florida.

13.    In 1999, David's Bridal conducted an initial public offering and was listed on the New York Stock Exchange.  Approximately one year later, the May Department Stores Company ("May") acquired David's Bridal and, in 2007, Federated Department Stores, Inc. (the successor of May) sold David's Bridal to affiliates of Leonard Green & Partners, L.P. ("Leonard Green") and other investors.  In 2012, David's Bridal was acquired by affiliates of Clayton, Dubilier & Rice, LLC ("CD&R"), with Leonard Green maintaining a minority equity interest.

14.    In 2018, the Company began exploring various strategic alternatives in response to substantial debt obligations and liquidity constraints.  On November 19, 2018, after months of extensive negotiations and preparation, the Company filed the Prior Chapter 11 Cases.  On January 18, 2019, pursuant to the Company's prepackaged plan of reorganization in the Prior Chapter 11 Cases, the ownership interests held by CD&R and Leonard Green were cancelled and the Company's debt was equitized.

**B. The Company's Business Operations.**

15.     The Company is an international bridal retailer that strives to inspire its customers, with the goal of delivering highly engaged bridal experiences that deliver memories to cherish for a lifetime.   The Company maintains a diverse product portfolio, offering dresses and accessories for any special occasion.   The Company offers a wide range of bridal gowns ranging in price from $199 to over $2,000.   The Company's strong brand recognition has enabled the Company to expand beyond bridal wear into adjacent special occasion categories such as proms, formals, and quinceañeras.



16.     As of the Petition Date, the Debtors employ approximately 10,000 employees (collectively,  the  "Employees"),  of  which  approximately  2,000  are  full-time  Employees  and approximately 8,000 are part-time Employees.   None of the Employees are party to a collective bargaining agreement or similar labor agreement.   The Company's corporate headquarters is located in Conshohocken, Pennsylvania and the Debtors maintain two distribution centers, one located in Conshohocken and the other in Bristol, Pennsylvania.

17.     As the largest bridal and special occasion retailer in North America, the Company currently operates 294 stores, including 278 stores in 49 states in the United States, 12 stores in Canada, and four stores in the United Kingdom.   Additionally, the Debtors provide support to eight franchised stores in Mexico.   The Company leases all of its retail stores, except for one store located in New Jersey.

18.    Below is a map of the Debtors' store locations in the United States as of the Petition Date:



19.    David's Bridal is the owner of various trademarks and service marks, including the marks DAVID'S BRIDAL, DB STUDIO, GALINA, GALINA SIGNATURE, MELISSA SWEET, OLEG CASSINI, JULES & CLEO, and FIFTEEN ROSES.



20.    The Debtors product design and development team is responsible for creating and bringing new products to market.  The Company's team consists of designers in the United States and in China.  This group works closely with the merchandising, planning, allocation, and supply chain teams to ensure that in-demand products reach the Debtors' store and e-commerce channels in a timely manner.

21.    The Debtors rely on their relationships with several key merchandise suppliers, most notably, their four joint ventures incorporated under the laws of, and operating out of, Hong

Kong, China (the "<u>Foreign Affiliates</u>"), to maintain the flow of merchandise critical to their business and to facilitate the Debtors' ability to respond quickly and effectively to changes in customer demands.  In particular, the Debtors source approximately 87% of their merchandise through their Foreign Affiliates, including Fillberg Limited ("<u>Fillberg</u>"), which is the exclusive buying agent for the Debtors outside of North America.  More specifically, the Foreign Affiliates provide the design, sourcing, and production of 100% of bridal, bridesmaids, and quinceañera dresses sold by David's Bridal, 80% of social occasion dresses, and 50% of accessories under the Debtors' proprietary brands.  The designs sold in David's Bridal stores combine the Company's merchandise and designs with the extensive design and technical operations provided for by the Foreign Affiliates.  Through the Foreign Affiliates, the Debtors deal with approximately 30 foreign suppliers and vendors consisting of fabric mills and production factories in China, Myanmar, Vietnam, Sri Lanka, and other locations.

