**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Felice R. Yudkin, Esq.
fyudkin@coleschotz.com
Jacob S. Frumkin, Esq.
jfrumkin@coleschotz.com

*Counsel to the Debtors*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
(212) 446-4900 Facsimile
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
joshua.sussberg@kirkland.com
Christopher T. Greco, P.C. (admitted *pro hac vice*)
christopher.greco@kirkland.com
Rachael M. Bentley (admitted *pro hac vice*)
rachael.bentley@kirkland.com

*-and-*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2000
(312) 862-2200 Facsimile
Alexandra Schwarzman, P.C. (admitted *pro hac vice*)
alexandra.schwarzman@kirkland.com

*Counsel to the Debtors*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>DAVID'S BRIDAL, LLC, *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-13131 (CMG)<br><br>(Jointly Administered) |

## NOTICE OF ASSET PURCHASE AGREEMENT RELATED TO <u>SUCCESSFUL BIDDER</u>

**PLEASE TAKE NOTICE** that on the April 19, 2023, the Court entered the *Order (A)*

*Approving Bidding Procedures and Bid Protections, (B) Approving the Form Asset Purchase*

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335). The location of debtor David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

*Agreement, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, and (E) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases* [Docket No. 72] (the "Bidding Procedures Order").[2]

**PLEASE TAKE FURTHER NOTICE** that on June 27, 2023, the Debtors filed the *Notice of Eighth Extension of Deadlines Set Forth In the Bidding Procedures Order* [Docket No. 531] (the "Extension Notice").

**PLEASE TAKE FURTHER NOTICE** that on July 5, 2023, the Debtors filed the *Notice of Cancellation of Auction* [Docket No. 572].

**PLEASE TAKE FURTHER NOTICE** that in accordance with the Bidding Procedures Order, the Debtors selected the going concern bid package submitted by CION Investment Corporation as the Successful Bidder and, on July 6, 2023, filed the *Notice of Successful Bidder* [Docket No. 581].

**PLEASE TAKE FURTHER NOTICE** that annexed hereto as **Exhibit A**, is a copy of the Asset Purchase Agreement.

**PLEASE TAKE FURTHER NOTICE** that the sale hearing will be held on **July 14, 2023 at 9:00 a.m. (ET)** (the "Sale Hearing") and at the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid.

*[Remainder of page intentionally left blank.]*

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order.

65783/0001-45715249v1

DATED:  July 10, 2023                 Respectfully submitted,

                                      **COLE SCHOTZ P.C.**

                                      By:_____/s/ Felice R. Yudkin_____
                                           Michael D. Sirota, Esq.
                                           Felice R. Yudkin, Esq.
                                           Jacob S. Frumkin, Esq.
                                           Court Plaza North
                                           25 Main Street
                                           Hackensack, NJ 07601
                                            (201) 489-3000
                                            (201) 489-1536 Facsimile
                                           Email: msirota@coleschotz.com
                                                   fyudkin@coleschotz.com
                                                   jfrumkin@coleschotz.com

                                      **KIRKLAND & ELLIS LLP**
                                      **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                           Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
                                           Christopher T. Greco, P.C. (admitted *pro hac vice*)
                                           Rachael M. Bentley (admitted *pro hac vice*)
                                           601 Lexington Avenue
                                           New York, New York 10022
                                           (212) 446-4800
                                           (212) 446-4900 Facsimile
                                           Email: joshua.sussberg@kirkland.com
                                                   christopher.greco@kirkland.com
                                                   rachael.bentley@kirkland.com
                                      *-and-*
                                           Alexandra Schwarzman, P.C. (admitted *pro hac vice*)
                                           300 North LaSalle Street
                                           Chicago, Illinois 60654
                                            (312) 862-2000
                                            (312) 862-2200 Facsimile
                                           Email: alexandra.schwarzman@kirkland.com

                                      *Counsel to the Debtors*

65783/0001-45715249v1

## Exhibit A

**Asset Purchase Agreement**

65783/0001-45715249v1

**DRAFT 7-10-23**

---

## ASSET PURCHASE AGREEMENT[1]

## DATED AS OF JULY [●], 2023

## BY AND AMONG

## DAVID'S BRIDAL, INC., AS PURCHASER,

## CION INVESTMENT CORPORATION, AS GUARANTOR,

## AND

## DBI INVESTORS, INC.

## AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS

---

*This is a draft agreement only, and delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever with respect to the proposed transaction unless and until the definitive agreement providing for such transaction has been executed and delivered by all parties thereto.*

---

[1] **Note to Draft**: This Agreement remains subject to Purchaser's continued review in all respects, including review by Canadian counsel.

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### PURCHASE AND SALE OF THE ACQUIRED ASSETS;
### ASSUMPTION OF ASSUMED LIABILITIES

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of the Acquired Assets | 1 |
| 1.2 | Excluded Assets | 5 |
| 1.3 | Assumption of Certain Liabilities | 7 |
| 1.4 | Excluded Liabilities | 8 |
| 1.5 | Assumption/Rejection of Certain Contracts | 9 |
| 1.6 | Canadian Purchaser | 11 |
| 1.7 | Canadian Tax Elections. | 11 |

### ARTICLE II
### CONSIDERATION; PAYMENT; CLOSING

| | | |
|---|---|---|
| 2.1 | Consideration | 12 |
| 2.2 | Closing | 12 |
| 2.3 | Closing Deliveries by Sellers | 13 |
| 2.4 | Closing Deliveries by Purchaser | 13 |
| 2.5 | Withholding | 14 |

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 3.1 | Organization and Qualification | 14 |
| 3.2 | Authorization of Agreement | 14 |
| 3.3 | Conflicts; Consents | 15 |
| 3.4 | Financial Statements; No Undisclosed Liabilities | 15 |
| 3.5 | Equity Interests of JVs | 16 |
| 3.6 | Title to Properties | 16 |
| 3.7 | Contracts | 17 |
| 3.8 | No Litigation; Orders | 19 |
| 3.9 | Permits; Compliance with Laws | 19 |
| 3.10 | Environmental Matters | 19 |
| 3.11 | Intellectual Property | 19 |
| 3.12 | Tax Matters | 21 |
| 3.13 | Assumed Benefit Plans | 22 |
| 3.14 | Employees | 23 |
| 3.15 | Affiliate Transactions | 23 |
| 3.16 | Suppliers | 23 |
| 3.17 | Brokers | 24 |
| 3.18 | No Other Representations or Warranties | 24 |

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

| | | |
|---|---|---|
| 4.1 | Organization and Qualification | 24 |
| 4.2 | Authorization of Agreement | 24 |
| 4.3 | Conflicts; Consents | 25 |

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.4 | Financing | 25 |
| 4.5 | Brokers | 26 |
| 4.6 | No Litigation | 26 |
| 4.7 | Investment Representation; Investigation | 26 |
| 4.8 | No Foreign Person | 26 |
| 4.9 | Solvency | 26 |
| 4.10 | GST/HST | 27 |
| 4.11 | . Canadian Purchaser will be registered for GST/HST purposes on or prior to the Closing Date | 27 |
| 4.11 | No Additional Representations or Warranties | 27 |

## ARTICLE V
## BANKRUPTCY COURT MATTERS

| | | |
|---|---|---|
| 5.1 | Bankruptcy Actions | 27 |
| 5.2 | Cure Costs | 29 |
| 5.3 | Sale Order | 30 |
| 5.4 | Canadian Sale Order | 30 |
| 5.5 | Approval | 30 |
| 5.6 | Canadian Reserve | 31 |

## ARTICLE VI
## COVENANTS AND AGREEMENTS

| | | |
|---|---|---|
| 6.1 | Conduct of Business of Sellers | 31 |
| 6.2 | Access to Information | 34 |
| 6.3 | Employee Matters | 36 |
| 6.4 | Filings and Authorizations | 39 |
| 6.5 | Reasonable Efforts; Cooperation | 39 |
| 6.6 | Further Assurances | 39 |
| 6.7 | Receipt of Misdirected Assets | 39 |
| 6.8 | Acknowledgment by Purchaser | 40 |
| 6.9 | Guaranty | 42 |
| 6.10 | Intellectual Property Matters | 43 |
| 6.11 | Delivery of Schedules | 43 |
| 6.12 | Insurance Matters | 43 |
| 6.13 | Data Transfer | 44 |

## ARTICLE VII
## CONDITIONS TO CLOSING

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Sellers | 45 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 45 |
| 7.3 | Conditions Precedent to the Obligations of Sellers | 46 |
| 7.4 | Frustration of Closing Conditions | 47 |
| 7.5 | Information Officer's Certificate | 47 |

# TABLE OF CONTENTS

**Page**

## ARTICLE VIII
## TERMINATION

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 47 |
| 8.2 | Effect of Termination | 49 |

## ARTICLE IX
## TAXES

| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 49 |
| 9.2 | Cooperation | 49 |
| 9.3 | Preparation of Tax Returns and Payment of Taxes | 49 |

## ARTICLE X
## MISCELLANEOUS

| | | |
|---|---|---|
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 50 |
| 10.2 | Expenses | 51 |
| 10.3 | Notices | 51 |
| 10.4 | Binding Effect; Assignment | 52 |
| 10.5 | Amendment and Waiver | 53 |
| 10.6 | Third Party Beneficiaries | 53 |
| 10.7 | Non-Recourse | 53 |
| 10.8 | Severability | 53 |
| 10.9 | Construction | 54 |
| 10.10 | Schedules | 54 |
| 10.11 | Complete Agreement | 54 |
| 10.12 | Specific Performance | 55 |
| 10.13 | Jurisdiction and Exclusive Venue | 55 |
| 10.14 | Governing Law; Waiver of Jury Trial | 56 |
| 10.15 | No Right to Set Off | 56 |
| 10.16 | Counterparts and PDF | 57 |
| 10.17 | Publicity | 57 |
| 10.18 | Bulk Sales Laws | 57 |
| 10.19 | Fiduciary Obligations | 58 |
| 10.20 | Time of Essence | 58 |
| 10.21 | Sellers' Representative | 58 |

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

| | | |
|---|---|---|
| 11.1 | Certain Definitions | 58 |
| 11.2 | Index of Defined Terms | 68 |
| 11.3 | Rules of Interpretation | 69 |

## INDEX OF EXHIBITS

## TABLE OF CONTENTS

**Page**

EXHIBIT A-1    FORM OF US BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT A-2    FORM OF CANADIAN BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT B-1    FORM OF US TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT B-2    FORM OF CANADIAN TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT C-1    FORM OF US COPYRIGHT ASSIGNMENT AGREEMENT

EXHIBIT C-2    FORM OF CANADIAN COPYRIGHT ASSIGNMENT AGREEMENT

EXHIBIT D-1    FORM OF BARGAIN AND SALE DEED (HQ PROPERTY)

EXHIBIT D-2    FORM OF BARGAIN AND SALE DEED (MAPLE SHADE PROPERTY)

EXHIBIT E      FORM OF SALE ORDER

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of July [●], 2023, is made by and among David's Bridal, Inc., a Delaware corporation ("Purchaser"), CION Investment Corporation, a Maryland corporation ("Guarantor"), and DBI Investors, Inc., a Delaware corporation ("DBI") and the Subsidiaries of DBI that are indicated on the signature pages attached hereto (together with DBI, each a "Seller" and collectively "Sellers"). Purchaser, Sellers and Guarantor are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on April 17, 2023 (the "Petition Date"), DBI, together with certain other of DBI's Subsidiaries, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes as *In re David's Bridal, LLC, et. al.*, case number 23-13131 (CMG) (collectively, the "Bankruptcy Cases"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, including the entry and terms of the Sale Order and the Canadian Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order and the Canadian Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in, to and under, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing subject to the terms of this Agreement, and including Sellers' right, title and interest in and under, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)     all Contracts to which any Seller is a party that are listed on Schedule 1.1(a) (including Acquired Real Property Leases) and all Contracts listed on Schedule 1.5 subject to Section 1.5, and all purchase orders, to the extent assignable under applicable Law (the "Assigned Contracts");

(b)     all (i) accounts receivable, notes receivable, negotiable instruments and chattel paper and other amounts owed to Sellers (whether current or non-current), including from David's Bridal UK Limited, together with all security or collateral therefor and any unpaid interest, financing charges or fees accrued thereon or other amounts due with respect thereto, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to Sellers with respect to products sold or services performed on or prior to the Closing Date, (ii) license and royalty receivables, (iii) rebate receivables from suppliers or vendors, (iv) tenant inducement receivables, and (v) other amounts due to Sellers, classified as accounts receivable in accordance with GAAP;

(c)     to the extent transferable in compliance with applicable Law, all Documents;

(d)     the real property owned by Sellers or their Subsidiaries listed on Schedule 1.1(d) (the "Owned Real Property");

(e)     subject to Section 1.5, all leasehold interests in the leased real property listed on Schedule 1.1(e) (the "Acquired Leased Real Property"), including any Leasehold Improvements and all rights of the Sellers in and to any permanent fixtures, improvements, and appurtenances thereto, and all leases, subleases and other occupancy Contracts with respect thereto (the "Acquired Real Property Leases"), and, solely to the extent located on or otherwise appurtenant to the Owned Real Property or the Acquired Leased Real Property, as applicable, (i) all other rights-of-way, surface leases, surface use agreements, easements, real property interests, real property rights, licenses, servitudes, Permits and privileges constituting real property or a real property interest owned or held for use by Sellers and (ii) Sellers' right, title and interest in and to all structures, facilities or improvements located thereon and all rights, tenements, appurtenant rights and privileges relating thereto ((i) and (ii), collectively, "Real Property Appurtenances");

(f)     all shares of capital stock or other equity interests that any Seller owns in the JVs, including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests, investments or contributions in the JVs;

(g)     all tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers, including the tangible assets owned, leased or used (or held for use) by Sellers located at any Acquired Leased Real Property or Owned Real Property and any tangible assets on order to be delivered to any Seller;

(h)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes that

2

constitute Excluded Assets), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(i)      to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(j)      the sponsorship of, and all rights, interests and assets associated with, the Seller Plans set forth on Schedule 1.1(j) (collectively, the "Assumed Benefit Plans");

(k)      all Seller Intellectual Property (including all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue, enforce, prosecute, and retain or recover damages, costs, or attorneys' fees for past, present and future infringements, dilutions, misappropriations of, or other conflicts with or violations of, such Intellectual Property and all rights of renewal with respect to the foregoing together with all royalties, fees, income, payments, and other proceeds due or payable to any Seller from and after the Closing with respect to the foregoing and any and all corresponding rights, privileges, and protections that, now or hereafter, may be accruing or secured throughout the world by any applicable law, treaty, or other international convention throughout the world, including the right to assign the rights conveyed herein, the same to be held and enjoyed by Purchaser for its own use and benefit, and for the benefit of its successors, assigns, and legal representatives) and Seller IP Rights;

(l)      all goodwill, payment intangibles and general intangible assets and rights of Sellers (including all goodwill symbolized by or associated with the Seller Intellectual Property);

(m)      all Inventory of Sellers wherever located;

(n)      all Cash and Cash Equivalents, subject to the Canadian Reserve;