22.    The scale and efficiency of the Debtors' vertically integrated, asset-light supply chain provides it with the capabilities to design and produce high quality bridal fashions at a low cost, the benefits of which are then passed on to the consumer as part of David's Bridal's overall value proposition.  The Debtors' supply chain provides the ability to distribute these fashions globally in a timely and efficient manner to customers whose events demand a high level of precision.  The majority of the Foreign Affiliates' manufacturing capacity is dedicated to David's Bridal.

23.    The Debtors' marketing is focused on creating and elevating positive emotional connections between brides and the David's Bridal brand, communicating the functional elements that highlight the Debtors' differentiated value proposition within its brand, ranging from opening price point to proprietary designer assortments.  The Debtors utilize a strategic mix of digital

television and radio advertising, paid digital internet advertising, social media and influencer campaigns, e-mail, direct mail, special events, and numerous local and regional bridal shows to communicate the Company's brand value and drive consumer traffic.    Through its digital platforms, David's Bridal receives more than 425 million page views annually on its proprietary website and the Company directly communicates with its approximately 15 million e-mail subscribers and over 1.2 million SMS subscribers.    Through its social media digital channels, the Company has approximately 2.6 million active followers.    The Company's website is designed to provide inspiration and guidance during the wedding planning process, while also offering robust functionality for brides to book an appointment or transact through the Company's e-commerce capability.    Given the unique nature of the wedding dress selection process, 90% of all brides who purchase a David's Bridal wedding dress book an appointment through the Company's website for an in-store visit.    The breadth of the Company's digital assets, along with its long-established history of serving brides, has allowed David's Bridal to build unparalleled brand recognition in the bridal industry in North America.

24.    The Debtors' brand equity and strong customer relationships enable them to offer bridal customers a unique omni-channel experience and a suite of wedding planning tools and service offerings.    The Debtors offer these services via three principal revenue models: (a) full-service through David's Bridal, with options like alterations services; (b) referrals to other industry merchants, including, among others, the Black Tux, Shutterfly, and Little Tuxedo, producing a steady stream of revenue through fee-sharing arrangements based on David's Bridal originated leads; and (c) advertising on www.DavidsBridal.com, the most highly trafficked bridal website, and through its bridal registry and vendor listing marketplace.

25.     While the Debtors continue to utilize their traditional marketing methods, the Debtors are constantly brainstorming new ways to increase their revenue.  In December 2020, the Company launched its Diamond Loyalty Program which allows brides to earn one diamond point for every dollar spent, receive diamond points from their friends and family, and use those points towards various rewards, ranging from free tote bags to free honeymoons.  As of the Petition Date, the Diamond Loyalty Program has more than 2.1 million active members, 87% of which have made purchases since the program's launch.  In 2022 alone, approximately $405 million of merchandise demand sales and approximately $63 million of alterations demand sales were attributable to Diamond Loyalty Program customers.  In March 2022, Retail Info Systems News recognized the Diamond Loyalty Program as one of the top loyalty programs in the United States, trailing only Nike, Ulta, and Starbucks.

26.     In addition, most recently, in January 2023, the Company launched an event planning application, Pearl, to further infiltrate the wedding and broader event network.  Pearl includes a robust vendor marketplace, for which the Debtors charge listing fees, and a variety of planning tools to engage brides, including, among others, a wedding checklist, a vision board, and a gift registry.  The Debtors' extensive reach and engagement with brides has driven over 15,000 vendors, in the short period since its launch, to join the Pearl platform, with now more than 600,000 vendor listings and the capability to provide brides with value throughout their entire wedding planning process.