(o)      all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, in each case, except to the extent in respect of an Excluded Asset;

(p)      subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights of Sellers to the websites, domain names, telephone and facsimile numbers and e-mail addresses used by each Seller, as well as rights to receive mail and other communications addressed to each Seller (including mail and communications from customers, vendors, suppliers, distributors and agents);

(q)      except as contemplated by Section 1.2(e), and to the extent transferable under applicable Law, each insurance policy covering the Business, the Acquired Assets and related to the Assumed Liabilities (the "Insurance Policies") and rights and benefits thereunder, including (i) all rights to indemnification for losses, defense costs and settlements, credits, refunds, proceeds, claims (including first party and third party insurance claims), causes of action or other

3

rights arising under or relating to such Insurance Policies, (ii) all claims, demands, proceedings and causes of action asserted or that may be asserted by such Seller under such Insurance Policies and (iii) any letters of credit or other credit support related thereto;

(r)     all benefits and rights under non-disclosure or confidentiality or invention assignment, non-compete, non-solicitation, non-interference, non-disparagement or similar agreements or arrangements or clawback arrangements to which any Seller is a party or with respect to which such Seller or any Affiliate of Sellers (or any of the predecessors in interest) is a beneficiary or has any rights thereunder, including any such agreement with current or former directors, managers, officers, employees, contractors or agents of Sellers or any Affiliate of Sellers (or any of the predecessors in interest), or with third parties (but excluding any Excluded Contracts);

(s)     all (i) rights (including lien rights), claims (including commercial tort claims), settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses, against Persons (including suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contract or Acquired Real Property Lease) and (ii) rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery to the extent relating to the Acquired Assets or Assumed Liabilities;

(t)     all claims, rights or causes of action of any Seller for avoidance, recovery, subordination or other relief and actions of Sellers (including, without limitation, any such claims, rights or causes of action arising under chapter 5 of the Bankruptcy Code, including Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code or applicable state or Canadian fraudulent conveyance, fraudulent transfer, or similar Laws), including all actions against (x) any counterparties to any Assigned Contract or Acquired Real Property Lease and (y) any Persons with whom Sellers contracted for goods and services;

(u)     except to the extent that any transfer or assignment is prohibited by applicable Law, (i) all personnel files for Transferred Employees and, (ii) to the extent such files relate to any of the Acquired Assets or any of the Assumed Liabilities, all personnel files for any former or current employee of such Seller that is not a Transferred Employee;

(v)     to the extent transferable under applicable Law, the bank and deposit accounts set forth on Schedule 1.1(v) (other than the Professional Fee Escrow Account); and

(w)     the purchase orders set forth on Schedule 1.1(w) (the "JV Purchase Orders");

(x)     the bonds set forth on Schedule 1.1(x) (the "Customs Bond");

(y)     the rights associated with the "Diamond Loyalty" customer program and other such customer programs; and

(z)     all proceeds and products of any and all of the foregoing Acquired Assets.

4

EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN ARTICLE III (AS MODIFIED BY THE SCHEDULES) OR ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT, (I) SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) SELLERS MAKE NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES AND (III) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE ACQUIRED ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):

(a)     except as contemplated by Section 1.1(o), (i) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, in each case of this clause (i), solely to the extent in respect of an Excluded Asset, and (ii) any retainers or similar amounts paid to Advisors or other professional service providers;

(b)     subject to Section 1.5, all Contracts of Sellers that are not Assigned Contracts or Acquired Real Property Leases (the "Excluded Contracts");

(c)     all documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate exclusively to any of the other Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents to the extent relating to the business activities of Sellers unrelated to the Business, all minute books, organizational documents, stock certificates and stock registers of any Seller as pertaining to the ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, (iii) that any Seller is required by Law to retain or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; *provided* that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies (in any form, whether physical or digital) of any portions of such Documents;

(d)     all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the transactions contemplated hereby or thereby, or the Bankruptcy

Cases or the CCAA Recognition Proceedings that are subject to any attorney-client privilege or solicitor-client privilege, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates and (iv) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Cases or the CCAA Recognition Proceedings;

(e)      all insurance Contracts or other Contracts associated with any Seller Plan that is not an Assumed Benefit Plan, each insurance policy covering the Excluded Assets or related to the Excluded Liabilities (to bring claims thereunder) and all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance policies or recoveries;

(f)      all stock, membership interests or other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests, in each case, other than such interests in any JV;

(g)      all claims that any Seller may have against any Person with respect to any Excluded Assets or any Excluded Liabilities;

(h)      Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)      all Tax refunds and Tax attributes that are not transferred by the operation of applicable Tax Law, except for any Tax refunds with respect to Assumed Liabilities;

(j)      all real estate and all interests in real estate other than the Owned Real Property and the Acquired Leased Real Property, including any Leasehold Improvements and Real Property Appurtenances thereto;

(k)      all tangible assets located at, or on order to be delivered to, any excluded store set forth on Schedule 1.2(k) (the "Excluded Stores");

(l)      except as set forth in Section 1.1(b) all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries;

(m)      the properties, rights, interests and assets set forth on Schedule 1.2(m);[2] and

---

[2]      **Note to Draft**: This is a placeholder; currently expected to be none.

(n)     all Seller Plans that are not Assumed Benefit Plans.

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order and Canadian Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     all Liabilities and obligations of any Seller under the Assigned Contracts and Acquired Real Property Leases that become due from and after the Closing (except for Liabilities arising out of (i) any breach or default of any Assigned Contract or Acquired Real Property Lease on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default or (ii) violations of any Law or Order with respect to any Assigned Contract or Acquired Real Property Lease by any Seller or any of its Subsidiaries; subject, in each case, to Purchaser having complied with section 365 of the Bankruptcy Code);

(b)     all Liabilities (including all government charges or fees) solely to the extent arising out of the conduct of the Business or the operation of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(c)     without duplication (i) all Taxes with respect to the Acquired Assets for any taxable period beginning after the Closing Date and the post-Closing portion of any Straddle Period (as determined in accordance with Section 9.3(c)); (ii) Transfer Taxes; (iii) all personal property Taxes with respect to the Acquired Assets for any Straddle Period (I) that are payable in arrears following the Closing Date, (II) with respect to which, if not paid, an Encumbrance will arise following the Closing Date and (III) that are payable only in the jurisdictions disclosed in the property liability summary on Schedule 3.12; and (iv) subject to the cap in Section 1.3(h), all sales and use Taxes with respect to the Acquired Assets with respect to which "responsible person" or similar claims may be made against any of Seller's or any Affiliate of any Seller's employees, managers, officers, directors or similar persons ("Responsible Person Liabilities"); provided that such Responsible Person Liabilities shall constitute Assumed Liabilities solely to the extent Sellers are unable to satisfy such Taxes due to a lack of available funds or discharge such Responsible Person Liabilities pursuant to the Bankruptcy Code; provided further that Sellers shall take all commercially reasonable steps to discharge or satisfy Responsible Person Liabilities in any way that avoids such Taxes becoming Assumed Liabilities; provided further that nothing herein (except the cap in Section 1.3(h)) nor in Schedule 1.3(h) shall be deemed to limit the amount of Taxes described in the foregoing clause (iv) that constitute Assumed Liabilities;

(d)     all Liabilities owing by Sellers to any JV (except to the extent relating to any Excluded Asset);

(e)     the sponsorship of, and all Liabilities with respect to the assets associated with or any unfunded amounts accrued on the books and records of Sellers as of the Closing Date associated with, the Assumed Benefit Plans, and all Liabilities for compliance with the

7

requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9 (other than employees and former employees of the Excluded Stores and their respective eligible dependents);

(f)      the Rollover ABL Obligations owed to Bank of America, N.A.; provided, for the avoidance of doubt, that, nothing in this Agreement shall result in Purchaser or any of its Affiliates assuming, and Purchaser and its Affiliates shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities owed by Sellers or any of their Affiliates to any other lender under the DIP ABL Credit Agreement;

(g)      all Cure Costs;

(h)      without duplication, (i) all Liabilities incurred by Sellers in connection with ceasing the operations or winding up the affairs of Sellers and their Affiliates and closing the Bankruptcy Cases and the CCAA Recognition Proceedings, including the following items set forth in Schedule 1.3(h): (w) the fees of Sellers' and their respective Subsidiaries' Advisors, (x) accrued and unpaid payroll, lease and rental payments, (y) costs and expenses incurred by Sellers and their Affiliates in connection with the transactions contemplated by this Agreement and the other Transaction Agreements (for the avoidance of doubt, excluding Cure Costs) and (z) the fees of the Information Officer and its Advisors and (ii) any unfunded or unpaid Liabilities or claims under Assumed Benefit Plans that are due or arise as a cash payment obligation on or prior to the Closing; provided, that the aggregate amount of the Liabilities contemplated by this Section 1.3(h) and Section 1.3(c)(iv) shall not exceed $22,450,615 (the "Wind-Down Cap"); provided that nothing herein (except the Wind-Down Cap) nor in Schedule 1.3(h) shall be deemed to limit the amount of Liabilities described in the foregoing clause (i) or (ii) that shall constitute Assumed Liabilities;

(i)      all Liabilities and obligations of any Seller under the JV Purchase Orders;

(j)      all Liabilities of any Seller under the Customs Bond (including any customs duties that could be covered or assessed in respect of such Customs Bond);

(k)      the Liabilities associated with the "Diamond Loyalty" customer program and other such customer programs; and

(l)      all Liabilities set forth on Schedule 1.3(l).

1.4      Excluded Liabilities. Notwithstanding any provision in this Agreement to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller, the Business or any of the Acquired Assets of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, Excluded Liabilities for all purposes hereunder includes all claims, demands, proceedings and causes of action asserted or that may be

8

asserted by or on behalf of any current or former employees or independent contractors of Seller, and any Liabilities, arising out of or relating to the employment or engagement of any current or former employees or independent contractors of Sellers on or prior to the Closing Date.

1.5    <u>Assumption/Rejection of Certain Contracts</u>.

(a)    <u>Assumption and Assignment of Executory Contracts</u>. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order and the Canadian Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to sections 365s 363, 364(f) of the Bankruptcy Code and Section 11.3 of the CCAA. Subject to the approval of the Bankruptcy Court and Canadian Court, as applicable, the Sale Order and Canadian Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure Sellers' monetary defaults, if any, and to pay all actual pecuniary losses that have resulted from such defaults under any Assigned Contract and that must be paid pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code, and section 11.3 of the CCAA, to effectuate the assumption of such Assigned Contract by the applicable Seller and the assignment thereof to the Purchaser as provided hereunder (such amounts required to be paid pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code, and section 11.3 of the CCAA, the "<u>Cure Costs</u>"). At the Closing, Sellers shall, pursuant to the Sale Order, Canadian Sale Order and the Bill of Sale and Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363, 364(f) and 365 of the Bankruptcy Code and Section 11.3 of the CCAA, subject to adjustment pursuant to <u>Section 1.5(b)</u>.

(b)    <u>Excluding or Adding Assigned Contracts Following Closing</u>. As of the date hereof, Sellers shall have delivered to Purchaser a list setting forth all executory Contracts and unexpired leases to which any Seller is a party (all such executory Contracts and unexpired leases, whether or not on such list, the "<u>Available Contracts</u>").

(i)    Purchaser shall have the right to notify Sellers in writing of any Available Contract (including purchase orders but excluding JV Purchase Orders and any Assigned Contract on <u>Schedule 1.1(a)</u>) that it does not wish to assume or an Available Contract that Purchaser wishes to add as an Assigned Contract up to the date that is the earlier of (A) 90 days following the Closing Date and (B) the closing of the Bankruptcy Cases (which shall not occur earlier than the date that is 45 days following the Closing Date) (the "<u>Designation Rights Period</u>"), and (i) (x) any such Available Contract or previously considered Assigned Contract (other than any JV Purchase Order or Assigned Contract on <u>Schedule 1.1(a)</u>) that Purchaser no longer wishes to assume shall be automatically deemed removed from <u>Schedule 1.5</u> and automatically deemed to be an Excluded Contract, in each case,

9

without any adjustment to the Purchase Price, and (y) to the extent such notice is provided to Sellers following the Closing, Sellers shall reject any such Contract as promptly as reasonably practicable upon Sellers' receipt of Purchaser's written request that such Contracts be rejected, and (ii) any Available Contract or previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to Schedule 1.5, automatically deemed not to be an Excluded Contract, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(ii)    During the Designation Rights Period, Sellers shall not reject or terminate and shall not amend, supplement, modify, waive any rights under or create an adverse interest with respect to any Available Contract, or take any affirmative action not required thereby, other than in accordance with this Section 1.5, without the prior written consent of Purchaser, given in its sole discretion.

(iii)    During the Designation Rights Period, Purchaser shall be responsible for any and all payment Liabilities of Purchaser, Sellers or any of their respective Affiliates (i) under the Available Contracts and/or (ii) as a result of, arising out of or in connection with the operation of any store or distribution center governed by any such Available Contracts that are incurred and come due and payable during the period from and after Closing through the effective date of such Available Contract's assumption and assignment to Purchaser or rejection by any Seller in accordance with this Agreement, in each case other than any Liabilities arising in connection with any breach of this Agreement by any Seller or any of its Affiliates.

(iv)    Each of Purchaser and Sellers shall take all actions reasonably required for Seller to assume and assign the Assigned Contracts and Acquired Real Property Leases to Purchaser; provided, that Purchaser and its Affiliates shall control and be responsible for the negotiation and verification of all Cure Costs for each Assigned Contract and Acquired Real Property Leases, and Sellers shall obtain an order of the Bankruptcy Court in a form reasonably satisfactory to Purchaser containing a finding that the proposed assumption and assignment of the applicable Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code and approving the assumption and assignment of the Assigned Contracts to Purchaser pursuant to, and subject to the provisions of, section 365 of the Bankruptcy Code and Section 11.3 of the CCAA.

(v)    Purchaser shall as promptly as reasonably practicable, but in any event within three (3) Business Days of assuming any Assigned Contract hereunder, pay all Cure Costs (if any) in connection with any such assumption in accordance with this Section 1.5 and Section 5.2.

(c)    <u>Non-Assignment</u>. Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court or the Canadian Court, including the Sale Order or the Canadian Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing Date (or the closing of the Bankruptcy Cases, if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order and Canadian Sale Order. Notwithstanding anything herein to the contrary, neither Purchaser nor any Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

1.6    <u>Canadian Purchaser</u>.  Prior to the Closing, the Purchaser shall assign to a wholly-owned Subsidiary incorporated under the Laws of Canada or a Province therein ("<u>Canadian Purchaser</u>") its rights and obligations hereunder to (a) purchase specified Acquired Assets including specified Assigned Contracts (the "<u>Canadian Assigned Contracts</u>") of David's Bridal Canada, Inc. ("<u>Canadian Seller</u>", and collectively, the "<u>Canadian Acquired Assets</u>") and pay the corresponding Purchase Price amount therefor to Canadian Seller, which purchase price shall be satisfied solely by the assumption of Assumed Liabilities of Canadian Seller, (b) employ specified Transferred Employees on and after the Closing Date of Canadian Seller, and (c) be entitled to the rights and benefits afforded to Purchaser hereunder with respect to the Acquired Assets and Assumed Liabilities contemplated by the foregoing <u>clauses (a)</u> through <u>(c)</u>.