## II.     The Debtors' Prepetition Capital Structure.

27.     A chart setting forth the Company's current organizational structure, including a depiction of the Debtors and their non-Debtor affiliates, is attached as **Exhibit A** hereto.  The following table depicts the Debtors' prepetition capital structure as of the Petition Date:

| Funded Debt | Stated Maturity | Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| Prepetition ABL Facility (Revolving Loans) | May 2024 | $35,500,000 |
| Prepetition ABL Facility (FILO Term Loans) | May 2024 | $10,100,000 |
| Prepetition Senior Superpriority Term Loan Facility | May 2024 | $91,700,000 |
| Prepetition Superpriority Term Loan Facility | December 2024 | $29,300,000 |
| Prepetition First Lien Term Loan Facility | June 2023 or December 2024 | $74,900,000 |
| Prepetition Takeback Term Loan Facility | January 2024 or December 2024 | $12,400,000 |
|  | Total Funded Debt | $256,900,000 |

28.     As set forth above, the Debtors' capital structure is comprised of four term loan facilities and one asset-backed revolving facility that also includes a "first-in-last-out" term loan. The agents for each of the five facilities are party to the Third Amended and Restated Intercreditor Agreement, dated as of April 30, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Intercreditor Agreement").  Among other things, the Prepetition Intercreditor Agreement establishes the lien priority of each facility with respect to the lenders' collateral, including the collateral comprised of the Debtors' fixed assets (the "Term Loan Priority Collateral") and current assets (the "ABL Priority Collateral").  The below table depicts the respective lien priorities under each of the Debtors' credit facilities.

| PREPETITION LIEN PRIORITY | | |
|---|---|---|
| **Facility** | **ABL Priority Collateral[3]** | **Term Loan Priority Collateral[4]** |
| Prepetition ABL Facility | 1st priority | 5th priority |
| Prepetition Senior Superpriority Term Loan Facility | 2nd priority | 1st priority |
| Prepetition Superpriority Term Loan Facility | 3rd priority | 2nd priority |
| Prepetition First Lien Term Loan Facility | 4th priority | 3rd priority |
| Prepetition Takeback Term Loan Facility | 5th priority | 4th priority |

## A. Prepetition ABL Facility.

29.     David's Bridal, LLC, DBI Midco, Inc., Blueprint Registry, LLC, and David's Bridal Canada Inc. (collectively, the "Prepetition Loan Parties"), the several lenders party thereto, and Bank of America, N.A., as agent, are each party to the Amended and Restated ABL Credit Agreement, dated as of November 26, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement" and the facility thereunder, the "Prepetition ABL Facility"). The Prepetition ABL Facility is comprised of a $125 million revolving loan commitment (any drawn and outstanding amounts thereunder, the "Prepetition ABL Loans") and a $10 million "first-in-last-out" term loan (the "Prepetition FILO Term Loan"). The Prepetition FILO Term Loan is contractually subordinated to the Prepetition ABL Loans under the Prepetition ABL Credit Agreement. The Prepetition ABL Facility is guaranteed by each of the Debtors and is secured by liens on substantially all of the Debtors' assets ("Collateral"), including a first-priority lien on certain receivables, accounts, and inventory (the "ABL Priority Collateral") and a fifth-priority lien on substantially all other assets, including equipment, fixtures, real property, and intellectual property (the "Term Loan Priority Collateral"). The ABL Facility matures in May 2024 and, as of the Petition Date, approximately $38.5 million was outstanding in

---

[3]    "ABL Priority Collateral" includes, among other things, the Debtors' accounts, payment intangibles, cash and equivalents, inventory, and proceeds of the foregoing.

[4]    "Term Loan Priority Collateral" includes, among other things, the Debtors' equipment, fixtures, real property, intellectual property, all assets other than ABL Priority Collateral, and proceeds of the foregoing.

Prepetition ABL Loans, approximately $10.1 million was outstanding under the Prepetition FILO Term Loan, and approximately $16.9 million in letters of credit had been issued under the Prepetition ABL Facility.

**B.  The Prepetition Senior Superpriority Term Loan Facility.**

30.    The Prepetition Loan Parties, the several lenders party thereto, and Alter Domus (US) LLC ("Alter Domus") as agent, are each party to the Senior Superpriority Term Loan Credit Agreement, dated as of April 30, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Senior Superpriority Credit Agreement" and the facility thereunder, the "Prepetition SS Term Loan Facility").  The Prepetition SS Term Loan Facility is guaranteed by each of the Debtors and is secured by liens on substantially all of the Debtors' assets. As summarized above, the liens securing the Prepetition SS Term Loan Facility are first in priority with respect to the Term Loan Priority Collateral and second in priority with respect to the ABL Priority Collateral.  As of the Petition Date, approximately $91.7 million in aggregate principal amount remained outstanding under the Prepetition SS Term Loan Facility.