1.7    <u>Canadian Tax Elections</u>.

(a)    At the request of Canadian Purchaser, Canadian Purchaser and Canadian Seller shall, to the extent applicable, jointly make an election under section 167 of the *Excise Tax Act* (Canada) to have the sale of the Canadian Acquired Assets take place on a GST/HST-free

basis.  Canadian Purchaser shall file such election no later than the filing date for its GST/HST return for the reporting period in which the Closing occurs.

(b)    At the request of Canadian Purchaser, Canadian Purchaser and Canadian Seller shall, to the extent applicable, jointly make an election pursuant to section 22 of the Tax Act and the corresponding provisions of any applicable Canadian provincial income tax statute, in respect of the Canadian Seller transferring its accounts receivable (excluding, for certainty, any Excluded Assets) to Canadian Purchaser as part of the Canadian Acquired Assets.  Purchaser and Canadian Seller agree to jointly make the necessary election(s) and to execute and file within the prescribed time the prescribed election form(s) required to give effect to the foregoing.

(c)    At the request of Canadian Purchaser, Canadian Purchaser and Canadian Seller shall, to the extent applicable, jointly make an election under Section 20(24) of the Tax Act and the corresponding provisions of any applicable Canadian provincial income tax statute, in respect of amounts for future obligations and shall timely file such election(s) with the appropriate Governmental Body.  To the extent applicable for Canadian Tax purposes, Canadian Seller and Canadian Purchaser acknowledge that a portion of the Canadian Acquired Assets was transferred to Canadian Purchaser as payment by Canadian Seller to Canadian Purchaser for the assumption by Canadian Purchaser of any such future obligations of Canadian Seller.

(d)    Canadian Seller and the Canadian Purchaser shall make and timely file such other elections under the Tax Act, *the Excise Tax Act* (Canada) and any other applicable Canadian provincial Tax legislation with respect to such purchase and sale as are reasonably requested by the Canadian Purchaser.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration. The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities plus (ii) the payment of all Cure Costs.

2.2    Closing. Upon the terms and subject to the conditions contained in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents and signatures (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the date that is the second (2nd) Business Day following, subject to the satisfaction or, to the extent permitted by applicable Law, due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted by applicable Law, waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."  For financial, accounting and economic purposes, including risk of loss, and for all other purposes under this Agreement, upon the occurrence of the Closing, the Closing shall be deemed to have occurred at 12:01 a.m., New York City time, on the Closing Date.

2.3    <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    bill of sale and assignment and assumption agreements substantially in the form of <u>Exhibit A-1</u> or <u>Exhibit A-2</u>, as applicable (the "<u>Bill of Sale and Assignment and Assumption Agreements</u>") duly executed by the applicable Sellers;

(b)    instruments of transfer of the equity interests of the JVs, in customary form (which shall not expand the representations and warranties, or rights or remedies, of Purchaser hereunder) and in the manner required by applicable Law, duly executed by the applicable Sellers, together with any approvals required in connection with such transfers;

(c)    short-form trademark assignment agreements substantially in the form of <u>Exhibit B-1</u> or <u>Exhibit B-2</u>, as applicable (the "<u>Trademark Assignment Agreements</u>"), duly executed by the applicable Sellers;

(d)    short-form copyright assignment agreements substantially in the form of <u>Exhibit C-1</u> or <u>Exhibit C-2</u>, as applicable (the "<u>Copyright Assignment Agreements</u>"), duly executed by the applicable Sellers;

(e)    an IRS Form W-9 executed by each Seller (other than Canadian Seller) or each Seller's regarded owner for U.S. federal income Tax purposes and an IRS Form W-8BEN-E executed by Canadian Seller;

(f)    with respect to each Owned Real Property, a bargain and sale deed (i) with respect to the HQ Property, substantially in the form attached hereto as <u>Exhibit D-1</u>, and (ii) with respect to the Maple Shade Property, substantially in the form attached hereto as <u>Exhibit D-2</u>, in each case, duly executed and notarized, together with any Transfer Tax forms that the Seller (or its applicable Subsidiary that is the owner of any Owned Real Property) is  required to file in connection with the conveyance thereof, and other transfer forms, duly executed and notarized, as necessary, required to be delivered by Seller (or its applicable Subsidiary that is the owner of any Owned Real Property) in the jurisdiction where any Owned Real Property is located;

(g)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of DBI certifying that the conditions set forth in <u>Sections 7.2(a)</u>, <u>7.2(b)</u> and <u>7.2(d)</u> have been satisfied; and

(h)    a written agreement, in form and substance reasonably acceptable to Purchaser, from each Person (other than Sellers) holding equity interests in each JV, consenting to the transactions contemplated by this Agreement and the other Transaction Agreements and waiving any rights of first offer, rights of first refusal or similar rights under the governing documents of each such JV.

2.4    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)    the Bill of Sale and Assignment and Assumption Agreements, duly executed by Purchaser or Canadian Purchaser, as applicable;

13

(b)    the Trademark Assignment Agreements, duly executed by Purchaser or Canadian Purchaser, as applicable;

(c)    the Copyright Assignment Agreements, duly executed by Purchaser or Canadian Purchaser, as applicable;

(d)    any Transfer Tax forms that Purchaser is required to file in connection with acquisition of the Owned Real Property, and other transfer forms, duly executed and notarized, as necessary, required to be delivered by Purchaser in the jurisdiction where any Owned Real Property is located; and

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.5    Withholding. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under Section 2.3(e).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents publicly filed with the Bankruptcy Court in connection with the Bankruptcy Cases, or the Canadian Court in connection with the CCAA Recognition Proceedings, prior to the date hereof, or (ii) set forth in the Schedules delivered by Sellers to Purchaser after the date hereof pursuant to Section 6.11 and subject to Section 10.10, Sellers jointly and severally represent and warrant to Purchaser as follows:

3.1    Organization and Qualification. Each Seller and  each JV is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has all requisite power and authority necessary to carry on the Business as it is now being conducted, except (other than with respect to each Seller's and each JV's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have an adverse effect on the Business or the Acquired Assets, taken as a whole, in any material respect or would not materially impair or delay Sellers' ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements.  Each Seller and each JV is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have an adverse effect on the Business or the Acquired Assets, taken as a whole, in any material respect or would not materially impair or delay Sellers' ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements.

3.2    Authorization of Agreement. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and

the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court and Canadian Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court and Canadian Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except as such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3    Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court and Canadian Court approvals are obtained, and (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the transactions contemplated hereby or thereby, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's or any JV's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, including the applicable JV Agreement (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Seller, except, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    Financial Statements; No Undisclosed Liabilities.

(a)    Attached to Schedule 3.4 are Sellers' and its Subsidiaries' audited consolidated balance sheets as of December 31, 2022 and January 1, 2022 and the related consolidated statements of operations, comprehensive loss, cash flows and deficit for the fiscal years then ended (collectively, the "Audited Financial Statements") and unaudited consolidated balance sheets as of May 27, 2023 and the related consolidated statements of operations, comprehensive loss, cash flows and deficit for the portion of the fiscal year then ended (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and, in the case of Unaudited Financial Statements, subject to (a) normal year-end audit adjustments (none of which are material, individually or in the aggregate) and (b) the absence of

notes (none of which if presented would materially differ in amount or nature from those included in the Audited Financial Statements) and such Financial Statements fairly present in all material respects the consolidated financial position of the Sellers and their Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown.

(b)     Sellers have no Liabilities, required by GAAP to be disclosed or reflected on or reserved on a consolidated balance sheet (or the notes thereto) prepared in accordance with GAAP, except for Liabilities (i) reflected and reserved for in the Financial Statements, (ii) incurred in the Ordinary Course since May 27, 2023, (iii) that are Excluded Liabilities, (iv) arising out of or incurred in connection with this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby, (v) that are not and would not reasonably be expected to be material, individually or in the aggregate, (vi) arising from the commencement of the Bankruptcy Cases or the CCAA Recognition Proceedings or (vii) disclosed on Schedule 3.4(b).

3.5     Equity Interests of JVs.

(a)     The authorized and outstanding capital stock or other equity interests of each of the JVs, and in each case, the owners thereof, are as set forth on Schedule 3.5(a). All of the outstanding capital stock or other equity interests of the JVs have been duly authorized, validly issued, fully paid, or owned free and clear of all Encumbrances and are non-assessable (where such concepts are legally recognized in the jurisdictions of organization of such JVs). Except as set forth on Schedule 3.5(a), there are no outstanding options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, sale or repurchase of any capital stock or other equity interests issued by the JVs containing any equity features, or Contracts, commitments, understandings, arrangements or other obligations by which any of the JVs is bound to issue, deliver or sell, or cause to be issued, delivered or sold, additional capital stock or other equity interests, or options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to any capital stock or other equity interests of the JVs, or that otherwise give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of capital stock or other equity securities of any JV (including any rights to receive any payment in respect, or based on the price or value, thereof). To the knowledge of the Sellers, no JV is a party to any shareholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any such securities or other agreement relating to the disposition, voting or dividends with respect to any such securities other than the JV Agreements.

(b)     Except as set forth on Schedule 3.5(a), there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which DBI or any of DBI's Subsidiaries own as of the date of this Agreement, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

3.6     Title to Properties.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Operating Company has good and valid title to the Owned Real Property free and clear of all Encumbrances, including any leases, subleases, licenses, concessions or other agreements by or pursuant to which the Operating Company grants to any party or parties the right of use or occupancy of any portion of the Owned Real Property (other than Permitted Encumbrances). Schedule 3.6(a) sets forth the address and owner of each Owned Real Property. Except as set forth on Schedule 3.6(a), the Sellers and their Subsidiaries do not own any real property.

(b)    Except as set forth on Schedule 3.6(b), there are no outstanding options, repurchase rights or rights of first refusal to purchase or lease any Owned Real Property, or any portion thereof or interest therein, granted by any Seller or any Subsidiary of any Seller or, to the Sellers' knowledge,  to which any Seller or any Subsidiary of any Seller is a party.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Operating Company has a good and valid leasehold interest to all Acquired Leased Real Property, in each case sufficient in all material respects to continue the conduct of the Business free and clear of all Encumbrances (other than Permitted Encumbrances).

(d)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Cases  and the CCAA Recognition Proceedings, Sellers hold good and valid title to, or good and valid leasehold interest in, all of the material tangible property necessary for, used in or held for use in the conduct of the Business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to the Business and the Acquired Assets, taken as a whole.

(e)    For the avoidance of doubt, no representation or warranty of Sellers under this Section 3.6 shall, or shall be construed to, encompass any property or assets of any JV.

3.7    Contracts.

(a)    Schedule 3.7 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, including the JV Agreements;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $1,000,000;

(iii)    relates to the acquisition or disposition of any business, equity interests or all or substantially all of the assets of any other Person (whether by

17

merger, sale of stock, sale of assets or otherwise) for aggregate consideration in excess of $1,000,000 pursuant to which any obligations (other than confidentiality obligations) remain outstanding (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, properties or other assets in the Ordinary Course, or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Sellers);

(iv)    is a Contract (other than purchase orders in the Ordinary Course consistent with past practice) (A) with any Material Supplier or (B) for the purchase of materials, supplies, goods, services, Equipment or other assets, in the case of this clause (B), pursuant to which DBI or any of its Subsidiaries would reasonably be expected to make payments of more than $1,000,000 during any fiscal year (other than a Contract with any Material Supplier); or

(v)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property (or any Seller IP Rights) that is material to the Seller, taken as a whole, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses <u>A</u> and <u>B</u>, other than a Contract that can be terminated by Sellers on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract or (C) pursuant to which any license, covenant, or immunity has been granted by or to any Seller under any Intellectual Property material to any Seller, other than licenses of uncustomized, commercially available, off-the-shelf Software granted to such Seller on standard terms and conditions for less than $1,000,000 annually;

<u>provided</u>, <u>that</u>, for purposes of <u>Section 6.1</u>, the references to $1,000,000 in each of the foregoing clauses <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u> and <u>(v)</u> shall be deemed to be replaced with $50,000.

(b)    Subject to requisite Bankruptcy Court and Canadian Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Cases or the CCAA Recognition Proceedings, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have not received written notice of the existence of any breach or default on the part of any Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, would constitute, a default under, result in a right to terminate or cancel, or cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit under, a Material Contract, on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except

in each case of <u>clauses (B)</u> through <u>(E)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.8    <u>No Litigation; Orders</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, other than as set forth on <u>Schedule 3.8</u>, there are no Actions pending or, to Sellers' knowledge, threatened against or affecting (i) the Acquired Assets or the Assumed Liabilities or (ii) Sellers or arising out of or relating to the Business, that will adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

3.9    <u>Permits; Compliance with Laws</u>. Except as set forth on <u>Schedule 3.9</u>, each Seller is, and has been since January 1, 2023, in compliance in all material respects with all state, provincial or federal Laws or Orders, applicable to such Seller, the Acquired Assets and the Assumed Liabilities, and each Seller holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of the Business and the lawful ownership of the Acquired Assets, except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (collectively, "<u>Permits</u>"). Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2023, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

3.10    <u>Environmental Matters</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws, (b) since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law, (c) Sellers possess and are in compliance with all Permits required under applicable Environmental Laws for the operation of their businesses as currently conducted at each Owned Real Property and each Acquired Leased Real Property ("<u>Environmental Permits</u>"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, and (f) to the Knowledge of Sellers, there has been no release of any Hazardous Substances at any Owned Real Property or any Acquired Leased Real Property in quantities or concentrations that currently require Sellers to conduct remedial activities, or that could reasonably be expected to result in a Liability for any Seller under Environmental Laws.

3.11    <u>Intellectual Property</u>.

(a)    <u>Schedule 3.11(a)</u> sets forth a true and accurate list of all Seller Intellectual Property: (i) that is registered or issued or subject of an application for registration or issuance (the "<u>Seller Registered IP</u>") (including for each item, the owner, the jurisdiction or registrar, the registration or application number, the registration or application date, the status, and the expiration date); and (ii) that is material unregistered Mark or material unregistered proprietary Software. Except as would not, individually or in the aggregate, reasonably be expected to have a

Material Adverse Effect, all necessary payments (including registration, maintenance, renewal and other filing fees due through the date that is thirty (30) days after the Closing Date) with respect to any material Seller Registered IP have been timely paid and all necessary filings (including necessary documents and certificates) in connection therewith have been timely filed with the relevant Governmental Body in the United States or foreign jurisdictions, as the case may be, and all other actions required to be taken for the purpose of maintaining such Seller Registered IP in full force and effect have been taken.