**C.  The Prepetition Superpriority Term Loan Facility.**

31.    The Prepetition Loan Parties, the several lenders party thereto, and Cantor Fitzgerald Securities ("Cantor Fitzgerald"), as agent, are each party to the Superpriority Term Loan Credit Agreement, dated as of June 19, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Superpriority Credit Agreement" and the facility thereunder, the "Prepetition Superpriority Term Loan Facility").  The Prepetition Superpriority Term Loan Facility is guaranteed by each of the Debtors and is secured by liens on substantially all of the Debtors' assets. As summarized above, the liens securing the Prepetition Superpriority Term Loan Facility are second in priority with respect to the Term Loan Priority Collateral and third in priority with respect to the ABL Priority Collateral.  As of the Petition Date,

approximately $29.3 million in aggregate principal amount remained outstanding under the Prepetition Superpriority Term Loan Facility.

### D. The Prepetition First Lien Term Loan Facility.

32.     The Prepetition Loan Parties, the several lenders party thereto, and Cantor Fitzgerald, as agent, are each party to the First Lien Term Loan Credit Agreement, dated as of November 26, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement" and the facility thereunder, the "Prepetition First Lien Term Loan Facility").  The Prepetition First Lien Term Loan Facility is guaranteed by each of the Debtors and is secured by liens on substantially all of the Debtors' assets.  As summarized above, the liens securing the Prepetition First Lien Term Loan Facility are third in priority with respect to the Term Loan Priority Collateral and fourth in priority with respect to the ABL Priority Collateral.  As of the Petition Date, approximately $74.9 million in aggregate principal amount remained outstanding under the Prepetition First Lien Term Loan Facility.

### E. The Prepetition Takeback Term Loan Facility.

33.     The Prepetition Loan Parties, the several lenders party thereto, and Cantor Fitzgerald, as agent, are each party to the Term Loan Credit Agreement, dated as of January 18, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Takeback Credit Agreement" and the facility thereunder, the "Prepetition Takeback Term Loan Facility").  The Prepetition Takeback Term Loan Facility is guaranteed by each of the Debtors and is secured by liens on substantially all of the Debtors' assets. As summarized above, the liens securing the Prepetition Takeback Term Loan Facility are fourth in priority with respect to the Term Loan Priority Collateral and fifth in priority with respect to the

ABL Priority Collateral.  As of the Petition Date, approximately $12.4 million in aggregate principal amount remained outstanding under the Prepetition Takeback Term Loan Facility.

## III.    Events Leading to these Chapter 11 Cases.

34.    A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  *First*, internal factors, including the liquidity needs of the Company to support its significant operating expenses, and disruptions to management initiatives, have impaired the Debtors' liquidity.  *Second*, the impact of the COVID-19 pandemic, as well as the significant shift in the competitive landscape due to the disruption in the retail industry, has led to a decrease in sales.  *Finally*, shifts in consumer behaviors have contributed to the elongation of wedding planning cycles and an overall casualization in wedding events, thereby affecting the demand for more traditional wedding gowns and formal attire, all of which have further reduced the Debtors' revenue.

### A.  Internal Factors.

35.    While the restructuring achieved in the Prior Chapter 11 Cases deleveraged the Debtors' balance sheet by approximately $434 million, the Company maintained a large store footprint and substantial operating expenses following its emergence from chapter 11. Given David Bridal's sizable store portfolio—with 294 stores across the United States, Canada, and the United Kingdom—inflationary pressures, which have led to higher inventory and operating costs, have significantly impacted the Company's revenue.

36.    Further, David's Bridal is primarily a seasonal business, and the Prior Chapter 11 Cases were pending at the height of the "Bridal Christmas" season, which is the period between January and May of each year.  Bridal Christmas generates a significant amount of the Company's yearly EBITDA as a substantial number of brides, bridesmaids, and other formalwear customers make their purchases during this period in anticipation of upcoming summer and fall events.