(b)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers possess and are the sole and exclusive owner of (and upon Closing, the Purchaser will possess and be the sole and exclusive owner of) all of the entire worldwide rights, title and interest in and to all Seller Intellectual Property and has a valid and enforceable license pursuant to an Assigned Contract to use, sell and license (and upon Closing, Purchaser will have a valid and enforceable license pursuant to an Assigned Contract to use, sell and license), as the case may be, all other Intellectual Property as used, sold, or licensed in, or that is otherwise necessary for the conduct of, the Business, in each case, free and clear of all Encumbrances (other than Permitted Encumbrances) (and other than Intellectual Property licensed pursuant to any Contracts that are rejected by Purchaser in accordance with <u>Section 1.5</u>), and none of the foregoing will be encumbered, extinguished, impaired, or otherwise adversely altered or impacted by (nor will require any consent, notification, approval, waiver, or payment or grant of additional amounts or consideration as a result of) the execution, delivery, or performance of any Transaction Agreement or the consummation of any transactions contemplated thereby except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. All of the Seller Intellectual Property that is material to the operation of the Business is subsisting, valid and enforceable.

(c)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Sellers as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances); *provided* that nothing in this <u>Section 3.11(c)</u> shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of <u>Section 3.11(e)</u>.

(d)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, none of the Sellers have received any written notice or claim (including any invitation or offer to license or demand for indemnification), (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating any Intellectual Property right of any Person.

(e)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2023, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to any Seller (and no Seller has instituted an Action or made any

claim alleging any of the foregoing against any Person) and (ii) none of the Sellers, the use of the Seller Intellectual Property, nor the operation of the business of Sellers has infringed, misappropriated, or otherwise violated any Intellectual Property right of any other Person.

(f)    The Seller Intellectual Property together with the Intellectual Property licensed to Purchaser pursuant to the Assigned Contracts (i) constitutes all of the material Intellectual Property used or practiced (or held for use or practice) in or in connection with or otherwise relating to or necessary for the conduct of the businesses of Sellers and (ii) includes all of the material Intellectual Property necessary and sufficient to enable Purchaser to conduct the businesses of Sellers from and after Closing in substantially the same manner and to the same extent as currently conducted or currently contemplated to be conducted, in each case, other than Intellectual Property licensed pursuant to any Contracts that are rejected by Purchaser in accordance with Section 1.5.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, as of the date of this Agreement, no Seller Intellectual Property is subject to any outstanding (or to the Knowledge of Sellers, prospective) Order or motion or petition for an Order or any settlement agreement restricting or impairing the ownership, the use or other practice or exploitation thereof by any Seller (or by Purchaser after the Closing) or restricting or impairing the sale, transfer, assignment or licensing thereof by any Seller (or by Purchaser after the Closing), except pursuant to export, import, trade control, environmental, Hazardous Substance, or other applicable Laws.

(g)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers have used commercially reasonable efforts in accordance with industry practice to maintain and protect the confidentiality of all non-public Seller Intellectual Property.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there has been no unauthorized disclosure of any Trade Secrets included in the Acquired Assets and no Trade Secrets included in the Acquired Assets have been used by or disclosed to any Person other than Persons who are subject to reasonably protective confidentiality obligations.

3.12    Tax Matters.

(a)    Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed prior to the Closing Date by it with respect to the Acquired Assets.

(b)    All material Taxes owed by a Seller with respect to the Acquired Assets that are due prior to the Closing Date (whether or not shown on a filed Tax Return) have been timely paid, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code.

(c)    There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)    None of the Sellers has been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is DBI or one of its Subsidiaries) or has any material Liability for the Taxes of any Person (other

than a Seller) under U.S. Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(e)     None of the Sellers has, within the past five (5) years, waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), in each case, which could have effect after the Closing Date.

(f)     None of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(g)     No Seller has any material liability under any escheat or unclaimed liability statute which by operation of Law would become a liability of Purchaser or any Affiliate.

(h)     Canadian Seller is not a "non-resident" of Canada for purposes of the Tax Act and none of the Acquired Assets of any other Seller are "taxable Canadian property" for purposes of the Tax Act.

(i)     Canadian Seller is registered for GST/HST purposes and its registration number is as set forth on <u>Schedule 3.12(i)</u>.

(j)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.12</u> and <u>Section 3.13</u> (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute in each case for any Tax period (or any portion thereof) following the Closing.

3.13     <u>Assumed Benefit Plans</u>.

(a)     Each Assumed Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to Purchaser.

(b)     None of the Sellers nor any of their ERISA Affiliates in the past six (6) years have maintained, contributed to, or has had any Liability or obligation to contribute to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code, (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA), or (iii) a "registered pension

plan" as that term is defined in the Tax Act.  For purposes of this Agreement, "ERISA Affiliate" means any employers (whether or not incorporated) that would be treated together with the Sellers or any of their Subsidiaries as a single employer within the meaning of Section 414 of the Code.

(c)    No Assumed Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(d)    Except as set forth in Schedule 3.13(d), the consummation of the transactions contemplated hereby will not (i) entitle any employees of Sellers (other than employees of Excluded Stores) to notice, pay in lieu of notice or severance pay or any material increase in notice, pay in lieu of notice or severance pay, (ii) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Assumed Benefit Plan, (iii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iv) require a "gross-up," indemnification for, or payment to any individual for any taxes imposed under Section 409A or Section 4999 of the Code or any other tax, or (v) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment" as defined in Section 280G(b)(1) of the Code.

3.14    Employees. None of the Sellers is party to or required to negotiate any collective bargaining agreements or similar Contracts with (nor are any Sellers subject to any legal binding commitments to) any labor union, employee association or similar entity, applicable to any employees of a Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) no demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union and (b) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the employees of any Seller. Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.15    Affiliate Transactions. Except as set forth on Schedule 3.15, no Affiliate of any Seller, or any officer or director of any Seller, (a) is a party to any material Contract that constitutes an Acquired Asset, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.16    Suppliers. Schedule 3.16 sets forth a true, complete and correct list of the five (5) largest suppliers from which DBI and its Subsidiaries purchased materials, supplies, services or other goods (measured by dollar volume of purchases from such suppliers) for the period ended December 31, 2022 (such suppliers collectively referred to as "Material Suppliers").

3.17   <u>Brokers</u>. Except for HL and A&G Real Estate Partners and their Affiliates, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

3.18   <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or any certificate delivered pursuant to this Agreement (the "<u>Express Representations</u>") (it being understood that Purchaser and its Affiliates have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of its Affiliates, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any of its Affiliates has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, any JV, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by HL) (the "<u>Information Presentation</u>") or in that certain "Diamond" datasite administered by Finsight or that certain "David's Bridal" datasite administered by Box (together, the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1   <u>Organization and Qualification</u>. Purchaser is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2   <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions

contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party, and the consummation by Purchaser of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court and Canadian Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court and Canadian Court approvals, this Agreement and the other Transaction Agreements to which it is a party have been, or will be, duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Assuming that (i) requisite Bankruptcy Court and Canadian Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(a) are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement or the other Transaction Agreements to which it is a party, nor the consummation by Purchaser of the transactions contemplated hereby or thereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof or thereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser or its assets, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or by which it or its assets are bound or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to materially impair or delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit, registration with or consent of or with any Governmental Body, other than the Canadian Sale Order, in connection with the execution, delivery and performance by Purchaser of this Agreement or the other Transaction Agreements to which it is a party or the consummation by Purchaser of the transactions contemplated hereby or thereby, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to materially impair or delay the ability of Purchaser to consummate the transactions contemplated hereby or thereby.

4.4     Financing. At the Closing, Purchaser will have sufficient funds in an aggregate amount necessary to perform the Assumed Liabilities as they become due in accordance with their

terms and to consummate all of the other transactions contemplated by this Agreement and the other Transaction Agreements, including the payment of all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code, and section 11.3 of the CCAA, with respect to the Assigned Contracts and the related Assumed Liabilities. Purchaser acknowledges that its obligations under this Agreement are not subject to any conditions regarding its ability to obtain financing for any portion or all of the Purchase Price.

4.5     Brokers. No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

4.6     No Litigation. As of the date hereof, there are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by the other Transaction Agreements or that would, individually or in the aggregate, reasonably be expected to delay the Closing or that would otherwise adversely affect Purchaser's performance of its obligations or covenants under this Agreement or the other Transaction Agreements to which it is a party or the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements to which it is a party.

4.7     Investment Representation; Investigation. Purchaser is acquiring the capital stock or other equity interests of the JVs for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which Sellers, their Subsidiaries and the JVs operate and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and the other Transaction Agreements and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded full access to the books and records, facilities and personnel of each Seller and their Subsidiaries for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of Sellers, their Subsidiaries and the JVs and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8     No Foreign Person. As of Closing, Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

4.9     Solvency. Assuming (a) satisfaction of the conditions set forth in Article VII and (b) the accuracy in all material respects of the representations and warranties of Sellers set forth in Article III, then immediately after giving effect to the transactions contemplated by this Agreement and the other Transaction Agreements, Purchaser will: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) not have

an unreasonably small amount of capital with which to conduct its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement or the other Transaction Agreements with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the transactions contemplated hereby, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured. There are no bankruptcy, reorganization or arrangement Actions pending, being contemplated by or, to the Knowledge of Purchaser, threatened against Purchaser.

4.10    GST/HST.  Canadian Purchaser will be registered for GST/HST purposes on or prior to the Closing Date.

4.11    No Additional Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or any certificate delivered pursuant to this Agreement (it being understood that Sellers and its Affiliates have relied only on such express representations and warranties), Sellers acknowledge and agree, on each such Seller's behalf and on behalf of their respective Affiliates, that neither Purchaser nor any other Person on behalf of Purchaser makes, and neither Sellers nor any of their respective Affiliates has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1    Bankruptcy Actions.

(a)    As promptly as practicable after the date hereof, and no later than five (5) days after the date hereof, Sellers shall file with the Bankruptcy Court a motion seeking approval of the Sale Order; *provided* that Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Cases, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Cases, or any other party in interest; provided, further, that, any modifications to such motion, including any exhibits thereto and any notices or other materials in connection therewith, must be in form and substance satisfactory to the Purchaser, in its sole discretion.

(b)    Following the date hereof and until the Closing or the earlier valid termination of this Agreement in accordance with its terms, Sellers and their Affiliates are neither permitted to, nor permitted to cause their Advisors and Affiliates to, (i) initiate contact with, solicit or knowingly encourage, induce or facilitate any bid, offer or proposal contemplating an Alternative Transaction (a "Competing Bid") or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid or (ii) participate or engage in any discussions or negotiations with any Person regarding, or furnish to any Person any information with respect to, or cooperate in any way with any Person (whether or not a Person making a Competing Bid) with respect to, any Competing Bid or any inquiry or proposal; provided, in the event that, without violation of the foregoing, Sellers, their Affiliates or their respective directors, officers, employees, advisors or

other representatives receive an unsolicited Competing Bid from a third party that any Seller's board of directors (or similar governing body) determine in good faith, after considering the advice of its financial and outside legal advisors would reasonably be expected to lead to a Superior Transaction and that the failure of such Seller to pursue such Competing Bid would reasonably be expected to result in a breach of the fiduciary duties of any Seller's board of directors (or similar governing body) under applicable Laws (a "Superior Proposal"), Sellers and their respective directors, officers, employees, advisors or other representatives shall be entitled to, in response to such Superior Proposal, negotiate the terms of any such Superior Proposal with such third party. Sellers shall provide (x) notice of all Competing Bids (whether oral or written) to Purchaser within twenty four (24) hours after the time of receiving such Competing Bid and (y) a copy of each such Competing Bid.  In addition to the foregoing, Sellers shall (i) promptly (and in any event within twenty four (24) hours of receipt thereof by Sellers or any representative or Affiliate of Sellers) advise Purchaser in writing of any proposal that would reasonably be expected to lead to a Competing Bid, (ii) keep Purchaser reasonably informed in all material respects on a reasonably current basis of the status and details (including any change to the terms thereof) of any Competing Bid, and (iii) provide to Purchaser as soon as practicable after receipt or delivery thereof copies of all material documentation exchanged between Sellers or any of their Affiliates or representatives and any Person that describes any of the material terms or conditions of any Competing Bid. Sellers shall also notify Purchaser promptly if any Seller's board of directors (or similar governing body) determine that a Competing Bid would reasonably be expected to lead to a Superior Transaction, and in any event no later than twenty-four (24) hours following such determination.

(c)     By no later than three (3) Business Days[3] after the Bankruptcy Court's approval of the Sale Order, David's Bridal, LLC, in its capacity as the foreign representative of the Sellers, shall file with the Canadian Court a motion seeking the Canadian Sale Order.

(d)     The Sellers and the Purchaser each acknowledges that this Agreement and the transactions contemplated hereby are subject to Bankruptcy Court and Canadian Court approval. From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use their reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Order no later than the date that is ten (10) days after the date hereof and the Canadian Sale Order by no later than the date that is three (3) Business Days after the date the Sale Order is obtained.

(e)     Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, the Canadian Court's issuance of the Canadian Sale Order  and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court or any other court of competent jurisdiction, and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of

---

[3]     **Note to Draft**: Canadian hearing currently scheduled for July 19 at 10am, subject to it being moved to an earlier date.

the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(f)    If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement (all such orders, the "Bankruptcy Court Orders") or the Canadian Sale Order or any other orders of the Canadian Court relating to this Agreement (all such orders, the "Canadian Court Orders") shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any Bankruptcy Court Order), the Sellers shall use their reasonable best efforts to diligently defend against any such appeal, petition or motion and shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion, and, upon the reasonable request of the Sellers, the Purchaser shall use its reasonable best efforts to assist the Sellers with the foregoing.  The Sellers shall notify the Purchaser of such appeal, petition or motion as promptly as practicable and shall keep the Purchaser reasonably informed and updated regarding the status of any such appeal, petition or motion. The Sellers and the Purchaser shall provide to the other party (i) draft copies of all motions, orders, notices, statements, schedules, applications, reports and other papers such party intends to file with the Bankruptcy Court and the Canadian Court, as applicable, in connection with the Sale Order, the Canadian Sale Order or any other Bankruptcy Court Order or Canadian Court Order in connection with the transactions contemplated by this Agreement within a reasonable period of time prior to the date such party intends to file any of the foregoing, and (ii) the proposed service lists in connection with the motions seeking Sale Order and the Canadian Sale Order prior to service of materials in connection therewith and, in each case of the foregoing clauses (i) and (ii), consult in advance in good faith with the other party regarding the form and substance of any such proposed filing with the Bankruptcy Court and Canadian Court and any such service list, as applicable.

(g)    Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court and Canadian Court if reasonably requested by the other Party or required by the Bankruptcy Court or Canadian Court in connection with the transactions contemplated by this Agreement or the other Transaction Agreements and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court and Canadian Court or any Person with respect to the transactions contemplated by this Agreement or the other Transaction Agreements.

(h)    Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

5.2    Cure Costs. Subject to entry of the Sale Order and Canadian Sale Order, Purchaser shall (i) on or prior to the Closing, pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts listed on Schedule 1.1(a) and Acquired Real Property Leases listed on Schedule 1.1(e) so that such Contracts may be assumed by the applicable Seller

and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code, Section 11.3 of the CCAA and this Agreement and (ii) in the case of any Assigned Contract and Acquired Real Property Lease that is assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment, pay the Cure Costs and cure any and all other defaults and breaches under such Assigned Contracts and Acquired Real Property Leases that are deemed to be listed on Schedule 1.5 so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code, Section 11.3 of the CCAA and this Agreement.