During Bridal Christmas, the Company generally collects the proceeds for a wedding dress in the form of a customer deposit and the Company fulfills the order from its inventory on hand in its distribution center, another store location, dresses in transit through the Company's normal supply chain, or through new production from Fillberg, the Company's vertical supply chain partner.

37.     Unfortunately, the timing of the Prior Chapter 11 Cases during the 2019 Bridal Christmas season impacted the customer's perception of the Company's brand and resulted in a decline in confidence in the Company during what should have been a peak sale period.  As a result of the foregoing, the Company experienced a significant decline in traffic, appointments, and unit sales in the Company's stores.  The marked shift in customer's perception of the business shortly following the Prior Chapter 11 Cases significantly eroded David's Bridal's liquidity forecast following emergence.  In response to the foregoing, the Company's then-existing management team engaged in excessive promotional activity which further exacerbated the deterioration of the Company's performance, as gross profit margins declined and fixed costs remained relatively unchanged, causing EBITDA degradation.

38.     In June 2019, I was hired as the Chief Executive Officer of the Company and immediately began to recruit and assemble a new management team of seasoned retail executives with unique expertise to stabilize the Company's business and implement a transformation plan focused on several key initiatives.  These initiatives stemmed from a focus on significantly improving the Company's customer service levels and execution in stores to improving customer perception of David's Bridal.  Under my leadership, the Company worked to remove friction points with its customers with respect to inconsistent customer policies, and the Company reset its brand hierarchy and assortments to improve its productivity.  Most notably, the Company launched a robust set of digital solutions to engage with brides at the outset of their wedding planning

process.  David's Bridal implemented various social media capabilities designed to strengthen the relevancy of David's Bridal to the modern bride.

39.     Simultaneously with the development and implementation of this transformation plan, the Company launched a restructuring process to recapitalize its outstanding funded debt.  In November 2019, the Company implemented an out-of-court restructuring transaction to exchange $276 million of its $300 million term loans into new preferred and common equity securities (the "Out-of-Court Restructuring").   In connection with the Out-of-Court Restructuring, the Debtors entered into the Prepetition First Lien Term Loan Facility, thereby obtaining $55 million of new growth capital to execute upon the Company's transformation plan.

40.     As a result of these transformation initiatives, during the first quarter of 2020, the Company was successful in reversing its comparable sale declines and was well positioned to reestablish David's Bridal's brand reputation within the wedding industry.  Despite the substantial progress made by the Company during the second half of 2019 and the first quarter of 2020, the Company's transformation efforts were immediately disrupted by the COVID-19 pandemic and the Debtors' outlook was immediately and significantly reversed, negatively impacting the Company's liquidity.

**B.  The Impact of COVID-19.**

41.     On March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic, and national, state, and local governments in the United States and around the world began imposing shelter-in-place and stay at home orders, as well as strict social distancing protocols.  On March 17, 2020, the Company temporarily closed all of its approximately 300 stores to protect the health and safety of David's Bridal's customers and associates.  David's Bridal continued to serve its customers online and utilized its fulfilment center and merchandise in store

locations to fulfill online orders.  David's Bridal began a phased reopening of stores on May 1, 2020, including by offering curbside pick-up, with substantially all of the Company's stores reopening by May 22, 2020.  Notwithstanding the reopening of David's Bridal stores, social distancing restrictions imposed by governmental authorities remained in place, and large events, such as weddings, continued to be postponed as new COVID-19 variants continued to be discovered.

42.    To fund operations and continue serving brides during the pandemic, on June 19, 2020, the Debtors entered into the Prepetition Superpriority Term Loan Facility.  As demand and sales began to stabilize, on April 30, 2021, the Company entered into the Prepetition SS Term Loan Facility to provide the Debtors with additional liquidity to further advance their transformation efforts.  Notwithstanding these efforts, the lasting effects of the pandemic continued to impact the Company's revenue and the Debtors liquidity began to deteriorate during the second quarter of 2022.  As a result, in November 2022, the Debtors secured additional incremental financing to provide the Company with time to conduct a marketing and sale process to maximize the value of the Company for all stakeholders.