5.3    Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser (and any Affiliate) on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and the assumption of the Assumed Liabilities on the terms set forth herein, and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser (or any Assignee) the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets, Assumed Liabilities or the Business other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4    Canadian Sale Order. The Canadian Sale Order shall, among other things, (a) recognize and give full force and effect to the Sale Order in all provinces and territories in Canada, pursuant section 49 of the CCAA, (b) approve this Agreement and the transactions contemplated hereunder, (c) vest the Canadian Acquired Assets in the Canadian Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances, (d) assign all of the Canadian Assigned Contracts to the Canadian Purchaser, and (e) provide that upon payment of the applicable Cure Costs, all past defaults under the Canadian Assigned Contracts shall be deemed to be cured and each such Canadian Assigned Contract shall be in good standing and effective, according to its terms.

5.5    Approval. Sellers' obligations under this Agreement and the other Transaction Agreements and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including

the Sale Order), and any Orders of the Canadian Court (including the Canadian Sale Order). Nothing in this Agreement or any of the other Transaction Agreements shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6     Canadian Reserve. On Closing, the Sellers shall deliver the Canadian Reserve to the Information Officer.

## ARTICLE VI
## COVENANTS AND AGREEMENTS[4]

6.1     Conduct of Business of Sellers.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) as required, limited or prohibited by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly required by this Agreement or the other Transaction Agreements, (iv) to the extent related to any Excluded Store, any Excluded Asset or any Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is validly terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their commercially reasonable efforts to (x) carry on their business in the Ordinary Course in all material respects, (y) preserve the Business and the Acquired Assets (excluding sales of Inventory in the ordinary course of business) and (z) preserve in all material respects their relationships with any customers, suppliers, vendors, payors, partners, Governmental Bodies, licensors and licensees and other Persons with which they have material business relations.

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) as required, limited or prohibited by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly required by this Agreement or the other Transaction Agreements, (iv) to the extent related to any Excluded Store, any Excluded Asset or any Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is validly terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not:

(i)     (A) permit the issuance, sale, encumbrance or grant of any shares of the capital stock or other equity or voting interests of the JVs, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights, warrants or options to purchase any shares of such capital stock or other equity or voting interests; (B) redeem, purchase or otherwise acquire any of the outstanding shares of capital stock or other equity or voting interests of the JVs, or

---

[4] **Note to Draft**: Covenant will be added for Canadian tax clearance certificates to be obtained prior to closing.

any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, (C) dividend or distribute any Cash and Cash Equivalents or establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of the capital stock or other equity or voting interests of the Sellers or any of the JVs, or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests of the JVs;

(ii)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except for Indebtedness incurred pursuant to an existing facility, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(iii)    sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets except (A) Ordinary Course dispositions of obsolete, surplus or worn out real or tangible assets or real or tangible assets that are no longer used or useful in the conduct of the business of Sellers, (B) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (C) other sales of Inventory, fixtures and leases in the Ordinary Course;

(iv)    make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (B) in the Ordinary Course;

(v)     except as expressly permitted under Section 6.1(b)(iv), and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger), except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to exclude any acquisition of capital stock or of a material portion of the assets of any other Person);

(vi)    except as required pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $300,000 per annum (other than filling any vacancies), (5) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (6) take any action to accelerate any rights or benefits under any Assumed Benefit Plan; *provided* that the foregoing shall not restrict any Seller from entering into or making

available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(vii)    make any changes in financial accounting methods, principles or practices, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(viii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its Acquired Assets;

(ix)    settle or agree to settle any pending or threatened Action against any Seller that would reasonably be expected to result in an (x) any Seller being enjoined from consummating the transactions contemplated by this Agreement, (y) any adverse effect on the Business or the Acquired Assets in any material respect or (z) an Assumed Liability;

(x)    (x) reject, terminate or cancel (other than at its stated expiry date) or modify or amend in any material respect any Material Contract or any Contract that would be a Material Contract if in effect on the date hereof, other than amendments (including, change orders) to Contracts with customers, suppliers or vendors in the Ordinary Course, (y) waive, release or assign any material rights or claims under any Material Contract or any Contract that would be a Material Contract if in effect on the date hereof, or (z) enter into any Contract that would have been a Material Contract had it been entered into prior to the date hereof, except, in the case of this clause (z), in the Ordinary Course of Business;

(xi)    sell, pledge, covenant not to assert, transfer, assign, abandon, dispose of, permit to lapse or grant any license or sublicense or other right or immunity in, to or under any material Seller Intellectual Property (other than nonexclusive licenses granted in the Ordinary Course and expirations of Seller Registered IP at the end of the full applicable statutory term);

(xii)    cancel or terminate any insurance coverage with respect to the Business, the Acquired Assets or the Assumed Liabilities without replacing such coverage with a comparable amount of insurance coverage;

(xiii)    make any change or amendment to the organizational or governing documents of any of the JVs, including any of the JV Agreements;

(xiv)    disclose any material Trade Secrets included in the Seller Intellectual Property to any Person (other than pursuant to written confidentiality

agreements entered into in the Ordinary Course that contain reasonable protections to preserve all rights in such Trade Secrets); or

(xv)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's Subsidiary's or JV's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by any Seller as required by any Law, Order, directive, pronouncement or guideline issued by any Governmental Body providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any reasonable protective action taken, or omitted to be taken, by a Seller in its good faith reasonable determination to be in the best interests of the Business, in order to mitigate, remedy, respond to or otherwise address the effects or impact of any pandemic, epidemic or disease outbreak (any action or inaction described in <u>clauses (i)</u> or <u>(ii)</u> of this <u>Section 6.1(c)</u>, a "<u>COVID-19 Response</u>"), shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2    <u>Access to Information</u>.

(a)    From the date hereof until the Closing (or the earlier valid termination of this Agreement pursuant to <u>Article VIII</u>), Sellers (in their discretion) will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to (x) the Sellers' accountants, counsel, financial advisors and other Advisors, officers and senior management possessing information relating to the Business, the Acquired Assets and the Assumed Liabilities, (y) all offices and other facilities of Sellers and (z) the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is in Sellers' possession or control and reasonably necessary in order to consummate the transactions contemplated by this Agreement; *provided* that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to HL or such other Person(s) as HL may designate in writing from time to time and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the transactions contemplated by this Agreement are not consummated, (B) would require any Seller to disclose any financial or proprietary information of or regarding the Affiliates of any Seller (other than any Subsidiary) or otherwise disclose information regarding the Affiliates of any Seller (other than any Subsidiary) that such Seller reasonably determines to be commercially sensitive, (C) would waive any legal privilege; <u>provided</u>, that the Purchaser and the Sellers shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of

the Sellers after consultation with outside counsel) reasonably be likely to cause such privilege to be undermined with respect to such information; or (D) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound. Notwithstanding anything to the contrary contained herein, failure to provide such access due to a COVID-19 Response by any Seller shall not be deemed to violate or breach this Section 6.2 in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)      The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the transactions contemplated hereby and by the other Transaction Agreements and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)      From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers (including, for clarity, any trust established under a Chapter 11 plan of any Seller or any other successors of any Seller) and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the Acquired Assets, the Assumed Liabilities, and the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, for the purpose of (i) completing Sellers' legal, regulatory, stock exchange and financial reporting requirements, as applicable, to the extent required by applicable Law, (ii) completing its Tax Returns, and (iii) the continued administration of the Bankruptcy Cases and the CCAA Recognition Proceedings and remaining asset and liabilities and the investigation, prosecution and defense of all claims, causes of action, lawsuits or demands to which the bankruptcy estates of Sellers may have. Notwithstanding anything to the contrary contained in this Agreement, Purchaser and its Affiliates may restrict the foregoing access and shall not be required to provide any information or access that Purchaser reasonably believes would violate applicable Law, including antitrust Laws and data protection Laws or the terms of any applicable Contract (including confidentiality obligations) or jeopardize any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege. Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down (if applicable) and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Sellers will, and will cause their Advisors to, hold in confidence, and without the prior written consent of Purchaser, not disclose any confidential, proprietary or non-public information involving or relating to any of the Acquired Assets or Assumed Liabilities, including any information obtained pursuant to Section 6.2(c).  Notwithstanding the foregoing, this Section 6.2(d) shall not (i) apply to information that is or becomes generally available to the public other than as a result of a disclosure by Sellers or any of their Advisors in breach of this Section 6.2(d) or (ii) prohibit any disclosure (A) required by Law or required or requested by any Governmental Body, in each case so long as, to the extent legally permissible and feasible, Sellers provide Purchaser with reasonable prior notice of such disclosure so that Purchaser may seek to obtain a protective order or other reasonable assurance that such disclosure shall be treated confidentially (at Purchaser's sole cost and expense) or (B) made in connection with any litigation regarding this Agreement, the other Transaction Agreements or the transactions contemplated hereby.

(e)     Purchaser will not, and will not permit any of its Affiliates to and will direct its representatives not to, contact any customer, supplier, lessee, lessor, licensee, licensor or distributor of any Seller prior to the Closing with respect to any Seller, the Business or the transactions contemplated by this Agreement or the other Transaction Agreements without the prior written consent of such Seller for each such contact (such consent not to be unreasonably withheld, conditioned or delayed).

6.3     Employee Matters.

(a)     Prior to Closing, Purchaser shall extend to each employee of Sellers (other than employees at Excluded Stores) (each a "Business Employee") a written offer of employment which Sellers will have had an opportunity to review and comment on, providing for a position that is comparable to such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") and that, if accepted, shall become effective immediately after the Closing. Employees who accept such Transfer Offers and begin active employment with Purchaser immediately after the Closing in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees."  Notwithstanding the foregoing, Purchaser will not be required to make offers of employment in accordance with the preceding sentence to any Business Employee who is absent from active employment on or following the date hereof and continuing through the Closing Date due to short or long-term disability or any other leave of absence (other than paid time off through the Sellers' general employment policies) (a "Leave Employee") until such Business Employee is able to return to active employment, provided such employee is able to return to active employment within six (6) months of the Closing for United States-based Business Employees (or eighteen (18) months of the Closing for Canada-based Business Employees).  If a Leave Employee is not able to return to active employment within six (6) months of the Closing for United States-based Business Employees (or eighteen (18) months of the Closing for Canada-based Business Employees), Purchaser shall not be required to make any offer of employment to such employee.  Leave Employees will become Transferred Employees for purposes of this Agreement on the date they begin active employment with Purchaser (but such delay shall not extend any of the covenants contained in this Section 6.3.  Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their

36

respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Sellers shall take steps to ensure that, effective as of immediately prior to the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates. Sellers will continue the Transferred Employees on the applicable Seller's payroll until such time as Purchaser's payroll is established and the Transferred Employees can be transferred to the payroll of Purchaser or one of its Affiliates, with the fees, costs and expenses (including Taxes) incurred or payable by Sellers in connection with such continuation of payroll to be reimbursed or paid by Purchaser (except that direct payroll costs and Taxes shall be pre-funded by Purchaser). The Parties shall comply with all applicable Laws in respect of such payroll continuation, including with respect to tax reporting, and shall continue to apply payroll deductions for benefits plans as directed by Purchaser.

(b)     For a period of one year from and after the Closing Date, Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base salary or wage rate, as applicable, that is no lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) annual cash bonus opportunities that are no less favorable than those provided to such Transferred Employee as of immediately prior to the Closing; and (iii) other employee benefits (including severance benefits, but excluding equity compensation, any cash long-term incentive compensation, the Special MIP Bonuses, any retention or transaction bonus and defined benefit pension or retiree medical benefits) that are substantially comparable in the aggregate to those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits (but not for purposes of benefit accrual) under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits; provided, for the avoidance of doubt, that any such credit shall not apply to equity compensation.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans, subject to the eligibility terms of such plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall use commercially reasonable efforts to cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall use reasonable best efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due the following: (i) all accrued and unused vacation, personal

days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date, solely to the extent that such amounts are accrued on the books and records of Sellers as of the Closing Date, which amounts shall be subject to the Wind-Down Cap; and (ii) all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case, accruing, incurred or arising solely as a result of employment or separation from employment with Purchaser after the Closing with respect to such Transferred Employee.

(e)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)     Effective as of the Closing, Purchaser and Purchaser's Affiliates shall assume all obligations, Liabilities and commitments in respect of claims made by any Transferred Employee (or any other individual claiming that he or she is or should be a Transferred Employee) for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of Contract) arising out of, relating to or in connection with any failure of Purchaser to offer employment in accordance with the terms of this Agreement to, or to continue the employment of, any such Transferred Employee (or other individual claiming that he or she is or should be a Transferred Employee) following the Closing on terms and conditions that would preclude any claims of actual or constructive dismissal or similar claims under any Law or other failure to comply with the terms of this Agreement.

(g)     For ninety (90) days following the Closing, Purchaser will not, and will cause its Affiliates not to, take any action that would cause any termination of employment of any employees by Sellers or their Affiliates occurring prior to or at the Closing to trigger the notice requirements of the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws (collectively, the "WARN Act"), or to create any Liability or penalty to Sellers or any of their Affiliates under the WARN Act, provided that such obligations of Purchaser are contingent upon Sellers providing Purchaser with substantially complete and accurate information regarding all employment losses, broken down by job location, that occur within ninety (90) days prior to Closing.

(h)     For any Transferred Employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

38

6.4    <u>Filings and Authorizations</u>. Each of the Sellers and the Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under Laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Bodies necessary to be obtained by it, in order to consummate the transactions contemplated herein, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for him, her or it to fulfill his, her or its obligations hereunder.  The Sellers and the Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

6.5    <u>Reasonable Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein and by the other Transaction Agreements to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. Except as otherwise provided herein, the "reasonable best efforts" of Sellers for the purposes of this <u>Section 6.5</u> will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)    The obligations of Sellers pursuant to this Agreement, including this <u>Section 6.5</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court, the Canadian Court, the Bankruptcy Code (including in connection with the Bankruptcy Cases) or the CCAA, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court and the Canadian Court (including the Sale Order and the Canadian Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6    <u>Further Assurances</u>. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will, and will cause its respective Affiliates to, without further consideration, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such conveyances, notices, assumptions, assignments, releases, documents and instruments, in form and substance reasonably satisfactory to the Parties, and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; *provided* that nothing in this <u>Section 6.6</u> will prohibit Sellers or any Affiliates of Sellers from ceasing operations or winding up their affairs following the Closing.

6.7    <u>Receipt of Misdirected Assets</u>.

(a)      Subject to the terms of this Agreement (including Section 1.5), during the six (6)-month period following the Closing, if either the Purchaser or any Seller becomes aware that any right, property or asset forming part of the Acquired Assets has not been transferred to the Purchaser or that any right, property or asset not forming part of the Acquired Assets has been transferred to the Purchaser, it shall promptly notify the such other Parties hereto and the Purchaser or the applicable, as applicable, shall, as soon as reasonably practicable thereafter, ensure that such right, property or asset (and any related Liability) is transferred at the expense of the Sellers and with any necessary consent, to (i) the Purchaser, in the case of any right, property or asset forming part of the Acquired Assets which was not transferred to the Purchaser at or in connection with the Closing, or (ii) the Sellers, in the case of any right, property or asset not forming part of the Acquired Assets which was transferred to the Purchaser at the Closing.