43.    In addition, the restrictions resulting from legally imposed measures, combined with radically altered behavior by consumers, precipitated an unprecedented decline in economic activity and record high inflation levels.  This significant change in consumer demand also led to increased competition among retailers, particularly online retailers.  The Debtors have continued to experience a decline in store traffic as a result of these factors, with in-store appointments declining more than 14% during the fourth quarter of 2022 and bridal unit sales declining almost 20% during the same period.  As a result of the COVID-19 pandemic and the ensuing global

economic issues, the Debtors' sales materially declined from forecasts and the Company quickly depleted its newly raised growth capital stemming from its Out-of-Court Restructuring.

**C. Substantial Shifts in the Wedding Industry.**

44.     Attitudes towards marriage have been evolving over the last few decades, with it becoming more common for people to not marry their long-term partners.  These trends are consistent with societal changes in attitudes and practices, which have moved in a less traditional direction over the past few decades.  Despite these shifts, the overall wedding industry historically remained stable with the number of weddings averaging above two million per year.  As a result of the COVID-19 pandemic and the related ban on in-person activities and large gatherings, the national marriage rate in 2020 fell to its lowest level in 121 years.  Based on the Company's data derived from various sources and customer surveys, the marriage rate in 2022 remained low, with only 1.9 million weddings occurring last year as compared to the more than 2.2 million weddings that occurred annually in the years leading up to the pandemic.

45.     Due to the significant number of weddings postponed during the pandemic, brides still find it challenging to secure their ideal wedding venue, resulting in couples elongating their wedding planning cycles and brides delaying their timing for selecting a dress.  While the wedding industry has not yet rebounded, the Debtors are also experiencing reduced demand due to shifts in consumer behavior in the post-COVID environment and the current macroeconomic environment. This environment has contributed to David's Bridal facing escalating competition from traditional online retailers and other pure-play clothing retailers, as an increasing number of brides are opting for less traditional wedding attire, including thrift wedding dresses.  Thus, the demand for formal wedding dresses, bridesmaid dresses, and related accessories has decreased substantially in the

current environment.  The bridal wear industry is unique and these shifting consumer preferences have significantly exacerbated the Debtors' liquidity issues.

## IV.    Restructuring Efforts.

46.    To counteract the lingering impact of the COVID-19 pandemic and macroeconomic headwinds, David's Bridal has taken several proactive measures to remain competitive.  The Company remodeled and modernized its stores while also expanding its e-commerce platform, launching a significant number of digital initiatives to leverage its engagement and relevancy to brides.    The Company has also implemented various cost cutting measures by closing underperforming stores and streamlining its workforce.

47.    In the fall of 2022, in light of the Debtors' constrained liquidity position and upcoming interest payments on its debt, the Company sought a near-term, holistic solution.  The Debtors contemplated various strategic alternatives, including both in- and out-of-court restructuring transactions.  The Debtors and their advisors began reaching out to certain of the Company's principal stakeholders to proactively develop a comprehensive restructuring solution that would address the Company's debt and liquidity situation and provide runway to implement a value-maximizing transaction.

48.    In November 2022, following negotiations with key stakeholders, the Debtors secured $25 million of new financing from new and existing lenders, including a $15 million incremental term loan under the Prepetition SS Term Loan Facility and the $10 million Prepetition FILO Term Loan.    In connection with the incremental financing, the Debtors entered into amendments to their existing credit agreements (the "Credit Agreement Amendments").  The Credit Agreement Amendments extended certain maturity dates under the Debtors' funded debt facilities and required the Debtors to, among other things, engage in a marketing process for the

sale of the Debtors' assets pursuant to an agreed upon timeline and to appoint a disinterested manager to the board of David's Bridal, LLC (the "Board").