(b)      From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset or any cash, checks with appropriate endorsements, or other payment which properly belongs to the Purchaser or its Affiliates pursuant to the terms of this Agreement (including any Cash and Cash Equivalents received in any bank account not transferred pursuant to Section 1.1(v)), the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer its right, title and interest in and to such right, property, asset, cash, check or other payment (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and Sellers' right, title and interest in and to such asset, cash, check or other payment will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset or any cash, checks with appropriate endorsements, or other payment which properly belongs to the Sellers or their respective Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

6.8      Acknowledgment by Purchaser.

(a)      Purchaser acknowledges and agrees that it has conducted its own independent investigation and verification of the Business (including its financial condition, results of operations, the Acquired Assets, Liabilities, properties, Contracts, business risks and prospects) of Sellers, the JVs and the Acquired Assets and the Assumed Liabilities and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the Express Representations and the results of Purchaser's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser has relied only on the Express Representations). Purchaser acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser  and

on which Purchaser may rely in connection with the transactions contemplated by this Agreement and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers or the JVs, or the quality, quantity or condition of any Seller's or any JV's, assets (including any express or implied warranty under Section 8-108 of the Uniform Commercial Code, or of merchantability, suitability or fitness for a particular purpose), are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any JV, or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, suitability or fitness for a particular purpose, or condition of any Seller's or any JV's, business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof (including any express or implied warrant under Section 8-108 of the Uniform Commercial Code), except, in each case, solely to the extent expressly set forth in the Express Representations. Purchaser will accept the Acquired Assets and Assumed Liabilities at Closing "as is", "where is" and "with all faults". Purchaser further acknowledges and agrees that the Acquired Assets that are capable of being delivered are being delivered by Sellers to Purchaser at the location where they are located on the Closing Date.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by Purchaser of Sellers, Purchaser and its Advisors have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees that it will not assert, institute, or maintain, and will cause its Affiliates not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.8.

(d)    Purchaser acknowledges and agrees that the covenants and agreements contained in this Section 6.8 (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.8, Seller would not enter into this Agreement.

6.9    Guaranty.

(a)    Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser (and any Affiliates to which this Agreement is assigned pursuant to Section 10.4) arising under or pursuant to this Agreement and (ii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser (and such Affiliates) under and in accordance with the terms of this Agreement, including the payment obligations set forth in Section 2.1 (the matters set forth in clauses (i) and (ii), collectively, the "Guaranteed Obligations").

(b)    If Purchaser (or its Affiliates) fails to perform any of the Guaranteed Obligations, then Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)    Nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself (or its Affiliates themselves) would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless the Seller against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this Section 6.9.

(d)    The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Section 6.9 and all dealings between Sellers and Purchaser (and its Affiliates) shall likewise be conclusively presumed to have been consummated in reliance upon this Section 6.9.

(e)    The guarantee by Guarantor contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the (i) consummation of the Closing and the payment in full by Purchaser of any and all amounts required to be paid by Purchaser at the Closing pursuant to this Agreement or (ii) the earlier valid termination of this Agreement pursuant to Section 8.1, upon which this guarantee and the obligations of the Guarantor pursuant to this Section 6.9 shall terminate automatically and be of no further force or effect without the need for any further action by any Person and Guarantor shall stand discharged of all of its obligations under this guarantee. Guarantor's obligations under this Section 6.9 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser (or its Affiliates) from any of Purchaser's (or its Affiliates') respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(f)     Except as otherwise set forth herein, the liability of Guarantor under this Section 6.9 shall be unlimited and unconditional, and this Section 6.9 shall be a continuing guaranty.

(g)     Guarantor hereby makes the representations and warranties set forth in Sections 4.1, 4.2 and 4.3 as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein. The Parties agree that Guarantor shall be entitled to, and Guarantor does not waive, any defenses to the payment or performance of the Guaranteed Obligations that are available to Purchaser under this Agreement.

6.10    Intellectual Property Matters.

(a)     For clarity, from and after Closing and except as expressly provided in Section 6.10(c), Sellers shall, and shall cause their Affiliates to, (i) cease any and all use or other exploitation of any and all Seller Intellectual Property and (ii) keep strictly confidential and not disclose to any Person (nor use for any purpose) any Trade Secrets included in the Seller Intellectual Property (including any source code for proprietary Software included in the Seller Intellectual Property).

(b)     At Closing, Sellers shall assign and transfer to Purchaser all rights, title, and interest in and to all Domain Names and Social Media included in the Acquired Assets.

(c)     To the extent any Marks included in the Acquired Assets are reasonably required to be used in connection with the completion of the wind-down of Sellers' estate, Purchaser hereby grants to each Seller and its Affiliates a limited, royalty-free, fully paid-up, worldwide, non-exclusive license to continue to use and display such Marks in the manner that such Marks were used at Closing until the completion of the wind-down of Sellers' estate (the "Wind-Down End Date") solely to the extent reasonably necessary for the wind-down of Sellers' and their respective Affiliates' remaining corporate operations.

(d)     From and after the Closing, Sellers shall be permitted and entitled until the Wind-Down End Date to permit Sellers and its designees to use and access the dbi.com email domain and davidsbridal.com email domain as an email server solely to the extent necessary for the wind-down of Seller's estate. Purchaser shall, and shall cause its Affiliates to, reasonably cooperate with and assist Sellers in connection with the foregoing (including maintain and operate the dbi.com email domain and davidsbridal.com email domain in all material respects as currently configured).

6.11    Delivery of Schedules.  As soon as possible after the date hereof, but in no event later than the date that is five (5) days after the date hereof, Sellers shall (a) deliver to Purchaser true, accurate and complete copies of all of the Schedules hereto and (b) confirm to Purchaser that such Schedules are final and complete and can be attached to this Agreement and incorporated herein.

6.12    Insurance Matters.  Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired

Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; provided, that, from and after the Closing until the date that is five years after the Closing Date, the Sellers shall, direct any carriers under any claims-made insurance policies of the Sellers and their respective Affiliates, set forth on Schedule 6.12, to continue to process any claims made thereunder by the Business, to the extent such claims were made after Closing which refer to pre-Closing wrongful acts. The Sellers or any of their respective Affiliates may amend, at the Closing, any insurance policies and ancillary arrangements in the manner they deem appropriate to give effect to this Section 6.12, other than any "tail" insurance policies purchased by the Sellers prior to the Closing. Notwithstanding anything to the contrary set forth herein, (a) Purchaser shall not take any action to cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Sellers prior to the Closing; provided that no payments shall be required of the Purchaser with respect to such policies after the Closing; and (b) Purchaser shall have the right to make claims against runoff, continuing claims-made, and occurrence-based Insurance Policies with respect to events that have occurred prior to the Closing Date related to the Business, the Acquired Assets or the Assumed Liabilities. Sellers shall use commercially reasonable efforts to cooperate with Purchaser or its Affiliates to make the benefits of any such Insurance Policies available to the Purchaser or its Affiliates (net of any Taxes payable by the Sellers in connection with such recovery), in each case, at Purchaser's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Purchaser or to the insurer in connection therewith, which costs and expenses shall be reimbursed to Sellers or their respective Affiliates, as incurred), and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Purchaser) to Purchaser or its designee.  In the event Sellers receive insurance proceeds in respect of any such claims made under this Section 6.12, they shall promptly remit such proceeds to Purchaser.

6.13    Data Transfer. As required under Section 7.2 of the Canadian *Personal Information Protection and Electronic Documents Act* ("PIPEDA"), the Parties confirm that the Personal Information (as defined in PIPEDA) governed by applicable Canadian privacy laws and disclosed in connection with the transactions contemplated by this Agreement ("Disclosed Canadian Personal Information") is necessary for the purposes of determining whether to proceed with the transactions contemplated by this Agreement and, if the determination is made to proceed with the transactions, to complete them. At all times, the Purchaser shall protect all Disclosed Canadian Personal Information using security safeguards appropriate to the sensitivity of the information. Prior to Closing, the Purchaser shall not use or disclose the Disclosed Canadian Personal Information for any purposes other than those related to determining if it shall proceed with the transactions contemplated by this Agreement, the performance of this Agreement, or the consummation of the transactions contemplated by this Agreement. Following the consummation of the transactions contemplated by this Agreement, the parties hereto agree that the Purchaser (i) shall not use or disclose the Disclosed Canadian Personal Information for any purposes other than those for which the information was initially collected, unless additional consent is obtained, or as otherwise permitted or required by applicable Laws; (ii) shall protect the confidentiality of all Disclosed Canadian Personal Information with security safeguards appropriate to the sensitivity of such information; and (iii) shall give effect to any withdrawal of consent with respect to the

Disclosed Canadian Personal Information. If the transactions contemplated by this Agreement do not proceed, the Purchaser shall return to the Sellers or, at the Sellers' request, securely destroy the Disclosed Canadian Personal Information within a reasonable period of time.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    no Governmental Body of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect;

(b)    the Bankruptcy Court shall have entered the Sale Order substantially in the form attached hereto as <u>Exhibit E</u> or otherwise in form and substance satisfactory to Purchaser in all respects, and such Sale Order shall be in effect and shall not have been reserved, modified, amended or stayed; and

(c)    the Canadian Court shall have issued the Canadian Sale Order substantially in form and substance satisfactory to Purchaser in all respects, and such Canadian Sale Order shall be in effect and shall not have been reserved, modified, amended or stayed.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that the representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of the Closing Date or such other specified date, as applicable, has not had a Material Adverse Effect (*provided* that for purposes of the foregoing clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.4</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.6(a)</u> and <u>Section 3.17</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all respects (other than any *de minimis* inaccuracies) as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all respects (other than any *de minimis* inaccuracies) only as of such date;

(b)    Sellers shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by Sellers on or prior to the Closing Date;

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.3;

(d)    Since the date hereof, there shall not have occurred and be continuing any Material Adverse Effect;

(e)    Sellers shall have delivered to Purchaser documentation in form and substance reasonably satisfactory to Purchaser evidencing the rent abatements or rent deferrals set forth on Schedule 7.2(e);

(f)    the Bankruptcy Court shall have approved and authorized an Order, which may be the Sale Order, permitting and authorizing the Designation Rights Period as set forth in Section 1.5(b) and such Order shall have been recognized by the Canadian Court;

(g)    (x) the ABL Loan Documents required to be executed at the Closing shall have been duly executed and delivered by each party party thereto and (y) (i) (a) revolving loans not to exceed $18,000,000 and (b) term loans not to exceed $20,000,000, shall have been funded (or deemed funded) to the Purchaser under the ABL Credit Agreement and (ii) letters of credit issued by BOA not to exceed $16,853,000 that are outstanding under the DIP ABL Credit Agreement shall have been rolled under the ABL Credit Agreement and deemed to have been issued thereunder; and

(h)    the balance of the deposits held with Fiserv, Bank of America, N.A. or Banc of America Merchant Services, LLC or any their respective Affiliates under that certain Merchant Services Agreement, dated as of July 25, 2019, by and among David's Bridal, Inc. (now known as David's Bridal, LLC), Bank of America, N.A. and Banc of America Merchant Services, LLC, shall be no less than $12,500,000.

7.3    Conditions Precedent to the Obligations of Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)    Purchaser shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by Purchaser on or prior to the Closing Date; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.4.

7.4    <u>Frustration of Closing Conditions</u>. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

7.5    <u>Information Officer's Certificate</u>. When the conditions to Closing set out in <u>Sections 7.1</u>, <u>7.2</u> and <u>7.3</u> have been satisfied and/or waived by the Sellers and the Purchaser, as applicable, the Sellers and the Purchaser will each deliver to the Information Officer the applicable Conditions Certificate. Upon receipt of each of the Conditions Certificates and the Canadian Reserve, the Information Officer shall (i) issue forthwith the Information Officer's Certificate concurrently to the Sellers and the Purchaser, at which time the Closing will be deemed to have occurred, and the specified Acquired Assets shall vest in and to the Canadian Purchaser pursuant to the Canadian Sale Order; and (ii) file as soon as practicable a copy of the Information Officer's Certificate with the Canadian Court (and shall provide a true copy of such filed certificate to the Sellers and the Purchaser). The Parties hereto acknowledge and agree that the Information Officer shall be entitled to file the Information Officer's Certificate with the Canadian Court without independent investigation upon receiving the Conditions Certificates, and the Information Officer will be relying exclusively on the basis of the Conditions Certificates and without any obligation whatsoever to verify the satisfaction or waiver of the applicable conditions and shall have no liability to Seller or the Purchaser or any other Person as a result of filing the Information Officer's Certificate upon receiving such Conditions Certificates.

**ARTICLE VIII**
**TERMINATION**

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; *provided* that no Party may terminate this Agreement under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's breach of its representations, warranties, covenants or failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before the date that is twenty-one (21) days from the date hereof (the "<u>Outside Date</u>"); *provided* that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if such Party is in material breach or violation of its representations, warranties, covenants or obligations under this Agreement that proximately caused the failure of the Closing to occur prior to the Outside Date;

47

(d)      by written notice of either Purchaser or Seller, if the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Sellers is appointed in the Bankruptcy Cases or any trustee, receiver or monitor is appointed in any Canadian bankruptcy, proposal, receivership or CCAA Recognition Proceedings in respect of any Seller;

(e)      by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; *provided* that (i) if such breach is curable by Purchaser then Sellers may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date that is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Sellers at any time that Sellers are in material breach of, any of Sellers' covenants, representations or warranties hereunder;

(f)      by written notice from Purchaser to Sellers, upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; *provided* that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of, any of its covenants, representations or warranties hereunder;

(g)      by written notice from Sellers to Purchaser, if (i) all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are, at the time the notice of termination is delivered by to the Purchaser, capable of being satisfied if the Closing were to occur at such time) or waived by Purchaser, (ii) Sellers have confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied, or waived by Sellers (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are, at the time the notice of termination is delivered by Sellers to Purchaser, capable of being satisfied if the Closing were to occur at such time), (iii) at a time when clauses (i) and (ii) are satisfied, Sellers have confirmed in writing to Purchaser that Sellers are ready, willing and able to effect the Closing and (iv) and Purchaser fails to complete the Closing within three (3) Business Days following the receipt by Purchaser of such notice specified in clause (iii);

(h)      by written notice of either Purchaser or Sellers, if prior to the entry of the Sale Order any Seller enters into one or more Superior Transactions with one or more Persons other than Purchaser or the Bankruptcy Court approves a Superior Transaction, other than with the Purchaser, that has not been solicited in violation of Section 5.1(b);

(i)      by written notice from Purchaser to Sellers if the Sale Order approved by the Bankruptcy Court differs in any material respect from the form of Sale Order attached hereto as <u>Exhibit E</u> other than any such differences that are mutually agreed in writing between Purchaser and Sellers; or

(j)      by written notice from Purchaser to Sellers, if (i) Sellers shall have failed to deliver to Purchaser final and complete copies of all of the Schedules hereto on or before the date that is five (5) days after the date hereof, or (ii) any of the final and complete Schedules, or any matter, fact, item of information, circumstance, event, Liability or other disclosure set forth on, or described or referred to in, any of the Schedules, shall not be acceptable to Purchaser in its reasonable discretion; <u>provided</u>, that the Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(j)</u> after the date that is the later of (A) one (1) day prior to the hearing before the Bankruptcy Court seeking entry of the Sale Order and (B) the date that is five (5) days after the date on which Sellers deliver final and complete copies of the Schedules to Purchaser, unless Purchaser shall have notified Seller in writing of its intention to terminate this Agreement pursuant to this <u>Section 8.1(j)</u> on or prior to such date.