49.    Beginning in December 2022, the Debtors began preparing for a potential going-concern sale transaction to maximize value for the Debtors and their stakeholders. The Debtors engaged Houlihan in December 2022 to act as their investment banker. Houlihan compiled a targeted list of strategic, financial, and brand investors and acquirers and initiated an expedited but comprehensive marketing process, launching outreach in late February. The Debtors and their advisors worked quickly to negotiate and enter into confidentiality agreements with more than 30 parties and to provide access to a virtual data room. Company management and Houlihan have since held several in-person and telephonic-meetings with potential bidders in the weeks prior to the Petition Date and, to date, have received indications of potential interest that could, if moved to a binding bid, provide additional liquidity for the Debtors' estates.

50.    In satisfaction of the requirements set forth in the Credit Agreement Amendments, in December 2022 and March 2023, respectively, the Debtors appointed, Ryan Esko and Matthew Kahn to the Board as independent and disinterested directors (collectively, the "Disinterested Directors"). The Board delegated decision-making authority to Matthew Kahn with respect to conflict matters and the Disinterested Directors have played an integral role in overseeing the Debtors' ongoing sale process.

51.    Most recently, in March 2023, lenders under the Prepetition ABL Facility informed the Debtors that, as a result of the Company's deteriorating liquidity position, a cash dominion period (the "Cash Dominion Period") had occurred and that Bank of America, N.A., as agent, delivered the applicable dominion notices to each applicable depositary bank of the Debtors. As of the Petition Date, the Cash Dominion Period remained ongoing and the Debtors were required

to seek approval from its lenders under the Prepetition ABL Facility prior to spending any of the estates' cash on-hand.  Operating under these circumstances proved difficult and impacted the Debtors ability to continue its prepetition marketing efforts.

## V.    The Debtors' First Day Motions.

52.    To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and to promote a smooth transition to operations in chapter 11, the Debtors have requested various relief in their First Day Motions.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  These First Day Motions include:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief*;

- *Debtors' Motion Seeking Entry of an Order Extending Time to (I) File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Redact Certain Personally Identifiable Information, and (II) Granting Related Relief*;

- *Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of Omni Agent Solutions as Claims and Noticing Agent Effective as of the Petition Date*;

- *Debtors' Motion for Entry of an Order (I) Authorizing David's Bridal, LLC to Act as Foreign Representative, and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code and (II) Approving the Related Form and Manner of Notice*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing the Payment of Prepetition Administrative Fees Relating to Utility Services, and (V) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay their Obligations Under Insurance Programs Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Honor the Terms of their Financing Agreement and Pay Premiums Thereunder, and (E) Maintain their Customs Surety Bonds, and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Claims of (A) Critical Vendors and (B) Lien Claimants and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms; and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief*;

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume and Perform Under the Consulting Agreement Related to the Sale of Inventory, (II) Approving Procedures for the Sale of Inventory, (III) Approving Modifications to Certain Customer Programs, and (IV) Granting Related Relief*;

- *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures and Bid Protections, (B) Approving the Form Asset Purchase Agreement, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, and (E) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases and (II)(A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, and (C) Authorizing the Assumption and Assignment of the Assumed Contracts*; and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.*

53.    The First Day Motions seek authority to, among other things, stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and provide postpetition financing and access cash collateral.  Receiving Court approval of the relief sought in the First Day Motions is essential to provide the Debtors with an opportunity to work towards an expeditious sale process in chapter 11.

54.    Further, the Debtors seek authority to continue paying obligations to certain vendors critical to the Debtors' operations.  I believe that such relief is essential for the Debtors' continued and uninterrupted access to merchandise and other goods and services needed to fulfill customer orders.  Given the specific nature of the Debtors' business, whereby brides, bridal parties, and other customers purchase merchandise from the Debtors for important life events, the Debtors must be able to rely on timely delivery of goods and services from their critical business partners.

55.    Several of the First Day Motions request authority to pay certain prepetition claims. Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."   In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to

pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

56.     I have reviewed each of the First Day Motions.  The facts stated in each of the First Day Motions are true and correct to the best of my information and belief.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully consummating a sale transaction while also pursuing, as an alternative, an orderly wind-down.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated:  April 17, 2023                    /s/ *James Marcum*
                                          James Marcum
                                          Chief Executive Officer
                                          David's Bridal LLC

## Exhibit A

**Corporate Structure**