8.2      <u>Effect of Termination</u>. In the event of the valid termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void without any further action by any Person and no Party or any of its partners, officers, directors, managers, employees, managers, Advisors or equityholders will have any Liability under this Agreement; *provided* that <u>Section 6.2(b)</u>, <u>Section 6.2(c)</u>, this <u>Section 8.2</u> and <u>Article X</u> shall survive any such termination; *provided further* that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses resulting from any Willful Breach of this Agreement prior to the date of such termination. Subject to <u>Section 10.12</u>, nothing in this <u>Section 8.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

**ARTICLE IX**
**TAXES**

9.1      <u>Transfer Taxes</u>. Any sales, use, value-added, GST/HST, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (excluding, for the avoidance of doubt, income taxes of Sellers) (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2      <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.3      <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)      Except as otherwise provided by <u>Section 9.1</u>, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Sellers.

(b)     Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a).

(c)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any Taxes other than Taxes specified in clause (i), deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(d)     Purchaser and the applicable Sellers agree to utilize the standard procedure set forth in Revenue Procedure 2004-53 with respect to wage reporting for the Transferred Employees.

(e)     Sellers and Purchaser agree to treat, for U.S. federal and applicable state and local income tax purposes, the transactions contemplated by this Agreement as a taxable sale of assets by Sellers and a taxable purchase of assets by Purchaser, and none of Purchaser, any Seller or any of their respective Affiliates shall file any Tax Return or other document with, or make any statement or declaration to, any Governmental Body that is inconsistent with such treatment, unless otherwise required by a "determination" under Section 1313 of the Code that is final.

## ARTICLE X
## MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement, the other Transaction Agreements or in any other document contemplated hereby or thereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing until fully performed in accordance with its terms, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of Purchaser's Affiliates or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing in accordance with its terms and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement. The Purchaser hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the

50

Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement, the other Transaction Agreements or the transactions contemplated hereby or thereby.

10.2   <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein or in the Sale Order, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u>.

10.3   <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands, consents, waivers and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail if transmitted prior to 5:00 PM (local time of the recipient) on a Business Day and otherwise on the next Business Day after transmittal, (c) the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

<u>Notices to Purchaser</u>:

David's Bridal, Inc.
c/o CION Investment Corporation
100 Park Avenue, 25th Floor
New York, New York 10017
Attention:      Geoffrey A. Manna
                Gregg Bresner
Email:          gmanna@cioninvestments.com
                gbresner@cioninvestments.com

with a copy to (which shall not constitute notice):

White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attention:      Eric Klar
Email:          eric.klar@whitecase.com

and

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention:      Scott Greissman
                Adam Cieply
Email:          sgreissman@whitecase.com
                adam.cieply@whitecase.com

<u>Notices to Sellers</u>:

DBI Investors, Inc.
1001 Washington Street
Conshohocken, PA 19428 Attn:
Attention:      Lori Cochran Kinkade, SVP Head of Legal
Email:          LKinkade@dbi.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Joshua A. Sussberg, P.C.
                Christopher T. Greco, P.C.
                Willard S. Boothby, P.C.
                Rachel M. Bentley
Email:          jsussberg@kirkland.com
                cgreco@kirkland.com
                willard.boothby@kirkland.com
                rachael.bentley@kirkland.com

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases and any trustee, receiver or monitor appointed in any Canadian bankruptcy, proposal, receivership or CCAA proceeding; *provided* that neither this Agreement nor any of the rights or obligations

hereunder may be assigned or delegated by any Party without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; *provided*, *however*, that the rights of Purchaser under this Agreement may be assigned by Purchaser, in whole or in part, without the prior written consent of Sellers to one or more of Purchaser's Affiliates, including, for the avoidance of doubt, the Canadian Purchaser; *provided*, *further,* that Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Furthermore, neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties and their permitted successors and assigns any legal or equitable right, remedy, cause of action or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law so as to produce as near as may be the economic result intended by the parties hereto, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. Upon determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; *provided* that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules to which its relevance is reasonably apparent on its face, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement to which its relevance is reasonably apparent on its face, without the need for repetition or cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits: (a) shall not be construed to mean that such information is required to be disclosed by this Agreement; (b) shall not be construed as or constitute an admission, evidence or agreement that a violation, right of termination, default, non-compliance, liability or other obligation of any kind exists with respect to any item; (c) with respect to the enforceability of contracts with third-parties, the existence or non-existence of third-party rights, the absence of breaches or defaults by third-parties, or similar matters or statements, is intended only to allocate rights and risks among the Parties and is not intended to be admissions against interests, give rise to any inference or proffer of accuracy, be admissible against any Party by any Person who is not a Party, or give rise to any claim or benefit to any Person who is not a Party; and (d) does not waive any attorney-client privilege associated with such item or information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. No Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened or would constitute a "Material Adverse Effect") or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations, warranties, obligations, covenants, conditions or agreements contained herein. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11    Complete Agreement. This Agreement (including the Schedules and the attached exhibits), together with the Confidentiality Agreement and the other Transaction Agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated hereby and thereby and supersedes all prior agreements among the Parties respecting

the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and the other Transaction Agreements. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12 <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches, or threatened breaches, of this Agreement and to enforce specifically the terms and provisions hereof and its rights hereunder in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, or other rights and remedies existing in its favor at law or in equity, and (b) the right of specific performance, injunctive relief and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13 <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the other Transaction Agreements or the negotiation, execution, or performance of this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement or the other Transaction Agreements (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the

Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the United States federal courts for the District of Delaware (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

      10.14   Governing Law; Waiver of Jury Trial.

      (a)   Except to the extent the mandatory provisions of the Bankruptcy Code or the CCAA apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

      (b)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

      10.15   No Right to Set Off. Purchaser, on its own behalf and on behalf of its Affiliates and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, or any of its Affiliates or any of its or their respective successors and permitted assigns has or may have with respect to the payment of

the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement, the Transaction Agreements or any other document or instrument delivered by Purchaser or any of its Affiliates in connection herewith.

10.16    Counterparts and PDF. This Agreement, the other Transaction Agreements and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any Party or pursuant to any such Transaction Agreement, each other Party hereto or thereto will re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such other Transaction Agreement will raise the use of a .PDF, DocuSign or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF, DocuSign or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    Publicity. No Party or any of its Affiliates shall issue, and shall cause its Advisors not to issue, any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court or Canadian Court with respect to filings to be made with the Bankruptcy Court or Canadian Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; *provided* that the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. Notwithstanding anything to the contrary in this Agreement, nothing shall restrict or prohibit (a) Sellers or their Affiliates from communicating with their respective employees, customers, suppliers or other business relations to the extent that such communications consist solely of, or are otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any Party hereto in accordance with this Agreement to the extent such disclosure is still accurate in all material respects (and not misleading) or (b) Purchaser or its Affiliates from making any announcement or communications to their employees, in each case, subject to the terms of the Confidentiality Agreement.

10.18    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate

to so provide in the Sale Order and Canadian Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19    <u>Fiduciary Obligations</u>. Subject to <u>Section 5.1</u>, nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law.

10.20    <u>Time of Essence</u>. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.21    <u>Sellers' Representative</u>. Each Party agrees that DBI has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes expressly specified under this Agreement. Such power will include the power to make all decisions, actions, consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by DBI on behalf of the Sellers.

**ARTICLE XI**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

11.1    <u>Certain Definitions</u>.

"<u>ABL Credit Agreement</u>" means that certain ABL Credit Agreement to be dated as of the Closing Date, by and among Purchaser as the Borrower, David's Bridal Holdings, LLC as Holdings, each other Guarantor party thereto, Bank of America, N.A., as Administrative Agent, Collateral Agent, L/C Issuer and Swing Line Lender, and each Lender from time to time party thereto (each term (or equivalent term) as defined in the ABL Credit Agreement).

"<u>ABL Loan Documents</u>" means the "Loan Documents" (or the equivalent term) as defined in the ABL Credit Agreement.

"<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

"<u>Advisors</u>" means, with respect to any Person, any directors, officers, members, shareholders, equity holders, manager, partners, employees, contractors, subcontractors,

investment bankers, financial advisors, accountants, auditors, agents, attorneys, consultants, or other representatives of such Person.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Alternative Transaction</u>" means (a) any sale, transfer or other disposition, directly or indirectly, of a material portion of the assets and properties of the Sellers, whether proposed to be effected pursuant to a merger, consolidation, share exchange or sale, amalgamation, foreclosure, compromise, asset sale, issuance, financing, recapitalization, liquidation, transfer or redemption of any assets or securities of any Seller or any successor thereto or any similar transaction, in one transaction or a series of transactions with one or more Persons other than the sale of the Acquired Assets to the Purchaser in accordance with the terms hereof, or (b) any restructuring or reorganization of any of the Sellers or their assets, properties or liabilities (including pursuant to a plan of reorganization) other than the sale of the Acquired Assets to the Purchaser in accordance with the terms hereof.

"<u>Business</u>" means any and all business or commercial activities or operations of any kind that are conducted by any of the Sellers and the JVs.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

"<u>Canadian Court</u>" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the CCAA Recognition Proceedings.

"<u>Canadian Reserve</u>" means the amount of CDN$1.5 million, which shall be delivered by the Sellers to the Information Officer on Closing for the benefit of the beneficiaries of the administration charge granted by the Canadian Court in the CCAA Recognition Proceedings and utilized solely to conduct an orderly wind-down of David's Bridal Canada, Inc. and to administer and close the CCAA Recognition Proceedings (and any subsequent proceedings). For the avoidance of doubt, if the reasonable and documented fees incurred by the beneficiaries of the administration charge in connection with the orderly wind-down of administration and closing of the CCAA Recognition Proceedings (and any subsequent proceedings) are less than the Canadian Reserve, the Information Officer shall return any remaining amounts to the Canadian Purchaser.

"<u>Canadian Sale Order</u>" means an Order of the Canadian Court granted in the CCAA Recognition Proceedings, in form and substance satisfactory to the Parties in all respects which, among other things, (a) recognizes and gives full force and effect to the Sale Order in all provinces and territories in Canada, pursuant section 49 of the CCAA, (b) approves this Agreement and the transactions contemplated hereunder, (c) vests the Canadian Acquired Assets in the Canadian Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances, (d) assigns all of the Canadian Assigned Contracts to the Canadian Purchaser, and (e) provides that upon

payment of the applicable Cure Costs, all past defaults under the Canadian Assigned Contracts shall be deemed to be cured and each such Canadian Assigned Contract shall be in good standing and effective, according to its terms.

"Cash and Cash Equivalents" means all of Sellers' cash (including checks and deposits in transit, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held and net of uncleared checks or drafts.

"CCAA" means the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended.

"CCAA Recognition Proceedings" means the proceedings commenced by David's Bridal, LLC under Part IV of the CCAA recognizing the Bankruptcy Cases as "foreign main proceedings".

"Conditions Certificates" means (i) a certificate signed by a duly authorized officer of the Purchaser and addressed to the Sellers and the Information Officer (in form and substance satisfactory to Sellers, acting reasonably) certifying that the closing conditions set forth in Sections 7.1 and 7.2 have been satisfied or waived and (ii) a certificate signed by a duly authorized officer of the Sellers and addressed to the Purchaser and the Information Officer (Purchaser, acting reasonably) certifying that the closing conditions set forth in Sections 7.1 and 7.3 have been satisfied or waived.

"Confidentiality Agreement" means any confidentiality obligations to which Purchaser or its Affiliates are subject pursuant to any agreement between Purchaser or its Affiliates, on the one hand, and Sellers and/or their respective Affiliates, on the other hand, with respect to the Business.

"Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court or the Canadian Court that deems or renders unnecessary the same.

"Contract" means any written or oral contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is legally binding upon a Person or its property, in each case, other than a purchase order, service order or sales order.

"Debtors" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

"DIP ABL Credit Agreement" means that certain Senior Secured, Super-Priority Debtor-in-Possession ABL Credit Agreement dated as of April 18, 2023, by and among the Debtors, the other guarantors party thereto, Bank of America, N.A. as administrative agent and collateral agent, the lenders party thereto, and the other parties thereto, as may be amended, modified, restated or supplemented from time to time.

"Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer and supplier lists, mailing lists regulatory filings, operating data

and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether in written or electronic form or any other medium.

"Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, licenses, encroachments, conditional sale or other title retention agreements and other similar restrictions on transfer or use.

"Environmental Laws" all applicable Laws concerning pollution or protection of the environment and natural resources, including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et. seq., and similar Laws.

"Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, supplies, vehicles, network storage infrastructure, network racks, servers, laptops and other physical IT infrastructure components, equipment (including computer equipment) and hardware, and all other fixed assets.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Final DIP Order" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 285].

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"GDPR" means Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018.

"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any government, quasi-governmental entity, administrative, taxing or regulatory authority, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, municipal, state, provincial, territorial, or local, or any agency, branch, department, board, bureau, official, commission entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"GST/HST" means goods and services tax and harmonized sales tax imposed under Part IX under the Excise Tax Act (Canada).

"Hazardous Substance" means (a) any pollutants, chemicals, contaminants, wastes or toxic, infectious, carcinogenic, reactive, radioactive, corrosive, ignitable, flammable or otherwise hazardous substances or materials, whether solid, liquid or gas, that are subject to regulation, control or remediation, or defined, under any Environmental Laws and (b) asbestos in any form, urea formaldehyde, polychlorinated biphenyls, radon gas, mold, crude oil or any fraction thereof, all forms of natural gas, petroleum, petroleum products, petroleum by-products, petroleum derivatives, petroleum breakdown products and per- and polyfluoroalkyl substances.

"HL" means Houlihan Lokey Capital, Inc.

"HQ Property" means certain real property owned by the Operating Company or its Subsidiaries and located at 1001 Washington Street, Conshohocken, Pennsylvania 19428.

"Information Officer" means PricewaterhouseCoopers Inc., in its capacity as information officer appointed by the Canadian Court in the CCAA Recognition Proceedings.

"Intellectual Property" means any and all intellectual or industrial property and any and all right, title, and interest therein or thereto, including any and all rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) patents, patent applications and patent or invention disclosures; (b) trademarks, service marks, brand names, trade dress, slogans, logos, corporate names, Internet Domain Names and other indicia of origin, together with all goodwill associated with each of the foregoing (collectively, "Marks"); (c) copyrights, works of authorship, design rights, and moral rights; (d) trade secrets, know-how, and confidential information (collectively, "Trade Secrets"); (e) Software and other Technology; (f) drawings, schematics and other technical plans; (g) rights of privacy and publicity; (h) rights in copies and tangible embodiments of all of the foregoing (in whatever form or medium); (i) rights in or relating to registrations, renewals, reversions, extensions, combinations, divisions, and reissues of, and applications for, any of the foregoing; and (j) all other intellectual property, proprietary rights and industrial property and rights therein or arising therefrom.

"Inventory" means all inventory (including materials, supplies, component parts, spare parts, work in process, finished goods and goods in transit and other property) owned or used (or held for use) by any of the Sellers, wherever located and whether in the Sellers' facilities, held by any third parties or otherwise.

"JV" means each of Executive Management Limited, Fillberg Ltd., Wingreat Limited and Maxtel Limited.

"JV Agreements" means, collectively, (a) that certain Joint Venture and Shareholders Agreements, dated July 1, 1998, by and among Maxtel Limited, Multihulls Trading Limited, Elemax Limited (n/k/a The Bridge Holding Limited), Pretty Fashions Inc. and David's Bridal, Inc. (n/k/a David's Bridal, LLC), (b) that certain Joint Venture and Shareholders Agreement, dated January 1, 2010, by and among David's Bridal, Inc. (n/k/a David's Bridal, LLC), The Bridge Holding Limited, Soundstone Limited, Executive Management Limited and Mordechai (Moty) Kafry, as amended, (c) that certain Joint Venture and Shareholders Agreement, dated August 1995, by and among David's Bridal, Inc. (n/k/a David's Bridal, LLC), Addwood Limited, Fillberg Limited and Mordechai (Moty) Kafry, as amended, and (d) that certain Joint Venture and

Shareholders Agreement, dated 2001, by and among Wingreat Limited, David's Bridal, Inc. (n/k/a David's Bridal, LLC), Elemax Limited (n/k/a The Bridge Holding Limited), Soundstone Limited and Mordechai (Moty) Kafry.

"Knowledge of Purchaser" or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Gregg Bresner or Geoff Manna, who shall not, for the sake of clarity and avoidance of doubt, have any personal liability or obligations regarding such knowledge.

"Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of James Marcum, Charles Lockyear or Robert Cooper, who shall not, for the sake of clarity and avoidance of doubt, have any personal liability or obligations regarding such knowledge.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned, leased or used, or held for use, by a Seller and located on any leased real property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such leased real property.

"Liability" means, as to any Person, any debt, adverse claim, lien, damages, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, secured or unsecured, liquidated or unliquidated, vested or unvested or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Maple Shade Property" means certain real property owned by the Operating Company or its Subsidiaries and located at 539 Route 38 West, Routes 38 & 73, Maple Shade, New Jersey 08052.

"Material Adverse Effect" means a material adverse effect on the financial condition or results of operations of the Business, Sellers, JVs, the Acquired Assets and Assumed Liabilities, taken as whole; *provided* that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (a) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and the JVs and their Affiliates

operate; (b) Effects in, arising from or relating to national or international political or social conditions, including tariffs, civil protests, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (c) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), outbreak of illness or public health event (whether human or animal), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (d) Effects in, arising from, or relating to financial, banking, securities or currency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, and (C) any decline or rise in the price of any security, commodity, Contract, or index); (e) Effects in, arising from or relating to changes in, GAAP occurring after the date hereof; (f) Effects in, arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with any Governmental Body occurring after the date hereof; (g) Effects in, arising from or relating to (i) the taking of any action at the written request of Purchaser or its Affiliates, (ii) the failure to take any action if such inaction is requested in writing by Purchaser, (iii) Purchaser's failure to consent to any of the actions restricted in <u>Section 6.1</u> or (iv) the announcement, consummation or pendency of this Agreement or the transactions contemplated hereby, the identity, nature, or ownership of Purchaser with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners or Governmental Bodies or litigation arising from or relating to this Agreement or the transactions contemplated hereby; (h) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is set forth in the Schedules or any matter set forth in any public filings with the Bankruptcy Court or the Canadian Court prior to the date hereof; (i) Effects that arise from any seasonal fluctuations in the Business; (j) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans or predictions (whether or not shared with Purchaser or its Affiliates or Advisors) (<u>provided</u>, that this <u>clause (j)</u> shall not prevent a determination that any Effect underlying such failure has resulted in a Material Adverse Effect, unless such Effect is otherwise excepted by this definition); (k) the Effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof or any breach by Purchaser of this Agreement; (l) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (m) the pendency of the Bankruptcy Cases or the CCAA Recognition Proceedings; *provided*, *however*, that, in the case of <u>clauses (a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(d)</u> , such Effects shall be taken into account in determining whether any such material adverse effect has occurred to the extent that any such Effect has a material and disproportionate adverse effect on the Business, taken as a whole, relative to similar businesses, operating in the industry or markets in which the Business operates.

"<u>Operating Company</u>" means David's Bridal, LLC, a Florida limited liability company.

"Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order) or CCAA Recognition Proceedings.

"Ordinary Course" means the ordinary and usual course of operations of the Business, taken as a whole, consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases; *provided* that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic, public health conditions or disease outbreak or to comply with any orders, directives, guidelines or commendations issued by a Governmental Body in response thereto or health and safety measures shall be deemed to be in the ordinary course of business.

"Permitted Encumbrances" means (a) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or  the nonpayment of which is permitted or required by the Bankruptcy Code where such Encumbrance will be released from the Acquired Assets pursuant to the Bankruptcy Code at Closing or otherwise upon the transfer of such Acquired Asset pursuant to Section 1.5, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially and adversely affect the operation of the Business or the applicable Acquired Assets and, in the case of the Owned Real Property and Acquired Leased Real Property, which do not, individually or in the aggregate, materially and adversely affect the use or occupancy of such Owned Real Property or Acquired Leased Real Property, (c) applicable zoning Laws, building codes, land use restrictions and other similar restrictions presently or hereafter imposed by Law which are not violated by the current use or occupancy of such Owned Real Property or Acquired Leased Real Property, as applicable, (d) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory Encumbrances incurred in the Ordinary Course after the Petition Date for amounts not yet due and payable, (e) non-exclusive licenses of Intellectual Property granted in the Ordinary Course, (f) any Encumbrances set forth on Schedule 11.1, and (g) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order or Canadian Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

"Professional Fee Escrow Account" means one or more segregated bank accounts or escrow accounts funded in an amount equal to the Carve Out (as defined in the Final DIP Order).

"Rollover ABL Obligations" means the outstanding amount of Revolving Obligations (as defined in DIP ABL Credit Agreement) of Bank of America, N.A. under the DIP ABL Credit Agreement.

"Sale Order" mean an Order of the Bankruptcy Court in form and substance satisfactory to the Parties in all respects approving this Agreement and authorizing Sellers to undertake the transactions contemplated hereunder, including pursuant to sections 363 and 365 of the Bankruptcy Code.

"<u>Securities Act</u>" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"<u>Seller Intellectual Property</u>" means any and all Intellectual Property owned (or purported to be owned), in whole or in part, by any Seller.

"<u>Seller IP Rights</u>" means any and all rights, title or interests of any Seller under any Intellectual Property of any other Person.

"<u>Seller Parties</u>" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

"<u>Seller Plan</u>" means each (a) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (b) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (c) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (d) employment, individual consulting, severance or retention agreement or (e) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

"<u>Software</u>" means any and all (a) computer programs, applications, code and other software, including any and all software algorithms, assemblers, applets, compilers, firmware, middleware, interfaces, applications, utilities, tools, and diagnostics, databases, compilations of data, and embedded systems, as well as fixes, upgrades, updates, enhancements, and past and future versions and releases, whether in source code, executable code or object code form., and any documentation (including user and installation manuals and training software) relating to the foregoing; (b) work product used to design, plan, organize, and develop any of the foregoing; and (c) source code annotations relating to any of the foregoing.

"<u>Special MIP Bonuses</u>" means the Special MIP Bonuses granted pursuant to the DBI Investors, Inc. Management Incentive Plan.

"<u>Straddle Period</u>" means any taxable period that includes but does not end on the Closing Date.

"<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"Superior Transaction" means a transaction that any Seller's board of directors (or similar governing body) determine in good faith, after considering the advice of their financial and outside legal advisors: (a) does not contain any financing contingencies, (b) would be in the best interests of such Seller and its creditors as a whole and (c) would reasonably be expected to be superior to such Seller and its creditors (taking into account (i) the likelihood and timing of consummation and (ii) all material legal, financial (including the financing terms of any such proposal), conditionality, regulatory and other aspects of such proposal, taken as a whole) as compared to the transactions contemplated by this Agreement.

"Tax" or "Taxes" means, whether disputed or not, any federal, state, provincial, territorial, local, non-U.S. or other income, gross receipts, capital stock, franchise, profits, withholding, social security, employment, unemployment, government pension plan premiums and contributions, social security premiums, workers' compensation premiums, employment/unemployment insurance or compensation premiums and contributions, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum, estimated and other taxes, duties, assessments or other charges in the nature of a tax, including any interest, penalty or addition thereto.

"Tax Act" means the Income Tax Act (Canada), as amended, and all regulations thereunder and all successors thereto.

"Tax Code" means the United States Internal Revenue Code of 1986.

"Tax Return" means any return, declaration, election, notice, designation, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

"Technology" means any and all (a) technology, formulae, algorithms, procedures, processes, methods and methodologies, models, techniques, know-how, ideas, creations, concepts, inventions, discoveries, improvements, and invention disclosures (whether patentable or unpatentable and whether or not reduced to practice); (b) technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, personnel and other information and materials; (c) customer lists, customer contact and registration information, sales and pricing data, supplier records and vendor data, business plans, forecasts, customer correspondence and customer purchasing histories; (d) specifications, designs, models, devices, prototypes, samples, schematics and development tools; (e) Software, websites, user interfaces, content, images, flow charts, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, blueprints, drawings, reports, analyses, writings, and other works of authorship; (f) databases and other compilations and collections of data or information, data, computer data, disks, diskettes, and other technical, financial, employee or business information or data; (g) domain names, uniform resource locators and other names and locators associated with the Internet ("Domain Names"); (h) social media and mobile communications accounts, identifiers, user names, handles or short code designations ("Social Media") and (i) Trade Secrets.

"Transaction Agreements" means this Agreement, the Bill of Sale and Assignment and Assumption Agreement, the Trademark Assignment Agreement, the Copyright Assignment

Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Willful Breach" shall mean a deliberate act or a deliberate failure to act.

11.2    Index of Defined Terms.

Acquired Assets ......................................... 1
Acquired Leased Real Property ................. 2
Acquired Owned Real Property ................. 2
Acquired Real Property Leases.................. 2
Agreement................................................. 1
Agreement Dispute ................................. 55
Assigned Contracts .................................... 2
Assumed Benefit Plans .............................. 3
Assumed Liabilities ................................... 7
Audited Financial Statements ................. 15
Available Contracts.................................... 9
Bankruptcy Cases...................................... 1
Bankruptcy Code ...................................... 1
Bankruptcy Court....................................... 1
Bankruptcy Court Orders......................... 29
Bill of Sale and Assignment and Assumption
    Agreement .......................................... 13
Business Employee ................................. 36
Canadian Acquired Assets ....................... 11
Canadian Assigned Contracts ................. 11
Canadian Court Orders ........................... 29
Canadian Purchaser.................................. 11
Chosen Courts ......................................... 56
Closing .................................................... 12
Closing Date............................................. 12
Competing Bid......................................... 27
Copyright Assignment Agreement ........... 13
COVID-19................................................ 64
COVID-19 Response ............................... 34
Cure Costs ................................................. 9
Customers Bond......................................... 4
Dataroom................................................. 24
DBI............................................................. 1
Designation Rights Period ......................... 9
Disclosed Canadian Personal Information 44
Effect....................................................... 63
Enforceability Exceptions......................... 15
Environmental Permits............................. 19

Excluded Assets ......................................... 5
Excluded Contracts .................................... 5
Excluded Liabilities ................................... 8
Excluded Stores ......................................... 6
Express Representations ........................... 24
Financial Statements ................................ 15
Fundamental Representations .................. 45
Guaranteed Obligations ........................... 42
Guarantor .................................................. 1
Indebtedness............................................ 32
Information Presentation........................... 24
Insurance Policies ...................................... 3
JV Purchase Orders .................................... 4
Leasehold Improvements ......................... 63
Leave Employee....................................... 36
Material Contract ..................................... 17
Material Suppliers.................................... 23
Outside Date............................................. 47
Parties ....................................................... 1
Party ......................................................... 1
Permits .................................................... 19
Petition Date.............................................. 1
PIPEDA.................................................... 44
Projections............................................... 41
Purchase Price ......................................... 12
Purchaser................................................... 1
Purchaser Plans ....................................... 37
Real Property Appurtenances ................... 2
Responsible Person Liabilities................... 7
Seller ......................................................... 1
Seller Registered IP................................. 19
Sellers........................................................ 1
Superior Proposal.................................... 28
Trademark Assignment Agreement .......... 13
Transfer Offer ......................................... 36
Transfer Taxes ......................................... 49
Transferred Employees ............................ 36
Unaudited Financial Statements .............. 15

WARN Act................................................ 38          Wind-Down End Date............................... 43
Wind-Down Cap ......................................... 8

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or" unless expressly indicated otherwise.

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)      Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom prior to the date of this Agreement, (ii) actually delivered or provided physically or electronically to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      A reference to any party to this Agreement or any other agreement or document shall include such party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)      A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow*.]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

**DAVID'S BRIDAL, INC.**

By: _____
Name:
Title:

**GUARANTOR:**

**CION INVESTMENT CORPORATION**

By: _____
Name:
Title:

**SELLERS:**

**DBI INVESTORS, INC.**

By: _____
Name:
Title:

[●]

By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

## **EXHIBIT A-1**

**FORM OF US BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

[***See attached***]

## <u>EXHIBIT A-2</u>

**FORM OF CANADIAN BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

**[*See attached*]**

## **EXHIBIT B-1**

**FORM OF US TRADEMARK ASSIGNMENT AGREEMENT**

**[*See attached*]**

## **EXHIBIT B-2**

**FORM OF CANADIAN TRADEMARK ASSIGNMENT AGREEMENT**

[***See attached***]

## **EXHIBIT C-1**

**FORM OF US COPYRIGHT ASSIGNMENT AGREEMENT**

[*See attached*]

## **EXHIBIT C-2**

**FORM OF CANADIAN COPYRIGHT ASSIGNMENT AGREEMENT**

[***See attached***]

## **EXHIBIT D-1**

**FORM OF BARGAIN AND SALE DEED (HQ PROPERTY)**

**[*See attached*]**

## EXHIBIT D-2

**FORM OF BARGAIN AND SALE DEED (MAPLE SHADE PROPERTY)**

**[*See attached*]**

## <u>EXHIBIT E</u>

**FORM OF SALE ORDER**

[*See attached*]